# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

―――――――――――――――――――――――――

|  |  |
|---|---|
| LEO KELLY, <u>et al.</u> | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) Case Number: 1:07CV1601(RBW) |
|  | ) |
| EVELYN UPCHURCH, Director, Texas | ) |
| Service Center, U.S. Department of | ) |
| Homeland Security, <u>et al.</u> | ) |
|  | ) |
| Defendants. | ) |

―――――――――――――――――――――――――

## MOTION TO DISMISS OR TRANSFER

Defendants Evelyn Upchurch, <u>et al.</u>, through undersigned counsel, hereby move for

dismissal of the complaint pursuant to Rule 12(b)(1) for lack of jurisdiction or, in the alternative,

pursuant to Rule 12(b)(6) for failure to state a claim. In the alternative, Defendants move that

the case be transferred to the Northern District of Texas. A proposed order and memorandum of

points and authorities are attached hereto.

Dated: November 16, 2007           Respectfully submitted,

                       /s/
                 JEFFREY A. TAYLOR, D.C. BAR # 498610
                 United States Attorney

                       /s/
                 RUDOLPH CONTRERAS, D.C. BAR #434122
                 Assistant United States Attorney

                   /s/ Robin M. Meriweather
                 ROBIN M. MERIWEATHER, D.C. Bar. # 490114
                 Assistant United States Attorney
                 555 Fourth St., N.W.
                 Washington, D.C. 20530
                 Phone: (202) 514-7198 Fax: (202) 514-8780
                 Robin.Meriweather2@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
LEO KELLY, <u>et al.</u>                            )
                                                    )
                    Plaintiffs,                     )
                                                    )
        v.                                          )    Case Number: 1:07CV1601(RBW)
                                                    )
EVELYN UPCHURCH, Director,  Texas                   )
Service Center, U.S. Department of                  )
Homeland Security, <u>et al.</u>                    )
                                                    )
                    Defendants.                     )
_____)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR IN THE ALTERNATIVE TO TRANSFER

### <u>INTRODUCTION AND SUMMARY</u>

This case concerns Form I-485 "adjustment of status" applications Plaintiffs filed to request that Defendant United States Citizenship and Immigration Services ("USCIS") exercise its discretion and make them lawful permanent residents of the United States.  USCIS has not completed its adjudication of Plaintiffs' I-485 applications because the national security screenings — which the FBI conducts for all adjustment applicants — are not yet complete. Plaintiffs ask the Court to order USCIS to immediately complete its adjudication of the I-485. The Court lacks subject matter jurisdiction to review those claims, and Plaintiffs' complaint should be dismissed.

The Immigration and Naturalization Act ("INA") deprives this Court of jurisdiction to review the timing of USCIS's processing of the I-485 applications.  Congress expressly withdrew judicial review of all issues concerning USCIS's "judgments" regarding the granting of an

adjustment application, and all discretionary USCIS actions or decisions concerning adjustment applications and other immigration matters. 8 U.S.C. § 1252(a)(2)(B). USCIS has determined that its adjudication of Plaintiffs' I-485 applications cannot be completed until the relevant background checks have been cleared. That determination is a judgment, a discretionary action, and a decision. The INA's jurisdiction-stripping provisions apply "notwithstanding any other provision of law," thereby foreclosing reliance on alternative sources of jurisdiction like the Mandamus Act and the Administrative Procedures Act ("APA"). Id. Further, the APA expressly provides that if another statute forecloses judicial review of agency action, the APA cannot be used to challenge that agency action. See 5 U.S.C. §§ 701(a), 702.

Even if the INA did not bar review under the Mandamus Act and the APA, the Court would still lack subject matter jurisdiction. The extraordinary remedy of mandamus is available only if the plaintiff has a clear right to relief and the defendant owes the plaintiff a clear, nondiscretionary duty to act. Plaintiffs have no right, let alone a clear one, to have their adjustment application adjudicated within any specific time frames, or to bypass the mandatory background checks. Likewise, USCIS has no clear nondiscretionary duty to complete adjudication before those mandatory background checks have been completed, regardless of how long the checks have been pending. Those factors also prevent Plaintiffs from invoking the APA as a source of jurisdiction, because the APA precludes judicial review of actions and decisions over which Congress has given an agency plenary discretion. That bar applies here because USCIS has complete discretion to require that adjustment applicants clear background checks prior to obtaining final adjudication of their applications.

Assuming arguendo that this Court did have subject matter jurisdiction to review Plaintiffs' challenge to the pace of USCIS's adjudication of their I-485s, they would be unable to

2

state a claim for unreasonable agency delay.  The D.C. Circuit has identified several factors courts should consider when determining whether an agency has unreasonably delayed final action, two of which are particularly significant here.  First, as noted, there is no statutory timetable for adjudicating adjustment applications.  Second, USCIS and the FBI have an interest in processing adjustment applications and background checks on a first-in, first-out basis, and in ensuring that lawful permanent residence status is not granted to individuals whose permanent residence in the United States would raise national security concerns.  Moreover, the D.C. Circuit has declined to intervene in agency delay cases when "a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain."  Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003).  Giving Plaintiffs' applications precedence over others' presents exactly that type of situation.

Finally, Defendants move in the alternative to transfer this case to the United States District Court for the Northern District of Texas.  The only nexus between this District and the case is the fact that some of the agency heads named as defendants have offices in D.C. However, most of the events giving rise to this complaint — namely, the processing and adjudication of Plaintiffs' I-485s — have transpired in the Texas Service Center of USCIS. Accordingly, the Northern District of Texas is a more appropriate forum for this case than this Court, and the interests of justice support transfer.

## BACKGROUND

### A.    Statutory and Regulatory Background

#### 1.    Adjustments of Status and Background Investigations

The Immigration and Nationality Act permits the Attorney General "in his discretion and under such regulations as he may prescribe," to adjust the status of an alien "to that of an alien

3

lawfully admitted for permanent residence."  8 U.S.C. § 1255(a).  Aliens that seek such

adjustments of status file applications referred to as an "I-485."  The procedures for admitted

aliens to apply for adjustment of status are set forth at 8 C.F.R. part 245.

USCIS processes adjustment applications in chronological order based on the date of

receipt.  Neither the statute nor the regulations establish a time frame in which adjudication must

occur.  The applicant must show that he is not inadmissible to the United States under any

statutory ground of inadmissibility set forth at section 212(a) of the Immigration and Nationality

Act, 8 U.S.C. § 1182(a), including health-related, criminal, terrorist, and other grounds.  See 8

U.S.C. § 1255(a)(2).  An alien seeking adjustment of status bears at all times the burden of

persuading the Attorney General to exercise his discretion in the alien's favor.  See Randall v.

Meese, 854 F.2d 472, 474 (D.C. Cir. 1988); Jain v. Immigration and Naturalization Service, 612

F.2d 683, 687 (2d Cir. 1979); see generally Elkins v. Moreno, 435 U.S. 647, 667 (1978) ("...

adjustment of status is a matter of grace, not right ...").

Before a decision is rendered on an alien's I-485 application for adjustment of status,

USCIS, in conjunction with the FBI, conducts several forms of security and background checks to

ensure that the alien is admissible, is not a risk to national security, and merits a favorable

exercise of discretion.  See Declaration of Kathy B. Vaughan, ¶¶ 5, 14 (Exh. 1) ("Vaughan

Decl.").  These checks currently include: (a) an FBI fingerprint check; (b) a check against the

Interagency Border Inspection System (IBIS), which is managed by the Department of Homeland

Security and contains records and "watch list" information from more than twenty law

enforcement and intelligence agencies; and (c) an FBI name check. Id. ¶ 14; see also 8 U.S.C. §

1105(a) (authorizing "direct and continuous liaison" with the Directors of the FBI and CIA to

obtain and exchange information for use in enforcing the INA and in the interest of the internal

and border security of the United States).

These security checks sometimes raise significant derogatory information which affect an applicant's eligibility for an immigration benefit. <u>See</u> Vaughan Decl. ¶ 15. In those cases, USCIS must conduct further inquiry to resolve any outstanding issues, and in some cases may initiate proceedings to remove the alien from the United States. <u>Id.</u> ¶ 15. USCIS cannot complete its adjudication of a request for permanent residence until all security checks have been completed, and until any and all issues that arise from those checks have been resolved. <u>Id.</u> ¶ 16.

Because of heightened national security concerns, a review of the background check procedures employed by USCIS was conducted in November 2002. <u>See</u> Decl. of Michael A. Cannon, ¶ 23 (Exh. 2) ("Cannon Decl."). It was determined that more detailed, in-depth clearance procedures were required in order to better protect the people and the interests of the United States. <u>See id.</u> The name check clearance performed by the FBI was one of the procedures that needed revision. <u>See id.</u> Prior to November 2002, only those "main" files that could be positively identified with an individual were considered responsive. <u>See id.</u> The FBI subsequently altered its search criteria because the risk of missing a match to possible derogatory record(s) was too great. <u>See id.</u> Therefore, the search criteria were expanded to access reference files in addition to the main files. <u>See id.</u> From a processing standpoint, this change meant the FBI would have to review many more files for each individual. <u>See id.</u>

In December 2002 and January 2003, USCIS resubmitted 2.7 million name check requests to the FBI in addition to the regular submissions. <u>See id.</u> ¶ 24. Over 440,000 of the responses to the 2.7 million resubmitted name check requests indicated that the FBI may have information relating to the subjects. <u>See id.</u> The FBI's processing of the more than 440,000 resubmissions that require follow-up to resolve the name checks has delayed the processing of the regular

submissions from USCIS.  See id. ¶ 25.  Several other factors, including the total volume of incoming name checks, the number of hits on a name when it is reviewed, and the processing of common names, contribute to potential delays in processing background checks for an applicant. See id. ¶¶ 26-30.  The FBI processes name check requests on a first-in, first-out basis (unless USCIS specifically requests that a particular name check be expedited).  See id. ¶ 18.

### 2.    Judicial Review of Immigration-Related Decisions

In 1996, Congress passed legislation to reduce, and in some cases eliminate, judicial review of certain immigration-related decisions made by the former Immigration and Naturalization Service ("INS").  See Sec. 306, Illegal Immigration Reform and Immigration Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009 (September 30, 1996).  In particular, 8 U.S.C. § 1252(a)(2)(B)(ii), divests courts of jurisdiction to review any "decision or action of the Attorney General the authority for which is specified … to be in the discretion of the Attorney General, other than the granting of [asylum]."

Because some courts, contrary to Congress' desires, found that this jurisdiction-stripping bar applied only to discretionary decisions made during removal (deportation) proceedings, on May 11, 2005, Congress amended Section 1252(a)(2)(B)(ii) to clarify that its proscription against judicial review applies regardless of whether the discretionary judgment, decision or action is made in removal proceedings.  See Section 101(f), Real ID Act of 2005, Pub. L. 109-13, Div. B, 119 Stat. 231; see also House Conference Report 109-72 at 170 (May 3, 2005).  The REAL ID Act also added references to the Secretary of Homeland Security consistent with the reorganization of INS (under the Attorney General and U.S. Department of Justice) into USCIS (under the Department of Homeland Security).  Id.  After passage of the Real ID Act, the statute reads as follows:

6

(B) Denials of discretionary relief

> Notwithstanding any other provision of law (statutory or nonstatutory) . . . and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review–
>> **(I)** any judgment regarding the granting of relief under section 1182(h), 1182(I), 1229b, 1229c, or 1255 of this title, or
>> **(ii)** any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. 1252(a)(2)(B).

### B.  Plaintiffs' Applications

On August 6, 2004, Plaintiffs filed Form I-485 applications to register permanent residence or adjust status.  See Compl. ¶ 11.  The applications were filed with United States Citizenship and Immigration Service's Vermont Service Center, which subsequently transferred them to the Texas Service Center.  See id. ¶ 12; Vaughan Decl. ¶18.  The Texas Service Center currently maintains the records concerning Plaintiffs' I-485s, and is the USCIS office that is processing their applications.  See Vaughan Decl. ¶ 18.

Shortly after Plaintiffs' applications for adjustment of status were filed, USCIS requested that the FBI conduct background checks in connection with the I-485s.  See Vaughan Decl. ¶ 19; Cannon Decl. ¶ 41.  Those checks are not yet complete.  See Vaughan Decl. ¶ 19; Cannon Decl. ¶ 41.  The Texas Service Center regularly checks the status of the background checks, but cannot complete its adjudication of the I-485s until it receives the results of those checks.  See id. ¶ 6.  The FBI will transfer the results of the background check to USCIS after the investigation is complete.  See Cannon Decl. ¶ 21.

Plaintiffs initiated this action with a mandamus complaint filed September 17, 2007.  The

complaint asks the Court to order Defendants to complete the security clearances and to complete

adjudication of Plaintiffs' I-485 applications.  Compl. at 7.

## STANDARD OF REVIEW

Defendants move for dismissal under Rule 12(b)(1) because the Court lacks subject matter

jurisdiction to review Plaintiffs' claims.  See Fed. R. Civ. P. 12(b)(1).  When reviewing a 12(b)(1)

motion to dismiss, "the court must accept the complaint's well-pled factual allegations as true and

draw all reasonable inferences in the plaintiff's favor."  Thompson v. Capitol Police Bd., 120 F.

Supp.2d 78, 81 (D.D.C. 2000) (citations omitted); see also Vanover v. Hantman, 77 F. Supp.2d

91, 98 (D.D.C. 1999).  "The court is not required, however, to accept inferences unsupported by

the facts alleged or legal conclusions that are cast as factual allegations."  Rann v. Chao, 154 F.

Supp. 2d 61, 64 (D.D.C. 2001), aff'd, 346 F.3d 192 (D.C. Cir. 2003).  In addition, plaintiffs bear

the burden of persuasion, and must establish subject-matter jurisdiction "by a preponderance of

the evidence."  Thompson, 120 F. Supp.2d at 81; Vanover, 77 F. Supp.2d at 98.  To determine the

existence of jurisdiction, a court may look beyond the allegations of the complaint, consider

affidavits and other extrinsic information, and ultimately weigh the conflicting evidence.  See

Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992); Rann, 154 F. Supp. at

64.

Defendants also move for dismissal under Rule 12(b)(6), for failure to state a claim upon

which relief can be granted.  Rule 12(b)(6) requires dismissal if a plaintiff fails to plead "enough

facts to state a claim for relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 127 S.Ct.

1955, 1974 (2007) (abrogating prior standard which required the moving party to show that

plaintiff can prove no set of facts in support of its claim which would entitle it to relief).  The

Court must resolve all factual doubts in favor of the plaintiff, and allow the plaintiff the benefit of

all inferences.  See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir.

1997).

## ARGUMENT

### I.    THE COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW PLAINTIFFS' CLAIMS.

 "Federal courts are courts of limited jurisdiction . . . [and] possess only that power

authorized by Constitution and statute."  Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377

(1994); see also Shaffer v. Veneman, 325 F.3d 370, 372 (D.C. Cir. 2003) (noting that district

courts "have only such jurisdiction as the Constitution and the Congress grant them").  Here,

Plaintiffs have failed to establish a statutory basis for the Court to exercise jurisdiction over their

claims.  Congress has expressly deprived courts of jurisdiction to review the USCIS discretionary

actions at issue here.  Section 1252 of the Immigration and Nationality Act ("INA") precludes

judicial review of USCIS's "judgments" on applications for adjustment of status, and of

numerous other discretionary decisions involving immigration-related applications and

proceedings.  8 U.S.C. § 1252(a)(2)(B).  That provision applies "notwithstanding any other

provision of law," thereby trumping any alternative source of jurisdiction.  Id.

Even if the INA did not preempt other sources of jurisdiction, there would be no such

alternative source available here.  The discretionary nature of the adjudication of adjustment of

status applications removes challenges to that adjudication process from the scope of the

Mandamus Act and the Administrative Procedures Act.  Therefore, Rule 12(b)(1) requires

dismissal of Plaintiffs' claims.

### A.    8 U.S.C. § 1252(a)(2)(B) Divests This Court of Jurisdiction Over Plaintiffs' Claims.

Section 1252(a) of the INA expressly precludes judicial review of adjustment of status

applications and other discretionary decisions.  As noted <u>supra</u>, Section 1252(a)(2)(B), provides

that "no court shall have jurisdiction to review:"

> (i)      any judgment regarding the granting of relief under section
> 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
> (ii)      any other decision or action of the Attorney General or the
> Secretary of Homeland Security the authority for which is specified
> under this title to be <u>in the discretion of the Attorney General or the</u>
> <u>Secretary of Homeland Security</u>, . . . .

8 U.S.C. § 1252(a)(2)(B) (emphasis added).

That provision bars judicial review of  Plaintiffs' attempt to compel the adjudication of

their adjustment of status applications.  First, the authority to adjudicate adjustment of status

applications arises under 8 U.S.C. § 1255(a), and subsection (i) expressly bars judicial review of

"any judgment regarding the granting" of such an application.  8 U.S.C. §§ 1252(a)(2)(B)(i),

1255(a).  It follows that the Court cannot review USCIS's judgment that its adjudication of

Plaintiffs' applications cannot be completed until the FBI has completed processing the

background checks.

Second, because the adjudication of an adjustment of status application is expressly

committed to the discretion of the Secretary of Homeland Security, Section 1252(a)(2)(B)(ii) also

divests this Court of subject matter jurisdiction over Plaintiffs' request for immediate adjudication

of their Form I-485s.  <u>See, e.g.</u>, <u>Luo v. Keisler</u>, No. 07-0395, Mem. Op. at 4-6 (D.D.C. Nov. 14,

2007) (discussing Section 1252(a)(2)(B) and granting motion to dismiss action to compel

adjudication of plaintiffs' I-485s) (Exh. 3 hereto); <u>Grinberg v. Swacina</u>, 2007 WL 840109

(S.D.Fla. March 20, 2007) (discussing Section 1252(a)(2)(B) and granting motion to dismiss);

<u>Safadi v. Howard</u>, 2006 WL 3780417 (E.D. Va.)(same); <u>Sharkey v. Ganter</u>, 2006 WL 177156

(S.D.N.Y.)(same).  But <u>see e.g.</u>, <u>Duan v. Zamberry</u>, 2007 WL 626116 (W.D.Pa. 2007) (finding

10

jurisdiction notwithstanding Section 1252(a)(2)(B)(ii)); Elmalky v. Upchurch, 2007 WL 940330 (N.D.Tex. 2007) (same). Section 1252(a)(2)(B)(ii) applies broadly to bar courts from reviewing any "decision or action" (other than asylum determinations) the "authority for which is specified . . . to be discretion[ary]" under "this subchapter."  In seeking to compel the adjudication of an adjustment of status application under 8 U.S.C. § 1255, Plaintiffs' claims fall squarely within the plain meaning of each of these terms.

First, "this subchapter" refers to Subchapter II of Chapter 12 of Title 8 of the U.S. Code, which is composed of 8 U.S.C. §§ 1151 through 1378.  Section 1255(a), which grants the Attorney General discretionary authority to adjudicate adjustment of status applications, is thus part of Subchapter II.  The "authority" for adjudicating adjustment of status applications is expressly "in the discretion of the Attorney General," pursuant to Section 1255(a).  See 8 U.S.C. § 1255(a) (providing that an alien's status "*may* be adjusted by the Attorney General, *in his discretion* and under such regulations as he may prescribe." Id. (emphasis added)).  The statute provides no time frame for the adjudication of I-485 applications, and gives the Attorney General complete discretion to prescribe any appropriate regulations.  See id.  Thus, Congress has given the Attorney General complete discretion over the process of adjudicating an I-485 application. That discretion necessarily extends to the assessment of when, whether, and how to grant an adjustment application.  Those factors have led numerous courts to conclude that Section 1252(a)(2)(B)(i) bars judicial review of claims challenging aspects of the I-485 adjudicative process.  See, e.g., Luo, Mem. Op. at 5; Dinsey v. Department of Homeland Security, No. 03-10081, 2004 WL 1698630, at * 4 (S.D.N.Y. 2004) (finding no jurisdiction over action to compel USCIS to adjudicate adjustment of status application because the INA "expressly places the adjustment of immigration status within the discretion of the Attorney General"); see generally

11

<u>Zhu v. Gonzales</u>, 411 F.3d 292, 294-96 (D.C. Cir. 2005) (concluding 1252(a) precludes judicial review of Attorney General's discretionary decision to require party to obtain labor certification prior to obtaining a work visa); <u>Mahaveer, Inc. v. Bushey</u>, No. 04-1275, 2006 WL 1716723, at *3-*4 (D.D.C. June 19, 2006) (concluding 1252(a) bars review of discretionary denial of visa).

Finally, Plaintiffs are seeking judicial review of both an agency decision and agency action. USCIS has, at this time, made a *decision* that it cannot immediately complete its adjudication of the applications because it is awaiting potentially relevant information from the mandatory security checks. This case also involves agency *action*. The word "action" is not limited to a single act, but also includes an ongoing process or a series of acts. See <u>Safadi</u>, 466 F. Supp. 2d at 699 (citing Black's Law Dictionary 28 (6th ed. 1990) defining action as "[c]onduct; behavior; something done; the condition of acting; an act or series of acts."); <u>Luo</u>, Mem. Op. at 5 (citing same); <u>see also</u> <u>Grinberg v. Swacina</u>, 478 F. Supp. 2d 1350, 1352 (S.D. Fla. 2007) (finding initiation of background checks was action); <u>Zhang v. Chertoff</u>, ___ F. Supp. 2d ___, 2007 WL 175358, at *4 (W.D. Va. June 19, 2007) ("the preclusion of judicial review over a discretionary act of USCIS encompasses . . . the pace of this process"). As explained in the Vaughan declaration, USCIS is engaged in the continuing "action" of adjudicating Plaintiffs' adjustment applications and checking their status, but is actively awaiting the results of the security checks. <u>See</u> Vaughan Decl. ¶ 18. Thus, this is not a case in which an agency has refused to act. Instead, the alleged delay is a direct consequence of USCIS's conclusion that national security interests preclude it from completing its adjudication of Plaintiffs' application until all background investigations are complete. <u>See</u> <u>Li v. Chertoff</u>, 482 F. Supp. 2d 1172, 1177-78 (S.D. Cal. 2007).

At bottom, Plaintiffs take issue with the fact that USCIS is still engaging in investigative and evaluative activities to determine their eligibility. They would have the Court order USCIS to

"immediately" adjudicate their applications, notwithstanding the need for these critical inquiries

and notwithstanding that the decision whether to grant adjustment of status and when to do so is

completely discretionary. However, USCIS's *decision* to continue evaluating Plaintiff's

application and the *action* it is taking in doing so lie within the discretion of the Attorney General

under § 1255(a). See Luo, Mem. Op. at 5 (noting that "given the national security implications

of immigration regulation, the broad discretion afforded the Attorney General permits the agency

to adjudicate applications only after conducting a careful and thorough investigation"). Thus

Section 1252(a)(2)(B)(ii) precludes judicial intervention in USCIS's adjudicative process. The

withdrawal of subject matter jurisdiction in this regard is consistent with the well-established

proposition that judicial review in immigration matters is narrowly circumscribed, see Reno v.

Flores, 507 U.S. 292 (1993), and that control over immigration is largely entrusted to the political

branches of the government, see United States v. Valenzuela-Bernal, 458 U.S. 858, 864 (1982);

Mathews v. Diaz, 426 U.S. 67, 81 (1976).

Defendants recognize that federal district courts are split on this issue, and that some

judges have concluded that they have jurisdiction to review the reasonableness of any delays in

completing adjudication of an I-485 petition. Compare, e.g., Liu v. Novak, No. 07-263, ___ F.

Supp. 2d ___, 2007 WL 2460425 (D.D.C. Aug. 30, 2007) (exercising jurisdiction over claim

alleging unreasonable delay in resolving adjustment of status application); Alsharqawi v.

Gonzales, No. 06-1165, 2007 WL 1346667 (N.D. Tex. Mar. 14, 2007) (same) with Luo, Mem.

Op. at 5-6 (dismissing claim alleging unreasonable delay in resolving adjustment of status

application for lack of jurisdiction); Elzer v. Mueller, No. 07-01666, 2007 WL 1221195 (E.D. Pa.

Apr. 23, 2007) (dismissing challenge for lack or jurisdiction);Grinberg, 478 F. Supp. 2d at 1352

(same). However, the D.C. Circuit has not yet addressed the issue, and the other courts' rulings

13

are not binding on this Court. As the foregoing discussion makes clear, the INA's jurisdiction-stripping provisions are best read as precluding judicial review of Plaintiffs' claims concerning the adjustment of status application. As another member of this Court recently noted, "the Court's insertion into [the I-485 adjudication] process would be inappropriate and could be detrimental to national security." Luo, Mem. Op. at 5.

**B.    No Other Statute Gives the Court Jurisdiction to Review Plaintiffs' Challenge to the Pace of the Adjudication of His I-485 Application.**

Even if some other statute conferred jurisdiction to review Plaintiffs' claims, the INA would foreclose the exercise of that jurisdiction because it applies "notwithstanding any other provision of law (statutory or nonstatutory)." 8 U.S.C. § 1252(a)(2)(A); see Luo, Mem. Op. at n. 4 (citing INA and noting that it specifically precludes judicial review "notwithstanding any other provision of law"); Danilov v. Aguirre, 370 F. Supp. 2d 441, 445 (E.D. Va. 2005) (Ellis, J.) ("[I]t is well settled that general grants of jurisdiction may not be relied upon to expand a very specific statute that either grants or limits jurisdiction."). However there is no alternative source of jurisdiction in this case. The Mandamus Act does not apply because the process of adjudicating Plaintiffs' applications involves discretionary acts and decisions. The Administrative Procedure Act is inapplicable for similar reasons.

**1.    The Mandamus Act Does Not Confer Jurisdiction Because The Adjudication of Adjustment of Status Applications Is Discretionary.**

The Mandamus Act would not confer subject matter jurisdiction even if the jurisdiction-stripping provisions of INA § 242 did not apply. That statute gives district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. The writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary

causes." Cheney v. United States District Court, 542 U.S. 367, 380 (2004) (internal quotations and citation omitted); accord Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980). District courts may issue a writ of mandamus only if three elements are met: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." In re Medicare Reimbursement Litigation, 414 F.3d 7, 10 (D.C. Cir. 2005); see also Heckler v. Ringer, 466 U.S. 602, 616 (1984) (noting that defendant must owe plaintiff "a clear nondiscretionary duty" and that all other remedies must be exhausted). Even when those factors are present, "a court may grant relief only when it finds 'compelling equitable grounds.'" In re Medicare Reimbursement Litigation, 414 F.3d at 10.

Here, Plaintiffs lack a clear right to immediate adjudication, and Defendants have no clear mandatory or ministerial obligation to adjudicate the application or complete background checks within a particular time frame. See Luo, Mem. Op. at 6 n.4; Safadi v. Howard, 466 F.Supp.2d at 700; Grinberg, 478 F. Supp. 2d at 1354. The decision whether to grant or deny Plaintiffs' adjustment applications is plainly discretionary by statute. See 8 U.S.C. § 1255(a). Surely, that discretion permits USCIS to enforce a background check requirement thereby ensuring that immigration benefits are not granted to an alien ineligible for the benefit due to fraud, criminal convictions, or national security matters. There are no statutory provisions or regulations that mandate the adjudication of adjustment applications within a particular time frame. Consequently, USCIS has no clear, mandatory duty to finish adjudicating Plaintiffs' applications prior to completion of background checks, or by a prescribed deadline. Likewise, Plaintiffs can point to no clear and indisputable right to have the background checks completed within a specific time frame, and the FBI has no statutory or regulatory duty to limit background examinations to a fixed period of time. See Shalabi v. Gonzales, No. 06-866, 2006 WL 3032413, at * 5 (E.D. Mo.

15

Oct. 23, 2006) (denying plaintiff's request that the court compel that plaintiff's background check be expedited). Those factors have led numerous district courts to find that mandamus relief is unavailable in cases such as this. See, e.g., Li, 482 F. Supp. 2d at 1177; Grinberg, 478 F. Supp. 2d at 1354; Safadi, 466 F. Supp.2d at 700; Saleh v. Ridge, 367 F. Supp.2d 508, 511 (S.D.N.Y. 2005); Karan v. McElroy, No. 02 Civ. 6678 (JGK), 2003 WL 21209769, at *1 (S.D.N.Y. May 23, 2003); Zheng v. Reno, 166 F. Supp.2d 875, 880-81 (S.D.N.Y. 2001); Sadowski v. INS, 107 F.Supp.2d 451, 453 (S.D.N.Y. 2000). This Court should do the same.

### 2.    The Administrative Procedures Act Does Not Permit This Court to Review Plaintiffs' Challenge to USCIS's Adjudication of Their I-485s.

Plaintiffs also have no right to judicial review under the APA. Although the APA is not an independent source of subject matter jurisdiction, it operates in tandem with federal question jurisdiction under 28 U.S.C. § 1331 to permit courts to review challenges to certain agency actions. See Califano v. Sanders, 430 U.S. 99, 107 (1977); Grinberg, 478 F. Supp. 2d at 1355; Galluci v. Chao, 374 F. Supp.2d 121, 128 (D.D.C. 2005). However, the APA expressly precludes judicial review of agency actions in two circumstances: (1) if another statute "preclude[s] judicial review;" and (2) when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); Brock v. Pierce County, 476 U.S. 253, 260 n.7 (1986). Both factors prevent Plaintiffs from using the APA as a means of challenging USCIS's processing of their adjustment applications.

First, as discussed above, the INA bars judicial review of challenges to the adjustment of status adjudication process. Accordingly, Section 701(a) of the APA, which "withdraws [an APA] cause of action" to the extent another statute "precludes judicial review," prevents Plaintiffs from raising an APA challenge. Block v. Community Nutrition Inst., 467 U.S. 340, 345 (1984);

see 5 U.S.C. § 701(a); Beyond Pesticides v. Whitman, 360 F. Supp. 2d 69, 71 (D.D.C. 2004); see generally Bruno v. Albright, 197 F.3d 1153, 1161-62 (D.C. Cir. 1999) (concluding that "the immigration laws preclude judicial review of consular visa decisions" and therefore bar APA challenges to a visa decision).  Section 702 forecloses judicial review of Plaintiffs' claims for the same reason, as it provides that "nothing herein affects other limitations on judicial review . . . or confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.

Second, the APA bars judicial review because the USCIS actions Plaintiffs have challenged are discretionary.  The APA generally permits challenges to "agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1); see also 5 U.S.C. § 555(b) (indicating that agencies should conclude matters "within a reasonable time").  However, such claims are unreviewable by the courts if the relevant agency action is "committed to agency discretion by law."  Id. § 701(a)(2).  In Heckler v. Chaney, the Supreme Court interpreted 5 U.S.C. § 701(a)(2) to mean that "review is not to be had if the statute is drawn so that the court would have no meaningful standard against which to judge the agency's exercise of discretion."  470 U.S. 821, 830 (1985).  As the Court explained, "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'"  Id.; see also Steenholdt v. Federal Aviation Admin., 314 F.3d 633, (D.C. Cir. 2003) (articulating same standard).  "The principal purpose of the APA limitations . . . and of the traditional limitations upon mandamus from which they were derived— is to protect agencies from undue judicial interference with their lawful discretion . . . ."  Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004).

Plaintiffs have no APA cause of action for "unreasonable agency delay" because the

17

timing of USCIS's adjudication of their adjustment of status applications is expressly committed to agency discretion, as are all other aspects of processing of the application. Section 1255(a) permits the Attorney General to adjust an alien's status "*in his discretion* and under such regulations as he may prescribe." 8 U.S.C. § 1255(a) (emphasis added). That is the type of "plenary" grant of discretion which renders agency actions unreviewable under the APA. Secretary of Labor v. Twentymile Coal Co., 456 F.3d 151, 157 (D.C. Cir. 2006). No statutory or regulatory provisions provide a "meaningful standard" against which to measure USCIS's process of adjudicating such an application. Heckler, 470 U.S. at 830. Rather, the agency maintains complete discretion to determine "how and when" to adjudicate the application. See id. In contrast with certain other immigration provisions, e.g., 8 U.S.C. § 1447(b), the statute and regulations governing Plaintiff's adjustment of status application provide no time frame for when such an application must be adjudicated. See Zheng, 166 F.Supp.2d at 879 ("[T]here is no requirement that the application be decided within a specific period of time[.]"). Consequently, there is no standard against which the Court can measure whether USCIS has acted "within a reasonable time," 5 U.S.C. § 555(b), or "unreasonably delayed" adjudication, id. § 706(1). The fact that the adjudicatory process is committed to agency discretion by law renders claims relating to alleged delays in the adjudication of an adjustment of status application unreviewable under the APA. See Luo, Mem. Op. at 6 n.4; Safadi, 466 F.Supp.2d at 700; Zheng, 166 F.Supp.2d at 878-89; Karan, 2003 WL 21209769, at *1 ("[B]ecause decisions regarding the plaintiff's immigration status are committed to the discretion of the INS, this Court lacks the authority under . . . the APA to grant the relief the plaintiff seeks."); see also Rahman v. McElroy, 884 F.Supp. 782, 787-88 (S.D.N.Y. 1995). In addition, at least two Supreme Court cases suggest that the presence of a specified time period triggers courts' ability to compel agency action that is

18

"unreasonably delayed" under § 706(1).  See Norton, 542 U.S. at 65 ("Thus, when an agency is compelled by law to act within a certain time period . . . a court can compel the agency to act . . . ."); Brock, 476 U.S. at 260 n.7 (finding that because "the statutory command that the Secretary 'shall' act within 120 days does not commit such action to the Secretary's discretion, . . . [t]he court would have the authority to 'compel agency action unlawfully withheld or unreasonably delayed,' § 706(1)").

Without any mandatory time frame to adjudicate Plaintiffs' claim that USCIS has "unreasonably delayed" adjudication of their applications, this Court would have to create a temporal standard out of whole cloth.  This is a perilous task given the national security considerations that permeate USCIS's adjudicative process.  It is a well-established proposition that judicial review of immigration matters is narrowly circumscribed, and that control over immigration is largely entrusted to the political branches of the government.  See Valenzuela-Bernal, 458 U.S. at 864; Diaz, 426 U.S. at 81 ("Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.").  Moreover, as other courts have cautioned, in "'matters solely within the INS's discretion[,] . . . aside from our powerlessness to intervene, the judicial creation of such a duty would have the potential for mischievous interference with the functioning of already overburdened administrative agencies.'"  Rahman, 884 F. Supp. at 787 (quoting Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1182 (2d Cir. 1978)); see also Heckler, 470 U.S. at 831-82 (noting that "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities"); Luo, Mem. Op. at 5 (concluding judicial intervention would be

"inappropriate" given national security concerns).  Those principles counsel against the

imposition of a judicially-created standard to gauge how long USCIS may wait for assurance that

the background checks have identified no national security reasons that would merit denial of an

applicant's adjustment application, or how much time the FBI may devote to its investigation.

**II.    IF THE COURT HAD SUBJECT MATTER JURISDICTION, PLAINTIFFS'
        CLAIMS  WOULD BE SUBJECT TO DISMISSAL UNDER RULE 12(b)(6).**

Even if the Mandamus Act or  the APA could be construed as permitting this Court to

review the reasonableness of the delay in completing the processing of Plaintiffs' adjustment

applications, Rule 12(b)(6) would require dismissal of any such claim.  The D.C. Circuit has

identified six factors courts should consider when reviewing claims that allege unreasonable

agency delay:

> (1) the time agencies take to make decisions must be governed by a "rule of
> reason"; (2) where Congress has provided a timetable or other indication of the
> speed with which it expects the agency to proceed in the enabling statute, that
> statutory scheme may supply content for this rule of reason; (3) delays that might
> be reasonable in the sphere of economic regulation are less tolerable when human
> health and welfare are at stake; (4) the court should consider the effect of
> expediting delayed action on agency activities of a higher or competing priority;
> (5) the court should also take into account the nature and extent of the interests
> prejudiced by delay; and (6) the court need not "find any impropriety lurking
> behind agency lassitude in order to hold that agency action is 'unreasonably
> delayed.'"

In re United Mine Workers of America Inter. Union, 190 F.3d 545, 547 (D.C. Cir. 1999) (quoting

Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 75-77, 79 (D.C. Cir. 1984)

("TRAC").  Where, as here, Congress has declined to establish a specific timetable for agency

action, the Court is "not free to ignore that judgment and rewrite the statute to include a specific

timetable." In re American Fed. of Govt. Employees AFL-CIO, 837 F.2d 503, 506 (D.C. Cir.

1988).  The D.C. Circuit also has emphasized the importance of considering the agency's

competing priorities, noting that agencies should be given "great latitude in determining their agendas." In re Monroe Comms. Corp., 840 F.2d 942, 946 (D.C. Cir. 1988).

The complaint does not allege facts sufficient to support Plaintiffs' claim that USCIS has unreasonably delayed processing their adjustment applications and that the FBI has unreasonably delayed completing the national security investigations. As noted, Congress has established no timetable for processing adjustment applications or national security investigations. Further, the competing interests at issue in this case militate against granting Plaintiffs the relief they seek. The D.C. Circuit has "declined to grant relief, even when all the other factors considered in TRAC favored it, where a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain." Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (citing In re Barr Labs., Inc., 930 F.2d 72, 75 (D.C. Cir. 1991)). Yet that is precisely what Plaintiffs ask this Court to do. Defendants and the numerous individuals with pending adjustment applications have a strong interest in processing the applications in an orderly fashion and ensuring that all applicants are treated the same. Allowing any alien that files a lawsuit to leapfrog to the head of the queue would be contrary to those interests, and potentially would lead applicants with pending background checks to flood the federal courts with mandamus actions in order to obtain that advantage. As the Eastern District of Virginia has recognized,

> to grant relief in this case would set a dangerous precedent, sending a clear signal that more litigious applicants are more likely to be moved to the top of the proverbial pile over other applicants that have waited even longer. Such a situation hardly optimizes resources, and serves only the individual at the detriment to the group.

Dmitrenko v. Chertoff, No. 07-82, 2007 WL 1303009, at * 1 (E.D. Va. Apr. 30, 2007); see also id. at n. 1 ("To grant relief to today's petitioners, compelling adjudication of their application over

persons that have waited even longer, would be far from equitable."). While Plaintiffs may desire

immediate adjudication of the application, they have no entitlement to that relief.

Finally, Defendants' obligation to protect national security is another "competing interest"

that makes any delay reasonable. Background checks serve an important law-enforcement and

public safety purpose. See Li v. Chertoff, 482 F. Supp. 2d 1172, 1178 (S.D. Cal. 2007); Cannon

Decl. ¶¶ 4, 17. Accordingly, courts have found it reasonable for an adjustment application to

remain pending for long periods of time when the delay is attributable to an ongoing security

investigation. See Zahani, 2006 WL 2246211, at *3 (noting "[c]ourts have routinely found delays

caused by FBI background checks to be justifiable delays" and citing cases); Zheng v. INS, 933 F.

Supp. 338, 341 (S.D.N.Y. 1996) (dismissing case pursuant to 12(b)(6) because delaying

processing of application pending completion of background checks was not an unreasonable

delay); Jabr v. Chertoff, No. 4:06cv00543, 2006 WL 3392504, at *2 (E.D. Mo. Nov. 21, 2006)

(finding plaintiffs failed to state a claim for unreasonable agency delay although adjustment

application had been pending for more than two years due to background checks). For all the

foregoing reasons, Plaintiffs have failed to state a claim for unreasonable delay in adjudicating

their I-485s.

### III.  IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THE CASE TO THE NORTHERN DISTRICT OF TEXAS.

This case is governed by the general venue statute, 28 U.S.C. § 1391, which establishes

default rules for venue that apply to federal lawsuits where the underlying statutes do not specify

their own venue rules. See 28 U.S.C. § 1391(a), (b), and (e) (each applying "except as otherwise

provided by law."). Section 1391 identifies three possible bases for venue for claims against

federal government officials or agencies: (1) where a defendant "resides;" (2) the district where "a

22

substantial part of the events or omissions giving rise to the claim occurred;" or (3) where "the

plaintiff resides, if no real property is involved in the action."  28 U.S.C. § 1391(e).  Plaintiffs

appear to rely on the first prong of this test, and allege that venue is proper in this Court because

two of the agency heads named as Defendants have offices in the District of Columbia.  See

Compl. ¶ 2.

When a plaintiff bases its venue arguments solely on federal agency defendants' presence

in Washington D.C., the venue challenge should be examined  "very closely."  Cameron v.

Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993).  That close scrutiny has led courts in this

District to invoke their transfer authority pursuant to 28 U.S.C. § 1404(a) and transfer cases to a

district with a closer nexus to the parties' dispute. See, e.g., Cameron, 983 F.2d at 256 (ruling

Washington, D.C. was not the proper venue because the sole connection to Washington, D.C. was

the inclusion of the Director of the Federal Bureau of Prisons and the Attorney General in their

official capacities); Abusadeh v. Chertoff, 2007 WL 2111036, at *6-*9 (D.D.C. July 23, 2007)

(transferring mandamus action seeking adjudication of I-485 to Southern District of Texas

because that was where the application was being adjudicated); Rosales v. United States, 477 F.

Supp.2d 213, 215-17 (D.D.C. 2007) (transferring case against federal agency to district in which

the challenged events took place); Southern Utah Wilderness Alliance v. Norton, 315 F. Supp.2d

82, 886-89 (D.D.C. 2005) (concluding environmental case should be transferred to Utah where

D.C. officials only set general policies and did not make specific decisions being appealed);

Joyner v. District of Columbia, 267 F. Supp.2d 15, 20-21 (D.D.C. 2003) (holding that the case's

only connection to Washington, D.C. was the situs of named federal government defendants and

transferring to a district with which the case had several connections).  Otherwise, "[b]y naming

high government officials as defendants, a plaintiff could bring suit here that properly should be

pursued elsewhere." Cameron, 983 F.2d at 256.

The fact that Defendants are high government officials who reside in the District of Columbia does not establish a sufficient connection to this District, and the Court should transfer this case to the Northern District of Texas.  Section 1404(a) permits the Court to transfer this case to "any other district or division where it might have been brought" for the "convenience of parties and witnesses, in the interest of justice."  28 U.S.C. § 1404(a).  A threshold question is whether the case could have been brought in the district to which transfer is sought.  See Stewart Organization v. Ricoh Corp., 487 U.S. 22, 29 (1988) (citing Van Dusen v. Barrack, 376 U.S. 612, 613 (1964)).  The Court then must engage in a case-by-case analysis and balance the private interests of the parties with public interests such as efficiency and fairness.  Id. at 29; Abusadeh, 2007 WL 2111036, at *3.  The moving party bears the burden to establish that it is proper to transfer the case.  See Southern Utah, 315 F. Supp. 2d at 86.  Trout Unlimited v. United States Dep't of Agriculture, 944 F.Supp. 13, 16 (D.D.C. 1996) (citing Air Line Pilots Ass'n v. Eastern Air Lines, 672 F.Supp. 525, 526 (D.D.C. 1987) (citations omitted).  Plaintiffs could have brought this case in the Northern District of Texas, and both the private and public interests favor transfer to that court.

The Northern District of Texas clearly is a district in which this case "might have been brought."  The Texas Service Center is responsible for adjudicating Plaintiffs' adjustment of status applications; therefore any delay in the processing of that application concerns that office, which is located in Dallas, Texas.  See Vaughan Decl. ¶ 7.  As a result, the events or omissions giving rise to Plaintiffs' claim occurred in the Northern District of Texas, making venue proper in that court under 28 U.S.C. § 1391.  See Abusadeh, 2007 WL 2111036, at * 6 (concluding venue was proper in Southern District of Texas because I-485 was being adjudicated there).

24

The private interests favor transfer. The factors courts consider when assessing those interests include: Plaintiffs' choice of forum, Defendants' choice of forum, whether the claim arose elsewhere, convenience of the parties, convenience of the witnesses, and ease of access to sources of proof. See Trout Unlimited, 944 F.Supp. at 16 (citation omitted). Although courts generally accord substantial deference to a plaintiff's choice of forum, that deference is lessened when the forum chosen is not the plaintiff's home forum. See Shawnee Tribe v. United States, 298 F.Supp.2d 21, 24 (D.D.C. 2002) (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)). Courts also apply less deference when the chosen forum has an inadequate nexus to the events in the case. See Southern Utah Wilderness Alliance, 315 F. Supp.2d at 86.

Plaintiffs' choice of forum deserves little deference because they do not reside in this District, and because this District lacks meaningful ties to the controversy. The Northern District of Texas is a more appropriate forum, because that is where the relevant decisions were made, and where Plaintiffs' claims arose. As noted, the Texas Service Center is charged with adjudicating Plaintiffs' adjustment applications. See Vaughan Decl. ¶ 20. The only named agency defendant with any arguably direct involvement in the adjudication of that application is Evelyn Upchurch --- Director of the Texas Service Center --- whose office also is in the Northern District of Texas. Accordingly, this case is similar to other cases in which courts have found that the private interests favor transfer because the "primary issue in th[e] case" concerns a decision made by an agency field office, and not headquarters. Southern Utah Wilderness Alliance, 315 F. Supp.2d at 87; see, e.g., Rosales, 477 F. Supp. 2d at 216; Shawnee Tribe, 298 F. Supp.2d at 24; Sierra Club v. Flowers, 276 F.Supp. 62, 67-68 (D.D.C. 2003) (transferring case because federal officials in Florida made the relevant decision and officials in Washington, D.C. were not involved in the decision-making process); see also Airport Working Group of Orange County, Inc. v. United

States Dep't of Defense, 226 F. Supp.2d 227, 230-31 (D.D.C. 2002) (transferring because connection to DC was "attenuated" where D.C. officials were not actively involved in challenged decision).

    The FBI's involvement in the background name check process also does not establish a close nexus to this District.  The background checks are not initiated by the FBI.  See Vaughan Decl. ¶ 5.  The FBI's completion of those background checks is not monitored by USCIS in Washington, D.C., but rather by the Texas Service Center.  See id.  ¶ 6.  Local officials at the Texas Service Center conduct the decision-making process and will make the final decision.  See id. ¶ 19.  In sum, the FBI has a very routine role regarding Plaintiffs' applications — to conduct the background checks and send the results to USCIS.  It does not determine whether, when, or how the adjustment application will be adjudicated.  See Cannon Decl. ¶ 40.  Accordingly, even if the FBI officer(s) processing Plantiffs' national security investigations were located in Washington, D.C., that would not make this Court the proper forum.

    Other private interest factors also support transfer.  The Northern District of Texas is Defendants' choice of forum, and Defendants have legitimate reasons for the Court to transfer the case there.  That district is the home jurisdiction of the Texas Service Center, which is charged with and is responsible for adjudicating Plaintiff's pending adjustment application.  See Vaughan Decl. ¶ 18.  Since this case arose in the Northern District of Texas, there is local interest in resolving it there.  See Schmidt v. American Institute of Physics, 322 F. Supp.2d 28, 36 (D.D.C. 2004) (holding that cases should be resolved in the locale in which they arise.)   That also makes the Northern District of Texas a more convenient jurisdiction in which to litigate this case because:  (1) the people directly involved in making the determination as to Plaintiff's application are located in Texas; and (2) documents or records related to the case are all located in Texas.

See Pierce Decl. ¶¶ 2, 7.

The public interest also favors transfer.  The relevant considerations include: the transferee's familiarity with governing laws, relative congestion of the calendars of the potential transferee and transferor courts, and local interests in deciding local controversies at home.  See Trout Unlimited, 944 F.Supp. at 16 (citation omitted); Airport Working Group of Orange County, Inc., 226 F. Supp.2d at 229.  Since this action concerns federal law, the Northern District of Texas is as familiar with the applicable law as the District of Columbia.  In addition, there is no evidence that the Northern District of Texas's docket is significantly more congested than the District of Columbia's docket.  See Trout Unlimited v. United States Dep't of Agriculture, 944 F.Supp. at 16.  See Exh. 4 hereto (spreadsheet demonstrating caseload of both districts).   In 2006 the districts had a similar number of pending cases (4,326 in the Northern District and 4,114 in this Court), and civil cases in the Northern District were resolved more quickly than civil cases in this Court.  See id.  Accordingly, both factors weigh in favor of the Court transferring this case to the Northern District of Texas.

The Court's analysis in Abusadeh v. Chertoff is instructive.  There, as here, the Plaintiff filed a mandamus complaint seeking to compel USCIS to complete its adjudication of a pending immigration application.  See 2007 WL 2111036 at *2.  The Plaintiff's application was pending in a local USCIS field office in Texas.  See id. at *6.  Plaintiff filed suit in this District, and named agency officials with offices in Washington, D.C. as defendants.  See id. District Judge Kollar-Kotelly concluded that Abusadeh's choice of forum was entitled to little deference because there were no meaningful ties between this District and pending immigration applications being adjudicated by a USCIS field office outside Washington, D.C.  See id. at * 6-*8.  Further, the public interests favored transfer because both districts were equally familiar with the

applicable law but the Southern District of Texas had a "superior interest in addressing the instant

controversy because 'there is a local interest in having localized controversies decided at home."

Id. at *8.  The same is true here.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court GRANT

Defendants' motion to dismiss or, in the alternative, TRANSFER this case to the Northern

District of Texas.

Dated:  November 16, 2007                    Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


_____/s/  Robin M. Meriweather_____
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198 Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

LEO KELLY, <u>et al.</u>                    )
                                            )
            Plaintiffs,                      )
                                            )
     v.                                      )   Case Number: 1:07CV1601(RBW)
                                            )
EVELYN UPCHURCH, Director,  Texas           )
Service Center, U.S. Department of           )
Homeland Security, <u>et al.</u>             )
                                            )
            Defendants.                      )
_____)

**ORDER**

Upon consideration of Defendants' Motion to Dismiss or Transfer, it is this

_____ day of _____, 200____,

_____ ORDERED that the Motion to Dismiss be and hereby is GRANTED, and that

complaint be and hereby is DISMISSED;

_____ ORDERED that the Motion to Transfer be and hereby is GRANTED, and that the

case be and hereby is TRANSFERRED to the United States District Court for the

Northern District of Texas.

SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Leo Kelly, Margaret Kelly, Jack Kelly &
Ross Kelly

                Plaintiff,

v.

Department of Homeland Security, et. Al

                Defendants.

Civ. Act. Number: **1:07-CV-01601**

## DECLARATION

I, the undersigned officer of the Texas Service Center, United States Citizenship and Immigration Services, pursuant to 28 U.S.C. 1746, do hereby declare the following under the penalty of perjury:

1. I am over the age of 21 and of sound mind.  I am an officer with the Texas Service Center, U.S. Citizenship and Immigration Services. There are five USCIS regional Service or Benefit Centers throughout the United States, each of which has jurisdiction over certain applications and petitions filed by persons or companies within its respective geographic jurisdiction, and/or exclusive nationwide jurisdiction over other types of applications. These Centers adjudicate cases on a mail-in basis only; they do not conduct in-person interviews. Employment-based adjustment of status cases like Plaintiff's are handled at the Nebraska and Texas Service Centers. TSC processes many type of applications/petitions that do not require personal interviews and anticipates annual receipts of about 800,000 with about 700,000 anticipated completions. The TSC receives roughly 6,000 pieces of mail a day, sends out a corresponding amount, and has about 2,000,000 active files.

2. The Plaintiff filed an I-140/I-485.  The goal of the 1-140 and 1-485 filings are to obtain lawful permanent resident ("green card") status for Plaintiff and any qualified dependent spouse or child through Plaintiff's employment. By statute, only about 140,000 aliens can get green cards through employment-based categories during each fiscal year, with percentage limits set per country and preference category. These visa numbers are tracked and issued by the Department of State.  The I-485 cannot be approved until after the I-140 is approved.  There is often a need to further develop the information needed for an I-140 petition before the I-485 may be considered.  Similarly, there is often a needed to further develop the information needed for an I-485 application before it is ready for consideration.

3. Center Adjudication Officer, under authority delegated by the Director, independently evaluates and weighs the sometimes voluminous and complex evidence and statements a petitioner submits, may request additional evidence from the petitioner and others, makes

discretionary factual determinations and resolve any conflicts in the evidence, reviews decisions of the Administrative Appeals Office (an appellate adjudicatory body that decides appeals and issues decisions), Policy Statements and Procedural Manuals issued under the authority of the Director of U.S.CIS, the Foreign Affairs Manual of the Department of State, the INA and other legal sources, and drafts a proposed written decision for the Director of the Texas Service Center that is consistent with the precedents, the policies, factual determinations, the Director's exercise of discretion, and the petitioner's burden of proving that they should be granted the visa petition and adjustment application. The decision to approve an immigrant visa or an adjustment involves national security, social, political and foreign policy considerations and determines when, how, and under what conditions foreign nationals are to be allowed to remain within the United States. Adjudications officers work. The decisions are subject to internal review before the Director accepts it. If the petitioner does not agree with the Director's Decision on the Immigrant Visa Petition, the petitioner may appeal to the Administrative Appeals Office to correct any errors in the decision but there is no internal appeal process for denial of an I-485. An I-485 can be reconsidered upon motion and it can be renewed before an immigration judge during removal proceedings.

4. General requirements for employment-based adjustment of status applications are that the alien is the beneficiary of an approved 1-140 visa petition (or whose spouse is such a beneficiary), is in lawful immigration status on the date the Form 1-485 is filed, has a visa number immediately available under the annual per-country and preference category quota, and is not inadmissible to the United States under listed statutory grounds that include health-related, criminal, and national security provisions.

5. Once USCIS receives an I-485, a file is opened and an electronic record of that application is created. Much of this initial electronic processing and data entry is automated, including the automatic generation and electronic transmission of a required national security screening request in FBIQUERY, the FBI repository and tracking system for FBI Name Check requests. Once the initial file creation and processing of an I-485 application is complete, each file is placed on a Just In Time ("JIT") shelf for processing and adjudication in chronological order according to date of receipt.

6. Initially, the TSC runs a daily electronic report in FBIQUERY system for all files on the JIT shelf to confirm the successful transmission of the FBI Name Check request and to identify those applications that have received responses from the FBI name checks and FD-258 (fingerprints) and are thus ready for adjudication. FBI name check requests that have been received by the FBI but have not yet been completed are indicated by a notation of "Pending" in FBIQUERY. An FBI Name Check that has been completed will be indicated by various entries depending on the result.

7. This report will also identify those I-485 applications that have received a "No Data" or "Error" response in FBIQUERY indicating a problem with transmission of the name check request from USCIS to the FBI. If such a problem is reported, the FBI name check requests will then be initiated a second time and resent manually or electronically to the FBI for a response. In this way USCIS ensures that the FBI has in fact received all requests for name checks

8. All files on the FBI Name Check Shelf are audited regularly in order to identify those in which a response from the FBI has been received. In this manner the agency ensures that as FBI responses are received, files are expeditiously released for adjudication.

9. Due both to the sheer volume of security checks USCIS conducts, and the fact that USCIS must await responses from the internal security agencies that conduct some of the required security checks, some delays on individual applications are unavoidable and may be lengthy.

10. Service Centers have a process for expediting processing of certain applications and petitions. However, it is important to note that whenever a particular application or petition receives expedited processing and is moved up in the adjudications queue, it is at the expense of those still unadjudicated petitions or applications that bear an earlier filing date. If, for example, USCIS asks the FBI to expedite a case, this action comes at the expense of other name check cases, many of which have been pending since December 2002, because FBI would have fewer resources with which to work the other pending cases. USCIS is currently limited in the number of expedite requests that can be made to the FBI each week, and there is a backlog even in submitting the expedite requests for cases that have been deemed to meet expedite criteria.

11. In order to address in a consistent and fair manner the increasing number of mandamus actions filed nationwide by aliens awaiting decisions on their petitions and applications, USCIS issued specific guidelines for requesting an expedited name check from the FBI. Expedited processing may be pursued in cases at USCIS's discretion for military deployment, age-out cases and applications affected by sunset provisions, significant and compelling reasons such as critical medical conditions, loss of social security benefits or other subsistence, severe financial loss, extreme emergent situation, humanitarian situation, nonprofit status of requesting organization in furtherance of the cultural and social interest of the United States, Department of Defense/National Interest requests from official U.S. government entity, USCIS error, or compelling interest of USCIS.

12. To my knowledge, Plaintiff has not made a formal request for expedited processing. Expedite requests are determined on a case-by-case basis. Plaintiff states in their complaint that they wishes to have their green card quickly so that they may begin accruing the years needed to apply for U.S. citizenship. This is a common reason for an alien to desire lawful permanent resident status and does not generally, as a single factor, constitute a special circumstance that would justify emergency or expedited processing. Other common reasons include a desire for "peace of mind" and the inability of non-lawful permanent residents or non-U.S. citizens to: petition for alien relatives, work and travel without special permission, get grant funds for research, apply for desirable jobs, qualify for scholarships or fellowships, or get in-state tuition for self, spouse or dependents.

13. Another common factor in the many mandamus lawsuits filed against USCIS involving pending FBI name checks is the plaintiffs' claims that they made repeated status inquiries about their case to USCIS, FBI, Congress, and the White House. While multiple status inquiries show the applicants frustration with the pace of the processing of their applications, the inquiries, and mandamus actions, increase the workload of the FBI and USCIS, rather than having the effect of faster or special treatment of the subject applications. USCIS neither tracks nor records customer service inquiries in the administrative record.

14. When an alien applies for adjustment of status, USCIS conducts several forms of security and background checks to ensure that the alien is eligible for the immigration benefit and they is not a risk to national security or public safety. In addition to records checks against DHS's own immigration systems, these background checks currently include (a) a Federal Bureau of Investigation (FBI) fingerprint check for relevant criminal history records on the alien (e.g., arrests and convictions); (b) a check against the DHS-managed Interagency Border Inspection System (IBIS) that contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies, such as the Central Intelligence Agency (CIA), FBI, other divisions of the United States Department of Justice, Department of State, DHS/U.S. Customs and Border Protection (CBP), and other DHS agencies (IBIS includes, but is not limited to, information related to persons who are wanted or under investigation for serious crimes or suspected of terrorism-related activity) ; and (c) an FBI name check, which is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS.

15. These law enforcement checks have revealed significant derogatory information on various alien applicants for immigration benefits, including applicants seeking permanent residency, which has resulted in the alien being found ineligible for the benefit and USCIS's denial of the application. Where applicable, the information has also resulted in aliens being arrested by law enforcement agencies or charged under removal grounds and deported from the United States following a final order of removal. In many instances, the disqualifying information on the alien has been discovered as a result of the IBIS or FBI name checks, but it has not been revealed by a fingerprint check alone.

16. Since the terrorist attacks of September 11, 2001, the need to conduct more rigorous and thorough background checks on aliens who are seeking immigration status in the United States has required procedures that sometimes result in individuals not receiving their documents and benefits as quickly as in the past. In order to ensure national security and public safety, as well as to reduce the waiting time for adjudication and documentation of lawful status, USCIS is currently working with DOJ, DHS, and ICE to develop and implement improved procedures that will ensure that all of the background checks are completed and the results considered as quickly as possible. However, the public safety requires USCIS to make certain that the checks have been done before it adjudicates any application or petition and before it issues any immigration status documents to such persons. USCIS will continue to perform any outstanding background and security checks as expeditiously as possible to help ensure that no eligible alien must wait longer than is reasonably necessary to receive a decision on his or her application or petition and to receive evidence of his or her immigration status.

17. The fingerprint check must be less than fifteen months old at the time any application or petition is adjudicated. The rescheduling of fingerprints is done to ensure that the case is ready to be adjudicated once Plaintiff's name check clears. Plaintiff's preliminary IBIS checks have been completed.. Since 9/11, USCIS has submitted millions of name check requests to the FBI, thus taxing that agency's resources and creating a backlog in FBI's performance of complete security checks. During the initial submission period of December 2002 and January 2003, USCIS submitted almost 3 million names to the FBI.

18. I have custody of the TSC records of Leo Kelly, Margaret Kelly, Jack Kelly & Ross Kelly, A98482952, A98482953, A98482954, A98482955, and I supervise TSC officers who are

processing Leo Kelly, Margaret Kelly, Jack Kelly & Ross Kelly's applications. After reviewing the information pertaining to Leo Kelly, Margaret Kelly, Jack Kelly & Ross Kelly, I attest that USCIS has referred this case for lawfully required security screening of aliens and that TSC suspended its processing in accordance with the requirements for security screening of aliens using intelligence information having a bearing on the security of the United States.

19. During the normal processing of this case, a national security screening was requested. Plaintiff's FBI name check is pending. A response is required from the FBI before the case can be adjudicated. The information and records pertaining to Leo Kelly, Margaret Kelly, Jack Kelly & Ross Kelly shows that TSC Officers under my supervision make regular inquiries about the status of their security screening. Plaintiff's application for adjustment of status is ready to be adjudicated except for their pending background and security check.

20. The Texas Service Center currently has approximately 114,500 employment-based Form I-485 adjustments of status cases pending, about 34,549 of which are still awaiting completion of FBI name checks before they can be adjudicated. Of an additional 27,332 pending asylum-based Form 1-485 adjustment of status cases, there are approximately 1,235 awaiting responses on FBI name checks. Of a total figure of approximately 148,790 naturalization applications filed and pending at TSC, approximately 48,059 are awaiting responses on FBI name checks. USCIS reports that there were 329,160 applications, nationwide, awaiting responses on FBI name checks as of May 2007. Of this number, 31,144 cases have been pending name check results for more than 33 months."

Kathy B. Vaughan
Supervisory Adjudication Officer

10/3/07
Date

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

LEO KELLY, et al,
Plaintiffs,

v.

UPCHURCH,
et al.,
Defendants

)
)
)
)
)
)
)
)
)
)
)
)

Case No: 1:07-CV-01601

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for LEO KELLY, a plaintiff in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)     The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)     The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

2

compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)  FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

(7)  Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)  The entries in the General Indices fall into two categories:

(a)  "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

(b)  "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)  In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system

3

consists of the following three automated applications that support case management functions

for all investigative and administrative cases:

   (a)  Investigative Case Management:  This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads.  A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed.  The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation.  Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

   (b)  Electronic Case File:  This application serves as the central electronic repository for the FBI's official text-based documents.  It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system.  All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

   (c)  Universal Index:  This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases.  Only the Office of Origin is required to index.  However, the Lead Offices may index additional information as needed.  The Universal Index, which consists of an index of approximately 99.6 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases.  Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program

5

application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)    If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a close date of birth or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)    There are four stages involved in the completion of an individual name check: batch processing, name searching, file review, and dissemination. The first stage in the process, batch processing, involves the transfer of the name check requests from USCIS to the NNCPS on magnetic tapes. Each tape can hold up to 10,000 names. (Some requests are transmitted via facsimile or verbally via telephone.) The tapes are uploaded into an FBI system and the names are electronically checked against the FBI's Universal Index (UNI). Historically, during the batch processing phase, approximately 68 percent of the name checks submitted by USCIS are returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)    The second stage in the process is name searching. For the name check requests that are still pending after the initial electronic check, additional review is required. An

6

FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS.

(15)    The third and fourth stages in the process are file review and dissemination. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(16)    Additional searches against the FBI's Universal Index, additional manual name searches, and/or additional file review of a name check request, depending on the length of time a name check request is pending in the processing queue, may occur periodically during the name check process to ensure that stale information is updated.

(17)    Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

7

(18)    At each stage of processing, the NNCPS generally works on the oldest name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly. However, if an applicant's name check requires a review of numerous FBI records and files, even though that person came in first, the name check may require additional time until all responsive records are located and reviewed.

(19)    The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis. USCIS determines which name checks are to be expedited based on criteria it determines. Once designated as an "expedite," that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the others waiting to be processed.

(20)    Another exception to the first-in, first-served policy is a near-term effort agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by prioritizing "single hit" name checks. This key initiative is explained in paragraph (33) below.

## GROWTH OF THE NAME CHECK PROGRAM

(21)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

(22)    A significant portion of the incoming name checks submitted over the past few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000)

of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45% (~1,512,000) of the total incoming name checks were submitted by USCIS; and in fiscal year 2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS.

## USCIS NAME CHECK REQUESTS

(23)   In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(24)   In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific

9

individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than 6,300 of those resubmitted requests remain pending.

(25)    The FBI's processing of the more than 440,000 residuals has delayed the processing of regular submissions from USCIS. A dedicated team within NNCPS has been assigned to handle only these re-submitted name check requests. To the extent that the team members are working on only these applications, they are unavailable to process the normal submissions.

(26)    There are numerous factors that have contributed to delays in the processing of name check requests. One is the volume of incoming name checks – the total volume of incoming name check requests combined with pending name check requests has historically outpaced the NNCPS's available resources to process this volume. As it concerns submissions by USCIS, for Fiscal Year 2006, USCIS submitted approximately 1,633,000 name check requests, of which approximately 718,000 represented naturalization-related name checks and approximately 658,000 represented adjustment of status-related name checks. As of the end of Fiscal Year 2006, the NNCPS had over 364,600 pending USCIS name check requests, of which over 157,300 represented naturalization-related name checks and over 157,800 represented adjustment of status-related name checks.

(27)    The number of "hits" on a name when it is reviewed may further contribute to a delay in processing a name check request. A "hit" is a possible match with a

name in an FBI record. The number of times the name appears in FBI records correlates to the number of records which require review.

(28)    The processing of common names also contributes to a delay in processing a name check request. The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on. Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records. Common names can often have more than 200 hits on FBI records.

(29)    The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. If the date of the record predates October 1995, the paper record has to be located, retrieved, and reviewed; if the date of the record is later than October 1995, the record text may or may not be available electronically depending on the type of record and whether it has been uploaded electronically. A paper record could be at one of over 265 possible locations across the country. Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. One person's name check may involve locating and reviewing numerous files, all at different physical locations. Each request must be communicated internally from the NNCPS to the field, and handled according to the current priorities of the particular field office. Since it is a paper based process, it is a process subject to misplaced or misfiled files. The process is time consuming and labor intensive.

11

(30)   Another contributing factor which was briefly mentioned earlier in this declaration is the expedited request. Processing an expedited case means that an employee is not available to work on a normal name check request.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(31)   The FBI is seeking a number of improvements to its process. Over the short-term:

(32)   NNCPS is continuing to develop the Name Check Dissemination Database ("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

(33)   NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks. For example, the FBI and USCIS have implemented a key initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name Check requests, that is, pending name check requests that have only one FBI file potentially identified with it that needs to be reviewed in order to process the request. By applying contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the pending USCIS name check workload.

(34)   The FBI is in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee

12

can begin to significantly impact the NNCPS workload. These efforts have led to the development of a name check employee training manual.

(35)    NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database. It is also building an Electronic Records System that allows for future automation of the name check process.

(36)    NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(37)    As a mid-term improvement, NNCPS is exploring technology updates to the name check process. Specifically, the FBI procured textual analysis software in order to investigate ways to further automate the name check process. The goal is to incorporate analytical software applications that reduce the time spent to verify the identity of the individual and, once verified, assists in the adjudication analysis. This type of automation should decrease the time required to process a name check, thereby increasing production. The FBI is building a proof of concept system for eventual integration into the FBI's core databases.

(38)    As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. Currently, paper files/information must be retrieved from over 265 locations throughout the FBI. The Central Records Complex will address this issue, creating a central repository-scanning of documents, and expediting access to information contained in billions of documents that are currently manually accessed in locations around the United States and world. In addition, the essential long term improvement for FBI Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check

services. Once in place, the FBI will be able to scale resources proportionally with workload demands – pending name checks will pay for themselves. At this time fees do not cover the basic costs of providing the service. Therefore, the FBI cannot adequately apply resources to processing name checks without pulling critically needed personnel and funding from other programs. The FBI procured services to conduct a study to determine an appropriate fee structure. The independent contractor hired to conduct the study has completed its work and the proposed fee structure is undergoing the Federal rulemaking process.

(39)    For the reasons stated earlier, the FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited at the request of USCIS, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of expedited name checks the analyst must process for, among others, military deployment, "age-outs," sunset provisions such as Diversity Visa cases, compelling reasons such as critical medical conditions, and loss of Social Security or other subsistence; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. Unfortunately, the proprietary software NNCPS utilizes to process name checks does not report where in the processing queue a particular name check request may lie vis-à-vis other name checks. Additionally, until review of each case is undertaken no estimate for the time required to complete it can even be attempted, no estimate can be made as to when the plaintiffs' cases will be reached by NNCPS staff, nor can any reliable estimate be made as to how long it will take to

. 14

complete the review once it has begun. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

(40)    It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

## PLAINTIFF'S NAME CHECK REQUEST

(41)    The name check request for plaintiff LEO KELLY was received by the FBI from USCIS on or about August 24, 2004 and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with the procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _29th_ day of October 2007.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

NOV 1 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S DISTRICT COURT

TAO LUO, *et al.*,                      )
                                        )
      **Plaintiffs,**                )
                                        )
v.                                      )   **Civil Case No. 07-0395 (RJL)**
                                        )
PETER D. KEISLER[*], *et al.*,          )
                                        )
      **Defendants.**                )

<u>**MEMORANDUM OPINION**</u>
(November 9, 2007) [#5]

Plaintiffs, Tao Luo, his wife Peng He, and their minor child Mengming Luo, bring

this action to compel defendants, the Department of Homeland Security ("DHS"), the

United States Customs and Immigration Services ("USCIS"), and the Federal Bureau of

Investigation ("FBI"), to approve pending Form I-485 applications for adjustment of

status to become lawful permanent residents. Currently before this Court is defendants'

motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim

upon which relief can be granted. For the following reasons, the Court GRANTS

defendants' motion.

---

[*]   Pursuant to Federal Rule of Civil Procedure 25(d)(1), Acting Attorney General Peter D.
Keisler is automatically substituted for former Attorney General Alberto R. Gonzales as a
defendant in this case.



**BACKGROUND**

Plaintiffs, nationals and citizens of China, filed the Complaint in this action on February 23, 2007, seeking to compel defendants to adjudicate plaintiffs' Form I-485 Application to Adjust Status to Permanent Resident (the "Application" or "Form I-485"). (Compl. ¶¶ 2, 7.)  The Application, filed on August 12, 2004, with the Vermont Service Center, USCIS, remains pending, as plaintiffs' national security background checks and plaintiff Tao Luo's name check have not been completed.[1]  (*Id.* ¶ 10; Mot. Dismiss at 2.) Plaintiffs claim that defendants have unreasonably delayed and have refused to adjudicate plaintiffs' Form I-485 applications.  (Compl. ¶ 16.)

**ANALYSIS**

*I.  Legal Standards*

Under Rule 12(b)(1), "the plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence." *Lindsey v. United States*, 448 F. Supp. 2d 37, 42 (D.D.C. 2006) (quoting *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006)).  "The [C]ourt, in turn, has an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Id.* at 42-43 (alteration in original) (quoting *Abu Ali v. Gonzales*, 387 F. Supp. 2d 16, 17 (D.D.C. 2005)).

---

[1]  Plaintiff Peng He's name check was completed on March 3, 2005. (Mot. Dismiss at 2.)

## II. Subject Matter Jurisdiction under the Immigration and Nationality Act

The Immigration and Nationality Act ("INA") grants exclusive discretion to the Attorney General[2] to adjudicate adjustment of status applications.[3]  8 U.S.C. § 1255(a). Specifically, the statute provides that "no court shall have jurisdiction to review . . . any judgment regarding the granting of relief" of an adjustment of status or "any other *decision or action* of the Attorney General or the Secretary of Homeland Security [that is] in the discretion of the Attorney General or the Secretary of Homeland Security."  8 U.S.C. § 1252(a)(2)(B) (emphasis added).  Defendants argue that this provision, 8 U.S.C. § 1252(a)(2)(B)(ii), divests this Court of subject matter jurisdiction because it commits the entire application process to the discretion of the Attorney General.  Plaintiffs argue that the application process itself is not a "decision or action," and therefore, the discretion of the Attorney General does not extend to the timing of application processing.

Courts addressing this issue of whether § 1252(a)(2)(b)(ii) applies to the pace of processing adjustment of status applications have reached different conclusions.  Some, for example, have concluded for a variety of reasons that federal courts have no jurisdiction to review the pace at which adjudication occurs.  *See, e.g., Serrano v. Quarantillo*, 2007 WL 1101434, at *3 (D.N.J. Apr. 9, 2007) (holding that "[b]ecause the

---

[2]  Although the text of § 1255(a) gives the Attorney General the authority to adjudicate adjustment of status applications, that authority has been transferred to the Secretary of Homeland Security and his delegate in USCIS.  *See* 6 U.S.C. § 271(b)(5); 6 U.S.C. § 557.

[3]  8 U.S.C. § 1255(a) provides that "[t]he status of an alien . . . may be adjusted by the Attorney General, *in his discretion* and under such regulations as he may prescribe, to that of an alien

pace of processing an adjustment application comprises a part of USCIS's 'action,' and because USCIS has discretion over such actions, there is no jurisdiction over plaintiff's complaint"); *Li v. Chertoff*, 482 F. Supp. 2d 1172, 1178 (S.D. Cal. 2007) (holding that "as long as USCIS is making reasonable efforts to complete the adjudication, the pace required to complete that process is committed to USCIS's discretion"); *Grinberg v. Swacina*, 478 F. Supp. 2d 1350, 1353 (S.D. Fla. 2007) (holding that Congress intended to include the pace of processing an adjustment of status application within the Attorney General's discretionary function).  Others, for a variety of reasons, have concluded the opposite.  *See, e.g.*, *Koren v. Chertoff*, 2007 WL 1431948 at *4 (D. Conn. May 14, 2007) (holding that committing the pace of adjudicating adjustment applications to the Attorney General's discretion, such that the entire process is out of the court's jurisdiction, is contrary to the general presumption in favor of judicial review); *Dmitriev v. Chertoff*, No. 06-07677, 2007 WL 1319533 at *3 (N.D. Cal. May 4, 2007) (holding that "action" refers to the specific decision to grant or deny an application, not the entire process of reviewing an application); *Linville v. Barrows*, 2007 WL 1544118, at *3 (W.D. Okla. Apr. 19, 2007) (holding that § 1252(a)(2)(B)(ii) does not preclude the court's jurisdiction because the timeliness of the process of adjudicating an adjustment application is not discretionary).  For the following reasons, this Court finds that the analysis applied by Judge Ellis of the Eastern District of Virginia to dismiss a recent case for lack of jurisdiction is the best-reasoned approach and adopts that holding here.  *See Safadi v. Howard*, 466 F. Supp. 2d 696, 699 (E.D. Va. 2006).

---

lawfully admitted for permanent residence." 8 U.S.C. § 1255(a) (emphasis added).

In *Safadi*, Judge Ellis first found that the plain meaning of the word "action" in §
1252(a)(2)(B)(ii) includes any acts within the adjustment of status process (not just the
final determination), including the completion of background and security checks and the
pace at which the process proceeds. *Safadi*, 466 F. Supp. 2d at 699 (noting definition of
"action" is "an act or series of acts") (citing Black's Law Dictionary 28 (6th ed. 1990)).
Moreover, he concluded that limiting the term "action" to encompass only a final
decision "fails as it would impermissibly render the word 'action' superfluous" in the
phrase "decision or action." *Id.* at 700.

Further, Judge Ellis found that the absence of statutory time limits imposed by
Congress suggests that Congress intended to include the pace of the process as part of its
broad grant of discretion to the Attorney General in such matters. *Id.* at 699. "If
Congress had intended for the pace of adjudication of adjustment applications to be
subject to judicial review, it could have expressly offered a standard with which to
measure the lapse of time." *Zwang v. Chertoff*, 2007 WL 1753538, at *4 (W.D. Va. Jun.
19, 2007) (citing *Grinberg v. Swacina*, 478 F.Supp.2d 1350, 1352 (S.D. Fla.2007)
(same). Finally, and most importantly, the *Safadi* court noted that given the national
security implications of immigration regulation, the broad discretion afforded the
Attorney General permits the agency to adjudicate applications *only* after conducting a
careful and thorough investigation. *See Safadi*, 466 F. Supp. 2d at 701. Thus, in this
context, the Court's insertion into that process would be inappropriate and could be
detrimental to national security.

As such, because the pace of processing a status application constitutes an "action" within the meaning of the INA, it is unreviewable by this Court. Accordingly, plaintiffs' complaint is DISMISSED for lack of subject matter jurisdiction.[4]

## CONCLUSION

For all of the foregoing reasons, this Court GRANTS defendants' motion to dismiss. An appropriate Order consistent with this ruling accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[4] It is important to note that the other statutes invoked by plaintiffs cannot confer jurisdiction upon this Court to address plaintiffs' claims. First, the INA specifically precludes judicial review "notwithstanding any other provision of law," § 1252(a)(2)(B). Moreover, mandamus relief pursuant to 28 U.S.C. § 1361 is available only if defendant owes plaintiff a "clear nondiscretionary duty," *Ganem v. Heckler*, 746 F.2d 844, 852 (D.C. Cir. 1984); *see also Kauer v. Chertoff*, No. 06-765, 2007 WL 1560319 at *9 (D.D.C. May 31, 2007), and, because § 1255(a) prescribes no time limits for review of adjustment of status applications, defendants owe no such duty to plaintiffs. *Safadi*, 466 F. Supp. 2d at 700. Additionally, plaintiffs' claims pursuant to the APA fail because that statute exempts from judicial review an agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Finally, the federal question statute, 28 U.S.C. § 1331, cannot confer subject matter jurisdiction because a specific statutory bar on jurisdiction defeats a general grant of jurisdiction. *See Safadi*, 466 F. Supp. 2d at 700 (quoting *Danilov v. Aguirre*, 370 F. Supp. 2d 441, 445 (E.D. Va. 2005)).

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| DISTRICT OF COLUMBIA | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 2,947 | 3,383 | 3,121 | 3,461 | 3,382 | 3,377 | U.S. | Circuit |
| | Terminations | | 3,458 | 3,305 | 3,365 | 3,101 | 3,159 | 3,291 | | |
| | Pending | | 4,114 | 4,634 | 4,422 | 4,656 | 4,338 | 4,151 | | |
| | % Change in Total Filings | Over Last Year | -12.9 | | | | | | 84 | - |
| | | Over Earlier Years | | -5.6 | -14.9 | -12.9 | -12.7 | | 69 | - |
| | Number of Judgeships | | 15 | 15 | 15 | 15 | 15 | 15 | | |
| | Vacant Judgeship Months** | | .0 | .0 | .0 | 3.1 | 17.1 | 27.4 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 197 | 226 | 208 | 231 | 225 | 225 | 91 | - |
| | | Civil | 159 | 180 | 163 | 184 | 179 | 197 | 86 | - |
| | | Criminal Felony | 25 | 30 | 32 | 35 | 34 | 28 | 92 | - |
| | | Supervised Release Hearings** | 13 | 16 | 13 | 12 | 12 | - | 73 | - |
| | Pending Cases | | 274 | 309 | 295 | 310 | 289 | 277 | 80 | - |
| | Weighted Filings** | | 239 | 272 | 261 | 280 | 271 | 284 | 88 | - |
| | Terminations | | 231 | 220 | 224 | 207 | 211 | 219 | 88 | - |
| | Trials Completed | | 7 | 10 | 15 | 15 | 12 | 12 | 93 | - |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 14.4 | 12.9 | 12.8 | 10.2 | 9.6 | 7.7 | 90 | - |
| | | Civil** | 10.2 | 10.8 | 10.3 | 10.3 | 10.5 | 9.8 | 56 | - |
| | From Filing to Trial** (Civil Only) | | 37.0 | 35.0 | 27.4 | 25.0 | 29.0 | 24.0 | 74 | - |
| OTHER | Civil Cases Over 3 Years Old** | Number | 433 | 468 | 408 | 445 | 359 | 282 | | |
| | | Percentage | 15.1 | 14.1 | 12.8 | 12.7 | 11.1 | 8.6 | 83 | - |
| | Average Number of Felony Defendants Filed Per Case | | 1.4 | 1.5 | 1.5 | 1.3 | 1.4 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 70.60 | 86.63 | 75.49 | 85.69 | 93.32 | 69.99 | | |
| | | Percent Not Selected or Challenged | 47.2 | 53.6 | 50.4 | 56.6 | 55.7 | 51.9 | | |

| 2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2382 | 22 | 35 | 491 | 28 | 21 | 135 | 228 | 209 | 42 | 514 | 61 | 596 |
| Criminal* | 367 | 1 | 106 | 12 | 63 | 78 | 20 | 10 | 2 | 13 | 5 | 26 | 31 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| **TEXAS NORTHERN** | | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 5,646 | 5,895 | 6,560 | 6,985 | 6,591 | 5,991 | U.S. | Circuit |
| | Terminations | | 5,745 | 6,179 | 7,191 | 6,111 | 6,413 | 6,406 | | |
| | Pending | | 4,326 | 4,390 | 4,686 | 5,455 | 4,496 | 4,342 | | |
| | % Change in Total Filings | Over Last Year | | -4.2 | | | | | 46 | 5 |
| | | Over Earlier Years | | | -13.9 | -19.2 | -14.3 | -5.8 | 61 | 8 |
| | Number of Judgeships | | 12 | 12 | 12 | 12 | 12 | 12 | | |
| | Vacant Judgeship Months** | | .0 | .0 | 8.5 | 2.4 | 18.4 | 12.0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 470 | 491 | 547 | 582 | 549 | 499 | 31 | 5 |
| | | Civil | 376 | 399 | 452 | 479 | 462 | 431 | 25 | 3 |
| | | Criminal Felony | 64 | 61 | 66 | 78 | 64 | 68 | 54 | 6 |
| | | Supervised Release Hearings** | 30 | 31 | 29 | 25 | 23 | - | 26 | 3 |
| | Pending Cases | | 361 | 366 | 391 | 455 | 375 | 362 | 54 | 8 |
| | Weighted Filings** | | 493 | 495 | 548 | 581 | 520 | 517 | 32 | 6 |
| | Terminations | | 479 | 515 | 599 | 509 | 534 | 534 | 34 | 5 |
| | Trials Completed | | 24 | 29 | 28 | 27 | 24 | 28 | 24 | 3 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 7.2 | 7.1 | 6.7 | 5.9 | 6.3 | 5.9 | 26 | 3 |
| | | Civil** | 7.4 | 8.6 | 7.4 | 7.2 | 6.6 | 7.1 | 11 | 3 |
| | From Filing to Trial** (Civil Only) | | 20.0 | 20.7 | 21.7 | 18.6 | 18.7 | 23.3 | 21 | 4 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 146 | 49 | 29 | 126 | 69 | 86 | | |
| | | Percentage | 4.3 | 1.4 | .8 | 2.8 | 1.8 | 2.3 | 28 | 4 |
| | Average Number of Felony Defendants Filed Per Case | | 1.5 | 1.6 | 1.5 | 1.5 | 1.7 | 1.7 | | |
| | Jurors | Avg. Present for Jury Selection | 39.54 | 40.42 | 51.06 | 50.46 | 56.30 | 47.80 | | |
| | | Percent Not Selected or Challenged | 36.2 | 34.8 | 43.9 | 54.9 | 54.1 | 52.7 | | |

| 2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 4516 | 187 | 150 | 1759 | 71 | 46 | 189 | 561 | 233 | 312 | 534 | 4 | 470 |
| Criminal* | 767 | 10 | 139 | 154 | 160 | 95 | 48 | 24 | 46 | 35 | 14 | 11 | 31 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."