# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **KELLY, et al.** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 1:07-CV-01601** |
| | ) | |
| **UPCHURCH, et al.** | ) | **JUDGE REGGIE B. WALTON** |
| **Defendants.** | ) | |

## <u>MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Plaintiff hereby moves for Summary Judgment. Summary judgment is appropriate in that more than 20 days have passed since commencement of the action. This matter has not yet been fixed for trial. There are no genuine issues of material fact and the Plaintiff is entitled to judgment as a matter of law.

*/s/ Thomas A. Elliot*
Thomas A. Elliot, Esquire
D.C. Bar No. 259713
Elliot & Mayock, LLP
1666 Connecticut Ave., NW
5th Floor
Washington, DC 20009
(202) 429-1725

*/s/Daniel M. Rudnick*
Daniel M. Rudnick, Esquire
PA Bar No. 201481
Steel, Rudnick and Ruben
1608 Walnut Street, Suite 1500
Philadelphia, PA 19103
(215) 546-4333

Dated: November 27, 2007          Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **KELLY, et al.** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 1:07-CV-01601** |
| | ) | |
| **UPCHURCH, et al.** | ) | **JUDGE REGGIE B. WALTON** |
| **Defendants.** | ) | |

## O R D E R

AND NOW, this _____ day of _____, 2007, upon

consideration of Plaintiffs' Motion for Summary Judgment and Plaintiffs' Memorandum

of Points and Authorities in Opposition to Motion to Dismiss and in Support of Motion

for Summary Judgment, IT IS HEREBY ORDERED THAT:

Plaintiffs' Motion for Summary Judgment is GRANTED and that Plaintiffs'

applications for adjustment of status to permanent residence must be adjudicated within

___ days; Defendant's Motion to Dismiss is hereby DENIED.


_____
HONORABLE REGGIE B. WALTON
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LEO KELLY, et al.                         )
                                          )
            Plaintiffs,                   )
      v.                                  )   CIVIL ACTION NO. 07-1601(RBW)
                                          )
EVELYN UPCHURCH, et al.                   )
                                          )
            Defendants.                   )

MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSTION TO MOTION TO DISMISS AND
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION AND SUMMARY OF PERTINENT FACTS

Defendants have moved to dismiss Plaintiffs' Complaint for want of subject

matter jurisdiction under Federal Rules of Civil Procedure 12(b)(1) and under Federal

Rule 12(b)(6) for failure to state a claim for relief. Contrary to Defendants' Motion, this

Court has jurisdiction and Plaintiffs' have presented a claim for which relief may be

granted. Further, Plaintiffs are entitled to summary judgment as a matter of law based on

the uncontraverted facts as set forth in the attached Motion for Summary Judgment.

The material facts in this matter are not in dispute. The facts are set forth in detail

in the complaint. Briefly, Plaintiffs are citizens of the United Kingdom who applied for

adjustment of status to lawful permanent residence on August 6, 2004. The applications

for permanent residence are based on an approved Immigrant Petition for Alien Worker

from Solae, LLC. which established that Mr. Leo Kelly is a multinational executive and

manager, the highest priority worker, pursuant to Section 204(a)(1)(F) of the Immigration

and Nationality Act ("INA"), 8 U.S.C. §1154(a)(1)(F).

While the standard processing time for like applications with the Texas Service Center is six months according to USCIS, Exhibit 1, the government attorney obfuscates the issue by claiming that USCIS is operating under a "first in, first out" policy and that Plaintiffs have simply failed to wait their turn.  Defendant's Memorandum of Law in support of Motion to Dismiss or in the Alternative to Transfer (hereinafter "Def's Memo") at 6, 21. However, under such a regime, Plaintiffs' applications would have been adjudicated in early March 2005.  Thus, many, many applicants have effectively jumped ahead of Plaintiffs, whose applications have now been pending more than 32 months beyond that of like applicants.

The government applies similar logic to Plaintiffs' long pending "name-checks," admitting that the FBI has taken no action with regard to the name-checks and claiming that Plaintiffs' only recourse is to wait in the queue to see if and when the FBI sorts through its backlog and reviews Plaintiffs applications.  Def's Memo of Law at 6, 21. The government attorney's assertions regarding the purported "first in, first out" policy are belied by the FBI's own admission that they are not truly operating under a "first in, first served protocol." See Cannon Decl. at ¶ 18 ("if an applicant's name check requires review of numerous FBI records and files, even though that person came in first, the name check may require additional time until all responsive records are located and reviewed").

Meanwhile, despite Defendants insistence otherwise, the more than three year long "name check" process that is stifling Plaintiffs' applications is in not a legal prerequisite to the issuance of permanent residence.  USCIS is statutorily required to capture the applicant's fingerprints and biometrics.  See Act August 26, 1994, P.L. 103-

317, Title V, §506(d), 108 Stat. 1766, which provides that "the Immigration and

Naturalization Service (now USCIS) shall conduct full *fingerprint identification checks*

through the Federal Bureau of Investigation for all individuals over 16 years of age

adjusting immigration status in the U.S. pursuant to this Section. (Amending the Section,

8 U.S.C. §1182, and §1182 n.)" (emphasis mine). This is the only security check

mandated by Congress.

     However, USCIS has, since 2002, conducted additional security checks that are

not statutorily required. The FBI fingerprint checks (biometrics) are not at issue in this

matter. What is at issue are the additional FBI name checks which are not required by

statute. In this vein, USCIS has admitted that "Plaintiff's FBI name check is pending,"

and that "[a] response is required from the FBI before the case can be adjudicated."

Vaughan Decl. ¶ 19. As further explained in the FBI's declaration, the name check is

totally different from the FBI fingerprint check. Cannon Decl. at ¶¶ 22-30.

     While some cases involve complex and highly sensitive information, the

government has failed to supply any evidence of an ongoing investigation into Mr. Leo

Kelly or his derivative family members. To the contrary, the Declarations attached to the

government's motion fail to provide any evidence justifying the more than three-year

long delay of Plaintiffs' individual applications. Moreover, they fail to state what, if any,

*action* is being taken with regard to Plaintiffs' security clearances. According to the FBI,

Plaintiff Leo Kelly's name check request was submitted on August 24, 2004. Cannon

Decl. at 41. However, the FBI fails even to state where the "name check" files are, what

action is being taken to complete the name check, or to state any extraordinary

circumstances that justify the delay of this name check while hundreds of thousands of

adjustment applicants who filed at much later dates have seen their applications adjudicated. Id.

While the FBI's boilerplate response fails to provide any pertinent information relating to this adjudication, the FBI does complain that it is overburdened by USCIS' requests and that they have been overtaxed by USCIS' commitment to the failed name-check policy. Cannon Decl. at ¶ 22-30. The FBI further admits that the name check program is deeply flawed and cites a number of initiatives which are needed to improve it. Cannon Decl. at ¶ 31-39. Further highlighting that it is FBI inaction that has paralyzed the adjudication of Plaintiffs' case, is the FBI's final admission that "the FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS." Cannon Decl. at ¶ 39

Thus, the government provides no assurance that the FBI name check will ever be completed. It is Defendants' position that no timeframe applies and that Defendants are under no obligation to ever complete the name check or adjudicate Plaintiffs' applications. Def's Memo at 15. Thus, Defendants' contend that Plaintiffs can be relegated to bureaucratic limbo indefinitely, if not forever. Id. This extreme assertion of executive authority is, as set forth below, contrary to the Administrative Procedures Act, as well as concepts of separation of powers. See Pinho v. Gonzales, 432 F.3d 193, 202 (3rd Cir. 2005).

## II.    STANDARD OF REVIEW FOR MOTION TO DISMISS

It is axiomatic that in the context of the Motion to Dismiss, Plaintiffs' allegations are taken as true and all ambiguities or doubts are resolved in favor of the pleader. Def's Memo at 9 (citations omitted). However, the Defendants appear to assert that the Court

may go beyond the allegations of the Complaint. Def's Memo at 3-7. The government

implicitly argues that the Court may take judicial notice of these records without

converting the Motion into one for summary judgment. Id. Surely, these Declarations do

not come under judicial notice. In any event, it is agreed that the Court may consider

undisputed facts in the record in deciding the Motion.

## III.    ARGUMENT

### a. THE COURT POSSESSES JURISDICTION OVER THE SUBJECT MATTER OF PLAINTIFFS' CAUSE OF ACTION

The Immigration and Nationality Act (hereinafter the "INA"), does not provide

Defendants unfettered discretion to indefinitely withhold adjudication on Plaintiff's

application for adjustment of status to permanent residence. As a result, Defendants'

arguments that the Court lacks subject matter jurisdiction due to the discretionary

language of INA § 245(a), 8 U.S.C. §1255(a), and the lack of a specified timeframe for

the adjudication therein, are unavailing.

In these cases, the government has advanced essentially four arguments which

have proven to be inapposite in the vast majority of cases, including a persuasive decision

from within this judicial district. First, Defendants' have advanced the untenable

interpretation that 8 U.S.C. §1252(a)(2)(B)(i) strips the Court of jurisdiction because

Defendants' have made a "judgment" regarding the "relief" to be accorded to Plaintiffs

under §1255(a). This argument is belied by the plain language of the jurisdiction

stripping statute which applies only to actions or judgments regarding the issuance of

relief. As several courts point out, a refusal to act is not tantamount to an administrative

"judgment" regarding the relief to be conferred under §1255(a). In this vein, Defendants'

construction of 8 U.S.C. §1252(a)(2)(B)(i) is at odds with the weight of federal court authority interpreting this section.

Second, the government has proffered the argument that the Attorney General, who has delegated the authority to adjudicate applications for adjustment of status to permanent residence to U.S. Citizenship and Immigration Services (USCIS), has the discretion to permanently withhold the determination of an alien's application for permanent residence under the adjustment of status statute, 8 U.S.C. § 1255(a), and therefore the prohibition on judicial review of discretionary decision-making of 8 U.S.C. §1252(a)(2)(B)(ii) bars judicial review.

However, innumerable district courts in this jurisdiction have rejected this argument, taking a limiting construction of § 1252(a)(2)(B)(ii) in keeping with Third Circuit precedent. These courts have held that the government lacks the discretion to indefinitely withhold the adjudication of an application for adjustment of status because it would provide Defendants a blank check to abuse intending immigrants in the face of the plain command of §706 of the Administrative Procedures Act, which mandates that a plaintiff may "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §706(1). These courts have reasoned that while Defendants may exercise their discretion under 8 U.S.C. § 1255(a) in determining whether an application for adjustment of status to permanent residence should be approved, albeit this discretion is narrowly channeled by Defendants' own regulations and interpretive guidance documents, they are not afforded the discretion to withhold the adjudication of Plaintiffs' applications for permanent residence or to indefinitely delay such adjudication.

Third, the government has argued that their failure to act under 8 U.S.C. §1255(a) represents a discretionary decision not to undertake enforcement action which is unreviewable pursuant to 8 U.S.C. §1252(g). Read in context, §1252(g) merely prohibits plaintiffs from pursuing civil actions to initiate removal proceedings or regarding administrative judgments in the context of removal proceedings in keeping with the long standing principle that an agency's decisions with regard to enforcement action is outside the bailiwick of judicial review. As Plaintiffs are not seeking the initiation of, or review of, enforcement action in the course of removal proceedings, but rather Plaintiffs' are seeking a court order to compel Defendants' to adjudicate his application administratively, this section is wholly inapposite to this action.

Fourth, the government contends that the discretionary language of 8 U.S.C. § 1255(a) divests the courts of jurisdiction under both the Mandamus statute, 28 U.S.C. § 1361, and the Administrative Procedure Act (APA). However, Defendants are under a mandatory ministerial duty to complete processing on Plaintiffs' applications and therefore mandamus relief is appropriate. Similarly, Defendants' failure or refusal to act is not an action committed to their discretion by law and therefore Plaintiffs have a right under the APA to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. §706(1).

Moreover, the majority rule is that a more than two year delay in adjudicating an application for adjustment of status constitutes an extreme agency delay which is patently unreasonable, especially in light of the agency's standard processing times and in light of the fact that Defendants have failed to supply any justification for the prolonged delay while similarly situated applicants are seeing their applications adjudicated within six

months. As a result, under the undisputed facts of this case, Plaintiffs' are entitled to an order from this Honorable Court compelling Defendants to complete the adjudication of Plaintiffs' applications for permanent residence forthwith or at least within 30 days of the Court's order.

### i. Statutory Framework

The government unduly fixates on certain language in §245 of the INA, 8 U.S.C. §1255 (hereinafter referred to as §245), noting that the ultimate relief of adjustment of status is discretionary and that there is no timeframe for the adjudication specified in the statute. Omitted from this discussion is the Administrative Procedures Act. The Administrative Procedures Act provides for judicial review of agency action at 5 U.S.C. §701(a) except where a statute precludes judicial review or agency actions are committed to agency discretion by law. As shown below, both of these narrow exceptions are inapposite to the current action.

Plaintiffs seek judicial review under §701 and under §706 of the APA which address the scope of review. Section 706 authorizes judicial review over relevant questions of law and the meaning or applicability of the terms of agency action. Under this section, this Honorable Court is authorized to compel agency action "unlawfully withheld or unreasonably delayed." §706(1). Further, the APA announces a right to review for any person suffering legal wrong because of agency action. 5 U.S.C. §702. Agency action is defined to include agency rule, order, license, sanction, relief or the equivalent or denial thereof, or **failure to act.** 5 U.S.C. §551(13) (emphasis added). Thus, the Administrative Procedures Act authorizes judicial review of an agency's failure

to act where that action is unlawfully withheld or unreasonably delayed and where an individual is wronged by agency inaction.

Additionally, the APA provides:

"With due regard for the convenience and necessity of the parties or their representatives and **within a reasonable time** (emphasis added), each agency shall proceed to conclude a matter presented to it." 5 U.S.C. §555(b).

Thus, in the absence of a specified duration for agency action within a given authorizing statute, the APA clearly imputes a reasonableness requirement for agency action: requiring the agency to complete action within a reasonable period and providing a private cause of action for the agency's failure to act within a reasonable timeframe.

Section 245 of the INA and the implementing regulations at 8 C.F.R. §245(a)(1) and (2) provides a mechanism for an individual lawfully present in the U.S. to apply to change status to that of a lawful permanent resident. Lawful permanent residence confers substantial benefits to an individual including the right to reside indefinitely and to work in the United States. *See* §101(a)(20) of the INA, 8 U.S.C. §1101(a)(20). In addition, after five years of permanent residence, an individual can apply for U.S. citizenship. *See,* §316(a) of the INA, 8 U.S.C. §1427(a). Clearly, the deprivation of permanent residence status results in significance disabilities to the applicant.

Finally, before turning to the government's jurisdictional claims, it should be noted that simply because §245 does not have a specific timeframe, and that the ultimate action on the application is discretionary does not mean that Congress intended that the government could indefinitely delay adjudication of the application. There is no indication of such intent in the statute or implementing regulations. To the contrary, the statute is silent with regard to the timeframe. The Administrative Procedures Act

therefore provides the timeframe. The timeframe is one of reasonableness. 5 U.S.C. §555(b) and §706(1). Thus, while the INA is silent as to the processing time, the APA supplies ample authority for the Court to determine whether the agency's action is reasonable.

### ii. Section 1252(a)(2)(B)(i) Does Not Strip The Court Of Jurisdiction

The government's argument that 8 U.S.C. §1252(a)(2)(B)(i) strips the Court of jurisdiction because Defendants' have made a "judgment" regarding the "relief" to accorded to Plaintiffs under §1255(a) is belied by the plain meaning of this statute. Compare 10 Def's Memo at 10 (where Defendants' telling cite no authorities for the proposition that §1252(a)(2)(B)(i) strips the court of jurisidiction and limit their analysis to a solitary paragraph) with Cao v. Upchurch, 496 F.Supp.2d 569, 572 (ED.PA. July 16, 2007) (providing a reasoned analysis as to why §1252(a)(2)(B)(i) is inapplicable here). For this reason, Plaintiffs' counsel have been unable to locate a single authority that has deprived federal courts of judicial review under this section.

Pursuant to 8 U.S.C. § 1252(a)(2)(B)(i) federal courts lack jurisdiction to review "any *judgment* regarding the *granting of relief* under §212(h), §212(i), §240A, §240B, or §245." 8 U.S.C. §1252(a)(2)(B)(i) (emphasis mine). Beginning with the plain meaning of this language, this section is clearly inapplicable to any decision other than one regarding the granting of relief. The failure to take any action on an application is in no way a "judgment regarding the granting of relief." A "judgment regarding the granting of relief" would be the grant or denial of Plaintiffs' applications. A failure to act is not a judgment regarding the granting of relief. That much is clear from the statute.

For this reason, in <u>Cao v. Upchurch</u>, 496 F.Supp.2d 569, 572 (ED.PA. July 16, 2007), Judge Stewart Dalzell, citing the everyday usage of the word "judgment," concluded that §1252(a)(2)(B)(i) is not implicated in the instant case because the government's failure to act is not a conscious decision or "a deliberate opinion" not to act, but rather is a lack of judgment. Applying common cannons of statutory construction, Judge Dalzell further reasoned that the government's avoidance of its duties could not be fairly characterized as a deliberate decision "regarding the granting of relief." <u>Id</u>.

The federal courts appear to be unanimous on this point, as Plaintiffs have been unable to locate any authority in or outside of this judicial district that supports the notion that §1252(a)(2)(B)(i) strips mandamus and federal question jurisdiction to compel the agency to act on long ignored applications for adjustment of status to permanent residence.

### iii. Section 1252(a)(2)(B)(ii) Does Not Strip The Court Of Jurisdiction

For similar reasons, the majority rule, including a highly persuasive decision emanating from within this district, is that 8 U.S.C. § 1252(a)(2)(B)(ii) does not strip the federal courts of jurisdiction. <u>Liu v. Novak</u>, 509 F.Supp.2d 1, 4-7 (D.D.C. Aug. 30, 2007) (J. Emmet Sullivan). Pursuant to § 1252(a)(2)(B)(ii), federal courts are debarred from reviewing a "decision or action of the Attorney General…**the authority for which is specified under this title** to be in the discretion of the Attorney General." 8 U.S.C. § 1252(a)(2)(B)(ii) (emphasis mine).

Recently, Judge Emmet Sullivan addressed the government's argument that subject matter jurisdiction is withdrawn by §1252(a)(2)(B)(ii) due to the "discretion" granted to the Attorney General by the Adjustment of Status statue, 8 U.S.C. § 1255(a) in

Liu v. Novak, 509 F.Supp.2d at 4-7 (D.D.C. Aug. 30, 2007). Citing the Supreme Court's mandate that there is a "strong presumption in favor of judicial review" over immigration matters, INS v. St Cyr, 533 U.S. 289, 298 (2001), the Judge Sullivan agreed with a leading decision from the Western District of Pennsylvania that 8 U.S.C. § 1252(a)(B)(2)(ii) "is to be read narrowly." Liu v. Novak, 509 F.Supp.2d at 5 (quoting Duan v. Zamberry, 2007 WL 626116, 2 (W.D.Pa. Feb. 23, 2007 (J. Ambrose)).

Applying the narrow reading of §1252(a)(2)(B)(ii) prescribed by the Supreme Court, Judge Sullivan noted that the discretionary decision bar on judicial review does not apply to the timing of the adjudication under the adjustment of status statute because 8 U.S.C. § 1255(a) does not specifically confer the Attorney General with discretion to indefinitely delay the adjudication of an application for adjustment of status. Id. at 6. The language of the adjustment of status statute reads in relevant part:

> The status of an alien…may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

Accordingly, while the ultimate decision to grant or deny adjustment of status is vested in the discretion of the Attorney General who may channel that authority through regulations, the obligation to make a decision is not. This drove Judge Sullivan to concur with Judge Amrose of the Western District of Pennsylvania, that the adjustment statute:

> specifies only that it is within the discretion of the attorney general to adjust one's statute it does not address much less specify any discretion associated with the pace of application processing. Liu v. Novak, 509 F.Supp.2d at 6 (quoting Duan v. Zamberry, 2007 WL 626116, 2 (W.D.Pa. Feb. 23, 2007 (J. Ambrose)).

While the D.C. Circuit has yet to speak directly on this issue, Judge Sullivan did not

reach this decision in a vacuum. Instead, he was guided by the reasoning of several

persuasive authorities from other judicial circuits. Id. at 7 (citing Batista v. INS, 2000 WL

204535, 2 (S.D.N.Y. Feb. 22, 2000), ElMalky v. Upchurch, 2007 WL 944330, 5

(N/D.Tex. Mar. 28, 2007); Kim v. Ashcroft, 340 F.Supp.2d 384, 389 (S.D.N.Y. 2004);

Nyaga v. Ashcroft, 186 F.Supp.2d 1244, 1252 (N.D.Ga. 2002); Paunescu v. INS, 76

F.Supp.2d 896, 900 (N.D.Ill.1999) ("Plaintiffs do not ask this court to 'review' a

governmental action, but to examine and rectify a gross inaction"); and Iddir v. INS, 301

F.3d 492, 497-98 (7th Cir.2002) (citing Nyaga and Paunescu with approval).

As in Liu and Duan, the government chiefly relies on a District Court decision

from within the Eastern District of Virginia: Safadi v. Howard, 2006 WL 3780417

(E.D.Va.). Judge Sullivan, in complete harmony with Judge Ambrose, found the

reasoning of this case to be wholly unpersuasive. See Id. at 7; Duan, 2007 WL 626116 at

3.

Both the Liu and Duan Courts specifically addressed the reasoning of the

government's cited cases as embodied in Safadi and rejected this logic as an unnecessary

grant of unfettered discretion to the government which would enable Defendants'

continued abuse of adjustment of status applicants.

Deconstructing Safadi, Judge Sullivan expressed grave doubt as to whether the

agency's failure to take action could rightfully be described as in fact a series of

conscious decisions not to act. Judge Sullivan explained:

> The Court is not persuaded by the 'plain meaning' argument in Safadi, clever
> though it may be. The court in Safadi artfully made the argument that the inaction
> at issue here is in fact a series of unspecified, affirmative, discretionary actions.
> 466 F.Supp.2d at 699. Plaintiff, however, is not challenging any of those discrete

actions, and the government has not even specified what steps it has taken in processing plaintiff's particular application. Id. at 7 (citing the fact that the defendants had failed to show that they were following any of the procedures provided in 8 C.F.R. § 103.2(b)(18) which requires the government to periodically take specified actions).

In this vein, while Defendants have provided two boilerplate declarations which broadly outline the "name check" policy, they have failed to state what, if any, action is being taken with regard to Plaintiffs' individual applications. According to the FBI, Plaintiff Leo Kelly's name check request was submitted on August 24, 2004.  Cannon Decl. at 41. However, the FBI fails even to state where the "name check" files are, what action is being taken to complete the name check, or to state any extraordinary circumstances that justify the delay of this name check while hundreds of thousands of adjustment applicants who filed at much later dates have seen their applications adjudicated. Id. It is clear that Defendants have failed to show that they have commenced any of the actions prescribed by 8 C.F.R. § 103.2(b)(18).

For this reason, the Duan Court rejected Safadi, because the Safadi decision failed to "address the existence of jurisdiction in the case of refusal to process an application, or a delay so unreasonable as to be tantamount to a refusal." Duan, 2007 WL 626116 (citing Safadi v. Howard, 2006 U.S. Dist. LEXIS 92722, 11 (E.D.Va. Dec., 2005)). The Duan Court recognized that when, as here, Defendants have refused to act on an application for adjustment of status for an unreasonable period, in this case more than three years, it cannot be reasonably construed that these failings constitute "action" for the purposes of §1252(a)(2)(B)(ii). Id. at 3.

Moreover, Judges Sullivan and Ambrose noted that Defendants' all encompassing construction §1252(a)(2)(B)(ii) conflicts with the plain command of the APA and thereby

the Court refused to adopt Defendants' construction which rendered Section 706 of the

APA nugatory.  Liu, 509 F.Supp.2d at 7; Duan, 2007 WL 626116, 3 (W.D.Pa.). In

summary, Judge Ambrose reasoned:

> In other words, to read the jurisdiction-stripping statute as did the Safadi court
> would render toothless all timing restraints, including those imposed by the APA
> and addressed below. ***Such a result would amount to a grant of permission for
> inaction, and a purposeful disregard of the potential for abuse thereof, on
> immigration matters. I will not, therefore, follow the line of reasoning
> represented by Safadi***. Instead, I find that Section 1252(a)(2)(B)(ii) does not
> divest this Court of jurisdiction over the Plaintiff's claims. Id. (Emphasis Mine,
> Footnote Omitted).

That is precisely what Defendants attempt here, to render 5 U.S.C. §706 wholly

inoperable based on the untenable construction that a complete failure to act qualifies

Defendants for immunity from judicial review under Section 1252(a)(2)(B)(ii).

Plaintiffs' urge this Court to follow the well reasoned decisions in Liu and Duan

which are consistent with circuit precedent. As indicated by Judges Sullivan and

Ambrose, Plaintiffs' position is wholly in keeping with the better rule of law.

### iv.  **Section 1252(g) Does Not Preclude Jurisdiction**

Read in context, 8 U.S.C. §1252(g) does not prohibit judicial review of

defendants failure to make a decision or to take action on Plaintiffs' application for

permanent residence. Liu, F. Supp.2d at 7-8. It is extremely important to read §1252(g) in

its entirety.  That section states, in relevant part, that "no Court shall have jurisdiction to

hear any cause or claim by or on behalf of any alien arising from the ***decision*** or ***action***

by the Attorney General to ***commence proceedings, adjudicate cases or execute removal***

***orders against*** the alien under this Act." 8 U.S.C. §1252(g) (emphasis mine). From this,

it is apparent that Congress intended this provision to apply solely to removal

proceedings and not to administrative adjustment of status.

The entire context and the words "commence proceedings" indicate the nature of the matters exempted. Id. This is a prohibition on outside intervention compelling Defendants to initiate removal proceedings and to undertake enforcement actions. In such cases, a plaintiff's standing is tenuous at best and decisions whether or not to take enforcement action involve a complex balancing of many factors which are peculiarly within the province of the agency. Heckler v. Chaney, 470 U.S. 821 (1985). Meanwhile, Plaintiffs did not initiate this suit to compel Defendants to make a decision to commence enforcement action, but instead is requesting that the agency fulfill its mandatory duty to adjudicate his application for permanent residence within a reasonable period.

In this regard, the decision in Serrano v. Quarantillo is clearly inapposite to this action. No. 06-2007 W.L. 1101434 (Dist. NJ Apr. 9, 2007). Serrano specifically holds that because an application for adjustment of status is not part of any deportation process, §1252(g) does not apply. This conclusion is clearly correct. The government also generally relies on Reno v. American-Arab Anti-Discrimination Commission, 525 U.S. 471, 482 (1999) which was, of course, a removal proceeding. Section 1252(g) was enacted in response to the American-Arab case to stop litigation which challenged the Department of Homeland Security's prosecutorial discretion in deportation proceedings. Plainly, that matter has no application to administrative adjustment of status which is entirely outside the context of deportation or removal.

It is important to note that the Reno decision involved a judicial injunction against deportation proceedings. The Court in Reno held that §1252(g) applied only to three discrete actions that the Attorney General may take in a deportation or removal case. Reno, 525 U.S. at 482. The Court made clear that the three discrete events were not a

shorthand way of referring to all claims arising from deportation proceedings, let alone administrative proceedings. The Court found a narrow reading of §1252(g) to be appropriate. Id. at 487. Of course, Reno involved a challenge to the Attorney General's decision to commence proceedings and clearly fell under §1252(g). Further, the concern addressed by §1252(g) is delay. Id. at 490. That is, that the alien will delay deportation proceedings through an attempt to enjoin deportation proceedings. This concern, of course, has no application to this matter.

It is clear that the Reno decision does not supply the basis for a jurisdictional preclusion.

Moreover, even if the section applied to administrative proceedings, Plaintiffs are not challenging a *decision* or *action* by the Attorney General. What Plaintiffs are challenging is the *lack* of a *decision* or *action*. Arguably, the phrase "adjudicate cases" would apply. However, reading the statute as a whole, as opposed to taking that phrase out of context, it is clear that the adjudication of cases that is referred to is in deportation proceedings as explained above. Further, assuming the statute's applicability to administrative proceedings, once again, jurisdiction is not withdrawn with regard to a lack of decision or lack of action in adjudicating cases.

The government also generally relies on Gomez-Chavez v. Perryman, 308 F.3d 796 (7th Cir. 2002). Gomez-Chavez involved removal proceedings. Gomez-Chavez was subject to a reinstated removal order. Clearly, the action taken was a decision to execute a removal order. Therefore, the Seventh Circuit found that the plaintiff's claim of inaction was simply re-characterization of a claim challenging their refusal to act. Id. at 800. In other words, Gomez-Chavez challenged the substantive law that prevented him from

applying for a waiver. Id. Plaintiffs, of course, are not in removal proceedings and are not

seeking to re-characterize a substantive argument in terms of failure to act. Gomez-

Chavez is wholly inapplicable.

The government also often relies on Castillo v. Ridge, 445 F.3d 1057 (8th Cir.

2006). However, Castillo was not eligible for adjustment of status until he received a

waiver. Since the INS was not under a non-discretionary duty to grant it, Castillo could

not establish a clear and undisputable right to a favorable adjudication of the application.

Plaintiffs are under no such limitation. There is no argument that he is not fully qualified

for adjustment of status but for the routine security clearance.

Accordingly, it is clear that the jurisdictional bar of §1252(g) do not apply to this

matter.

### v.  Plaintiffs May Compel Defendants to Adjudicate their Applications under the Mandamus Statute and the Administrative Procedure Act

In keeping with the majority rule, Plaintiffs have a justiciable cause of action to

compel Defendants to adjudicate his application for permanent residence both under the

Mandamus statute, 28 U.S.C. §1361, and the APA, 5 U.S.C. §706(1).

Pursuant to 28 U.S.C. § 1361, Plaintiffs are entitled to a writ of mandamus "to

compel an officer or employee of the United States or any agency thereof to perform a

duty owed to the plaintiff." For mandamus jurisdiction to vest, defendants must have a

clear, ministerial, duty to act. Duan, 2007 WL 626116 at 3.

The APA provides a cause of action to "compel agency action unlawfully

withheld or unreasonably delayed." Id. at 4 (citing 5 U.S.C. §706(1)). The APA further

provides that "with due regard for the convenience and necessity of the parties or their

representatives and within a reasonable time, each agency shall proceed to conclude a

matter presented to it." Id. (citing 5 U.S.C. § 555(b)). One exception to this rule is that an aggrieved party may not seek judicial review of action that is specifically "committed to agency discretion by law." Id. (citing 5 U.S.C. § 701(a)(2)).

Several courts have held that "for purposes of compelling action that has been unreasonably delayed the mandamus statute and the APA are coextensive." Cao v. Upchurch, 496 F.Supp.2d 569, 575 (ED.PA. July 16, 2007) (citations omitted).

As with the discretionary bar of 8 U.S.C. § 1252(a)(2)(B)(ii), the government argues that it has no duty to ever adjudicate an alien's application for adjustment of status and that the discretionary language of the adjustment of status statute, 8 U.S.C. §1255(a), allows for unfettered discretion to never adjudicate an application for adjustment of status. Def's Memo at 15. The government maintains, in effect, that it may informally and perpetually bar an applicant from permanent residence by simply refusing to make a determination. Id. If the government possesses infinite discretion to leave an applicant for adjustment of status in perpetual limbo, one wonders what service the government is required to provide in exchange for the very substantial application fee for the application for adjustment of status to permanent residence (Form I-485) which is currently $1,010, a portion of which is funneled directly to the FBI.

In fact, the agency's own interpretation in the *Adjudicator's Field Manual*, which is USCIS' interpretive guidance document of the INA and its implementing regulations, provides further proof that Defendants' themselves recognize that their discretion relates to the content of their decision under 8 U.S.C. 1255(a) and not to their mandatory duty to make a decision in the first place. Exhibit 5 (*Adjudicator's Field Manual* §10.15). In this

regard, the relevant portion of the *Adjudicator's Field Manual* is entitled "Exercise of

Discretion; Uniformity of Decisions" and it reads as follows:

> Although all types of adjudications involve proper application of laws and
> regulations, a few also involve an exercise of discretion: ***adjustment of status
> under section 245 of the Act***, change of status under section 248 of the Act and
> various waivers of inadmissibility are all discretionary applications, requiring
> both an application of law and a consideration of the specific facts relevant to the
> case. An ***exercise of discretion*** does not mean ***the decision*** can be arbitrary,
> inconsistent or dependant upon intangible or imagined circumstances. Although
> regulations can provide guidelines for many of the types of factors which are
> appropriate for consideration, a regulation cannot dictate the ***outcome*** of a
> ***discretionary application***. Id. (*Adjudicator's Field Manual* §10.15 (emphasis
> mine)).

As a result, Defendants well know that the discretion involved in 8 U.S.C. 1255(a) refers

to the content of the agency's decision and not to their mandatory duty to act, but they

advance this argument today in an effort to dismiss a wholly meritorious claim on the

supposition that they may indefinitely withhold adjudication from adjustment applicants

for want of duty. As for the FBI's duties with regard to Plaintiffs' name checks,

Defendants similarly admit that "the FBI has a very routine role regarding Plaintiffs'

applications – to conduct the background checks and send the results to USCIS." Def's

Memo at 26.

In this regard, the government's reliance on Norton v. So. Utah Wilderness

Alliance, 542 U.S. 55 (2004) is misplaced. Def's Memo at 17. First, Norton was a very

broad attack on the overall administration of agency programs. Id. Under the guise of 5

U.S.C. §706(1) claim for administrative action unreasonably withheld, the plaintiffs were

really challenging the substantive action taken. Id. That is, the plaintiffs' complaint was

not that the agency had not acted but it was with the agency's interpretation and

application of the law. Id.

There was a general claim of deficiency and compliance rather than a specific

claim. Id. As the Court noted, the plaintiffs simply sought to review the U.S. Bureau of

Land Management Stewardship of Public Lands under the guise of the Administrative

Procedure Act, prohibition on unreasonably withholding administrative action. Id.  For

instance, the plaintiffs complained the BLM failed to protect public lands from damage

caused by off road vehicles.  Id. All three claims involved assertions that the BLM failed

to control off road vehicles on public land. Id. Each decision by the BLM was not a

discrete action, but instead a policy determination.  Id. The Court found that mandamus is

limited to a precise definite act for which there is no discretion. Id.  Mandamus lies to

compel an agency to perform a ministerial or a non-discretionary act or to take action

upon a matter without directing how it shall act. Id. That is precisely Plaintiffs' claim.

Similarly, the government's claim that there is no law to apply is simply incorrect.

Def's Memo at 18,  In two instances, the APA itself provides law to provide which is that

the adjudication must be take place within a reasonable time and that the failure to act

within a reasonable time is subject to judicial review.  Further, the agency itself has its

own processing standards including its publicly stated processing time. Exhibit 1. The

regulations themselves supply law to apply. 8 C.F.R. §103.2(b)(18). The regulations

provide for withholding of adjudication only to facilitate a further investigation which

must be undertaken in a specified manner. Even that provision provides a limit of two

years to adjudicate the application.

For this reason, the majority of courts have found that Defendants are indeed

compelled to adjudicate Plaintiffs' application for permanent residence. Plaintiffs'

complaint relates to very discrete action that the agency is required to take, to wit, the

completion of FBI name check and the adjudication of his application for adjustment of

status. See Duan, 2007 WL 626116, 3 (Noting that despite Defendants argument that they

are under no duty to adjudicate applications for permanent residence because of the

discretionary nature of 8 U.S.C. 1255(a), "[t]he weight of authority, however, supports a

finding that Defendants have a non-discretionary duty to process or adjudicate an

adjustment application; that duty supports a mandamus action") (citing Haidari v. Frazier,

No. 06-3215, 2006 U.S. Dist. LEXIS 89177, at 10-11 (D.Minn. Dec. 8, 2006);

Valenzuela, 2006 U.S. Dist. LEXIS 61054, at 19-20; Aboushaban v. Mueller, No. C 06-

1280, 2006 U.S. Dist. LEXIS 81076, at 4 (N.D.Ca. Oct. 24, 2006); Elkhatib v. Bulter, 04-

22407-CIV, 2005 U.S. Dist. LEXIS 22858, at 4 (S.D. Fla. June 6, 2005); Yu v. Brown,

36 F.Supp.2d 922, 928 (D.N.M.1999); Paunescu v. INS, 76 F.Supp.2d 896, 901

(N.D.Ill.1999)); also see Cao, 496 F.Supp.2d. at 575-76 (noting that "the majority

position appears to be that, while USCIS has broad discretion to grant or deny an

application for permanent residency, it has a non-discretionary duty to make some

decision on the application.") (citing Kaplan, 481 F.Supp.2d at 399; Song, 2007 WL

1101283 at 3 n. 6.) (emphasis the Court's)).

Furthermore, the interpretation suggested by the government would read out of

existence part of the Administrative Procedure Act, 5 U.S.C. §706(1), which precludes

agency action unlawfully withheld or unreasonably delayed. The government attributes

no meaning to the prohibition on "unreasonable delay." Clearly, Congress intended the

Courts to determine the reasonableness of agency inaction.

**b. SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS IS WARRANTED**

The more than three-year delay in adjudicating Plaintiffs' adjustment of status applications which are based on an approved petition for Mr. Leo Kelly classifying him as a Multinational Executive or Manager is both extreme and unreasonable. As a result, there are no genuinely disputed issues of material fact and the only remaining questions relate to the application of the law to these facts, therefore summary judgment pursuant to F.R.C.P. 56(a) is appropriate. Meanwhile, the majority of authorities are in agreement that the more than three year delay in completing the adjudication of Plaintiffs' applications for permanent residence is both extreme and patently unreasonable.

The D.C. Circuit has established a framework for analyzing what constitutes unreasonable delay. Liu, 509 F.Supp.2d at 9 (citing Telecommunications Research & Action Center v. FCC, 242 U.S. App. DC 222, 750 F.2d 70, 79-80 (DC Cir. 1984). In Telecommunications Research & Action Center v. FCC, the D.C. Circuit cited six factors for the consideration of whether agency delay is reasonable. 242 U.S. App. DC 222, 750 F.2d 70, 79-80 (DC Cir. 1984) ("TRAC Factors"). The TRAC Factors include a "rule of reason". Consideration is given to whether Congress has provided a timetable or other indication of the speed at which it expects the agency to act; whether the delay is in the economic regulation or in human health and welfare; the effect of expediting delayed action on the agency; the nature and extent of the interest prejudiced by delay; and there is no requirement that the court find any agency impropriety. TRAC, 750 F.2d at 79-80.

With regard to the first TRAC Factor, Congress has clearly intended through the APA that the agency act within a reasonable time. As shown above, in the absence of specific timetable in the authorizing statute, a reasonable time-frame is imputed to the

agency. Consideration of the effect on Plaintiffs is that they are left in a state of limbo. They are neither in a nonimmigrant status nor immigrant status. It is the government's claim that they can be left in limbo permanently.

Moreover, the Court has at very significant benchmark to judge the reasonableness of these agencies' inaction: the stated processing report of the USCIS itself. See Exhibit 1 (the most recent processing report of the Texas Service Center). That processing report indicates that employment-based adjustment of status applications (filed on Form I-485) are adjudicated in six months. Exhibit 1. The applications at issue in this matter were filed on August 6, 2004. Therefore, Plaintiffs' applications have been pending for more than 32 months beyond Defendants' standard processing times. Plainly, in relation to the normal processing time, the agency action is unreasonable. A delay of more than 32 months to process routine applications that do not contain any significant legal or factual issues is not reasonable.

Second, while Plaintiffs' have waited more than 32 months beyond the standard processing time for like applications, Exhibit 1, the government attorney argues that Defendants' are operating under a "first in, first out" protocol and that Plainmtiffs are usurping the queue, thereby delaying other applicants. Def's Memo at 6, 21. However, under such a regime, Plaintiffs' applications would have been adjudicated in early March 2005. Thus, many, many applicants have effectively jumped ahead of Plaintiffs, whose applications have now been pending more than 32 months beyond that of like applicants.

The government applies similar logic to Plaintiffs' long pending "name-checks," admitting that the FBI has taken no action with regard to the name-checks and claiming that Plaintiffs' only recourse is to wait in the queue to see if and when the FBI sorts

through its backlog and reviews Plaintiffs applications. Def's Memo of Law at 6, 21.  The

government attorney's assertions regarding the purported "first in, first out" policy are

belied by the FBI's own admission that they are not truly operating under a "first in, first

served protocol." See Cannon Decl. at ¶ 18 ("if an applicant's name check requires

review of numerous FBI records and files, even though that person came in first, the

name check may require additional time until all responsive records are located and

reviewed").

Third, the delay at issue here is not in the interest of the economic regulation or in

human health and welfare. While Defendants' argue that they require an unlimited period

of time to complete Plaintiff Leo Kelly's background check and render a decision on

Plaintiff's case based on an individualized analysis of him, the reality is that there is no

ongoing investigation into Plaintiff's background and that the postponement of the

adjudication of Plaintiffs' case relates simply to an uncompleted "name check." This is

evident from the complete lack of any evidence regarding the investigation by

Defendants in their own boilerplate declarations.

The "name-check" at issue in Plaintiffs' case involves the manipulation of

Plaintiff Leo Kelly's first, middle and last names which are then compared to a list of

individuals on FBI watch lists. See Exhibit 2 (Cyrus D. Mehta, "Understanding The FBI

Name Check Policy That Is Causing Naturalization Delays", ILW.Com with cited USCIS

Memo). Individuals with common names, such as Plaintiff, are likely to have some

iteration of their names match a name on the FBI's lists. Id. Once the FBI has a name

check "hit," meaning that some form of the alien's name matches a name on the list, the

FBI often stops processing on the case and sits on the background investigation for years. Id.

There are literally hundreds of thousands of applications for naturalization and permanent residence that have been pending for years simply waiting for the security clearances to come through and the delay is open-ended. See Exhibit 3 (Citizenship and Immigration Services Ombudsman's Annual Report 2007 to Congress, (June 11, 2007) at 38). According to USCIS Ombudsman Prakash I. Khatri in his report to Congress, as of May 2007 the number of aliens awaiting FBI name check clearances has doubled over the last two years to 329,160. Of which, about a third, 106,738, remain pending for a year or more and about 10% of the cases, 31,144, have been left pending for more than 33 months. Id.

In this report, USCIS expressed to Congress the widely held view that the name checks are in fact counterproductive, and may enhance the danger to our nation and its people. In this vein, the USCIS Ombudsman called the backlog of FBI name checks "unacceptable from the standpoint of national security and immigration benefits processing." Id. In his report, Mr. Khatri stated that the FBI name check is the "most pervasive problem" in processing immigrant applications. Id.

Mr. Khatri explains that these checks are valueless in one sense and dangerous in another. He clarifies that "[n]ame checks are not conducted by the FBI as part of ongoing investigations or from a need to learn more about an individual because of any threat or risk perceived by the FBI. Instead, the name checks are a fee-for-service that the FBI provides to USCIS according to USCIS-defined standards." Id. at 38. In this vein, the name check provides little, if any, benefit to our national security.

In fact, as the USCIS Ombudsman points out, it is widely understood that these prolonged checks that are wholly unconnected with any active investigation may endanger our security. He states:

> The Ombudsman agrees with the assessment of many case workers and supervisors at USCIS field offices and service centers that the FBI name check process has limited value to public safety or national security, especially because in almost every case the applicant is in the United States during the name check process, living or working without restriction. Id. at 40.

In particular, the USCIS Ombudsman points to the lengthy delays on these checks as themselves a hindrance to our national security:

> Delays in the name check process actually prolong an individual's presence in the United States while the check is pending. In this sense, **the current USCIS name check policy may increase the risk to national security by extending the time a potential criminal or terrorist remains in the country. Id. (emphasis mine).**

In this vein, it is entirely nonsensical that if the government has concerns about the background of a given person or large numbers of persons that they would take years to obtain these clearances. In the meantime, these applicants continue their lives in the United States. If in fact there is any concern that these applicants are threats, it would be in everyone's interest for these clearances to be done in an expeditious manner.

With these admissions from USCIS, the claim that the name-check is necessary to protect our national security is dispelled and the specter of the 9/11 attacks cannot be used to justify Defendants' continued inaction and commitment to failed policy. In fact, as there is no law or regulation which compels USCIS to send cases to the FBI for name checks, this practice is entitled to little or no deference. Indeed, as the *Washington Post* in a recent front page article discusses, it is for this reason that large numbers of applications for Writs of Mandamus have been filed in recent times. Exhibit 4 (Spencer S. Hsu and N.C. Aizenman, "FBI Name Check Cited In Naturalization Delays: Official Calls

Backlog 'Unacceptable'," *Washington Post* (Sunday, June 17, 2007; A01)). It is well known that the usual result in filing such actions was that the government, miraculously, was able to expedite these clearances to resolve these matters. Id. To say the least, this is an unwieldy mechanism for achieving this result, which involves the waste of time and effort by a lot of people including U.S. District Courts. Id.

Fourth, while the benefit of the prolonged "name check" is illusory, the harm to Plaintiffs is very much real. Therefore, the third TRACC factor militates heavily in favor of the grant of Plaintiffs' motion for summary judgment. As noted in USCIS' Annual Report to Congress, the benefits of U.S. permanent residence are innumerable. Exhibit 3 at 39. In addition to the "substantial consequences to applicants and their families, as well as to our country and the economy" of withholding permanent residence from Plaintiffs' enumerated in USCIS' list, Exhibit 3 at 39, individuals who have been deprived of permanent residence must, on a yearly basis, apply and pay substantial fees for employment authorization documents (Form I-765), currently $340, and travel authorization (Form I-131), currently $305, if they seek employment or foreign travel. They do not accrue time towards U.S. citizenship and the panoply of rights entailed therein, and they are subject to removal from the U.S. on grounds that would not render them removable if they were permanent residents. Individuals that are left perpetually in non-resident alien status are also foreclosed from applying for immigration benefits for their immediate family members.

For similar reasons, Judge Sullivan granted the plaintiff's motion for summary judgment in Liu, 509 F. Supp.2d at 9-10. As in this case, Defendants' factual declarations generally "describe[ed] the name check process, but fails to explain what the average or

expected processing times are, or why plaintiff's particular name check has not been processed." Id. As in Liu, the absence of any particularized evidence to support their contention that an indefinite delay is reasonable in Plaintiffs' case is determinative. Id.; also see Cao, 496 F.Supp.2d at 577 (holding that once a plaintiff has demonstrated an unreasonable delay in a motion for summary judgment, defendants' are required to rebut this evidence with individualized reasons justifying the delay, and their failure to supply specific rebuttal evidence is dispositive) (Citing Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

As a result, Defendants' delay in adjudicating Plaintiffs' applications is both extreme and patently unreasonable in light of the foregoing. Moreover, under the standards for reasonableness and extreme agency delay enunciated in Liu, *supra,* and Duan, *supra,* Cao, *supra,* the more than three year adjudication period at issue in this case is grounds for summary judgment in Plaintiffs' favor. Therefore, as there are no disputed issues of material fact, Plaintiffs are entitled to an order from this Honorable Court compelling Defendants to complete the adjudication of their applications for adjustment of status to permanent residence.

Both the Administrative Procedure Act and the mandamus statute provide for causes of action to compel agency action unreasonably withheld. The contrary conclusion argued by the government is that it is entirely in the discretion of the agency when, if ever, to adjudicate the application for adjustment of status. The government suggests no limitation to the unbridled principle of agency discretion to withhold action. Again, it is highly unlikely that Congress intended such a result. To attribute such an

intent would be violative of the principles of the Administrative Procedure Act and separation of powers.  See Pinho, *supra* at 202.

Accordingly, the government's request for dismissal should be denied and the Plaintiffs' Motion for Summary Judgment should be granted.

## C.    THE TRANSFER OF THIS CASE WOULD FRUSTRATE JUSTICE

Finally, Defendants devote no less than five pages of their argument to a further delay tactic that would unduly frustrate justice: the transfer of the instant matter to the Northern District of Texas. Def's Memo at 22-28. Defendants argue that because the Texas Service Center is currently responsible for periodically checking on the status of Mr. Kelly's FBI background checks, Vaughan's Decl. at ¶ 18, which are to be conducted within the District of Columbia, this matter should be further delayed by the transfer of the case to the Northern District of Texas.

The fact is, the connection between Plaintiffs' applications to Texas is attenuated at best. In fact, the applications were not even filed with Texas, but rather were filed in Vermont and then transferred to Texas belatedly during USCIS consolidation of the "name check" delayed cases with the Texas Service Center. In fact, USCIS has itself admitted that the delay at issue here is solely attributable to the "FBI Name Check." See Vaughan Decl. ¶ 19 (conceding that "Plaintiff's FBI name check is pending," and that "[a] response is required from the FBI before the case can be adjudicated"). One wonders if USCIS could again attempt to stifle justice by again transferring Plaintiffs' applications to yet another location and then proclaiming that to be the proper venue for this cause of action.

Meanwhile, the interests of this Judicial District are clearly impacted. First, two of the three named Defendants officially reside here. Second, the "name check" policy which has resulted in the prolonged delay of Plaintiffs' applications for permanent residence is the result of a policy judgment made by USCIS central headquarters in Washington, D.C. See Exhibit 3 (Citizenship and Immigration Services Ombudsman's Annual Report 2007 to Congress, (June 11, 2007). According to the USCIS Ombudsman, many case workers within the service centers do not even agree with the "name check" policy, as the policy is being foisted upon them by USCIS headquarters in Washington, D.C. Id. at 40. Third, the "name check" is to be conducted by the FBI in this District. See Cannon Decl. As a result, most if not all of the relevant witnesses, in the highly unlikely event that there is a need for them, are located within this District. Finally, as there are no material issues of fact here, this matter may be decided on the instant motions without the need for transfer. Therefore, the instant transfer certainly is contrary to the interest of judicial economy.

Thus, Plaintiffs respectfully ask that this Honorable Court refrain from frustrating justice in this matter by unnecessarily and counterproductively transferring this case to the Northern District of Texas.

## II. RELIEF

Plaintiffs respectfully request that this Honorable Court direct the agencies to adjudicate the application within 30 days. This result is consistent with the limits of the Administrative Procedure Act and mandamus review as well as in compliance with the ordinary remand rule as articulated in Ventura v. INS, 537 U.S. 12 (2002).

Respectfully Submitted,

*/s/ Thomas A. Elliot*
Thomas A. Elliot, Esquire
D.C. Bar No. 259713
Elliot & Mayock, LLP
1629 K Street, N.W., Suite 1250
Washington, DC 20006-1641
(202) 429-1725

*/s/Daniel M. Rudnick*
Daniel M. Rudnick, Esquire
PA Bar No. 201481
Steel, Rudnick and Ruben
1608 Walnut Street, Suite 1500
Philadelphia, PA 19103
(215) 546-4333

Dated: November 27, 2007          Attorneys for Plaintiffs

# EXHIBIT 1

Home   Contact Us   Site Map   FAQ

Search
Advanced Search



Services & Benefits    Immigration Forms    Laws & Regulations    About USCIS    Education & Resources    Press Room

[ Print This Page ]  [ Back ]

## U.S. Citizenship and Immigration Services
## Texas Service Center Processing Dates
## Posted November 14, 2007

The processing times shown below are a tool for our customers to gauge our current processing times. When applications and petitions are completed within our target timeframes, that goal will be shown in the data display.

The processing times shown below are for applications that have just been completed. If you have just filed your application, these timeframes may not reflect how long your application will take to be completed. We encourage you to check this page periodically before inquiring about your case. The processing times are updated monthly.

USCIS has received a significant increase in the number of applications filed. In July and August, nearly 2.5 million applications and petitions of all types were received. This compares to 1.2 million applications and petitions received in the same time period last year. This fiscal year, we received 1.4 million applications for naturalization; nearly double the volume we received the year before. The agency is working to improve processes and focus increased resources, including hiring approximately 1,500 new employees, to address this workload.

As a result, average processing times for certain application types may be longer. In particular, naturalization applications filed after June 1, 2007 may take approximately 16-18 months to process.

We offer a variety of services after you file.  For example, for most kinds of cases you can check the status of your case online.

For more information about when and how to contact us, whether your case is outside our processing time or if there are other issues, please see our customer guide –

Case Services - How do I... know what kind of services are available to me after I file my application or petition?

Service Center Processing Dates for **Texas Service Center** Posted November 14, 2007

| Form | Title | Classification or Basis for Filing | Processing Timeframe |
|------|-------|-----------------------------------|----------------------|
| I-90 | Application to Replace Permanent Resident Card | Initial issuance or replacement | 6 Months |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival/Departure Record | Initial issuance or replacement of a Form I-94 | 3 Months |
| I-129 | Petition for A Nonimmigrant Worker | H-1B - Specialty occupation - Visa to be issued abroad | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | H-1B - Specialty occupation - Change of status in the | 2 Months |

| | | U.S. | |
|---|---|---|---|
| I-129 | Petition for A Nonimmigrant Worker | H-1B - Specialty occupation - Extension of stay in the U.S. | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | H-2A - Temporary workers | 15 Days |
| I-129 | Petition for A Nonimmigrant Worker | H-2B - Other temporary workers | 30 Days |
| I-129 | Petition for A Nonimmigrant Worker | H-3 - Temporary trainees | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | E - Treaty traders and investors | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | L - Intracompany transfers | 30 Days |
| I-129 | Petition for A Nonimmigrant Worker | Blanket L | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | O - Extraordinary ability | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | P - Athletes, artists, and entertainers | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | Q - Cultural exchange visitors and exchange visitors participating in the Irish Peace process | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | R - Religious occupation | 2 Months |
| I-129 | Petition for A Nonimmigrant Worker | TN - North American Free Trade Agreement (NAFTA) professional | 2 Months |
| I-131 | Application for Travel Document | All other applicants for advance parole | 3 Months |
| I-140 | Immigrant Petition for Alien Worker | Extraordinary ability | 6 Months |
| I-140 | Immigrant Petition for Alien Worker | Outstanding professor or researcher | 6 Months |
| I-140 | Immigrant Petition for Alien Worker | Multinational executive or manager | 6 Months |
| I-140 | Immigrant Petition for Alien Worker | Schedule A Nurses | 6 Months |
| I-140 | Immigrant Petition for Alien Worker | Advanced degree or exceptional ability | 6 Months |
| I-140 | Immigrant Petition for Alien Worker | Advanced degree or exceptional ability requesting a National Interest Waiver | 6 Months |
| I-140 | Immigrant Petition for Alien Worker | Skilled worker or professional | 6 Months |
| I-140 | Immigrant Petition for Alien Worker | Unskilled worker | 6 Months |
| I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | All other special immigrants | October 10, 2006 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Employment-based adjustment applications | 6 Months |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on grant of asylum more than 1 year ago | August 01, 2004 |
| I-526 | Immigrant Petition By Alien Entrepreneur | For use by an entrepreneur who wishes to immigrate to the United States | 6 Months |
| I-539 | Application to Extend/Change Nonimmigrant Status | Change of status to H or L dependents | June 13, 2007 |
| I-539 | Application to Extend/Change Nonimmigrant Status | Change status to the F or M academic or vocational student categories | June 13, 2007 |
| I-539 | Application to Extend/Change Nonimmigrant Status | Change Status to the J exchange visitor category | June 13, 2007 |
| I-539 | Application to Extend/Change Nonimmigrant Status | All other change of status applications | June 13, 2007 |

# EXHIBIT 2



*Immigration Daily*

| Find a Lawyer | More Options |
|---|---|
| State: All | Find |

**Home Page**

SEARCH  GO
Advanced search

**IMMIGRANTS &
EMPLOYERS**
Immigrant's Weekly
Advertise
Discussion board
Immigrationlawwiki
Find a lawyer
Processing times
Immigration forms
Resources

**LAWYERS**
Immigration Daily
Archives
Classifieds
Seminars
Workshops
Immigration books
Yellow pages
Processing times
Immigration forms
CRS reports
Resources
Joel Stewart
Greg Siskind
Hammond Law Firm

**About ILW.COM**
**Non-profit**
**Link to us**

**SUBSCRIBE**
Enter email:
**Immigration Daily**
enter email  GO

**Immigrants Weekly**
enter email  GO

Share this page
Bookmark this page
Print this page

| Find a Lawyer |
|---|
| State: All |
| Find |

The Immigration
Portal from the
leading immigration
law publisher - over
25000 pages of
free information!

**Immigration Daily:** the news source for
legal professionals. Free! Join 17000+ readers

Enter your email address here:
Enter email address  Go

Immigration Forms, Case Management & E-filing: INSZoom.com
Books on Family-Immigration, Crimes, Removal, CSPA, PERM and more

< Back to current issue of Immigration Daily                    < Back to current issue of Immigrant's Weekly

# Understanding The FBI Name Check Policy That Is Causing Naturalization Delays
## by Cyrus D. Mehta

A detailed internal memo from the US Citizenship and Immigration Services (USCIS) explains the labyrinthine FBI name check procedure that has caused delays to many people applying for citizenship or other immigration benefits, such as permanent residence.

The Interoffice Memorandum by Michael L. Aytes, Associate, Director, Domestic Operations, USCIS, dated December 21, 2006, at its very core, states that the USCIS will no longer expedite FBI name checks when an applicant brings a mandamus law suit against the USCIS. On the other hand, expedite request can still be made by an official when at least one of the following criteria for expeditious treatment are met:

1.  Military deployment;

2.  Age-out cases not covered under the provision of the Child Status Protection Act (CSPA) and applications affected by sunset provisions such as Diversity Visas (DVs);

3.  Compelling reasons as provided by the requesting office (e.g. critical medical conditions); and/or

4.  Loss of social security benefits or other subsistence in the discretion of the District Director.

On February 20, 2007, USCIS issued a brief notice to the public reiterating the new expedite policy without referring to the internal memo.

According to the memo, the expedite request has to be initiated by the USCIS official via fax and not by the applicant. It remains to be seen whether an applicant can prevail upon an officer to expedite the FBI name check claim. The memo specifically states that cases that are simply "old" or subject to a congressional inquiry do not qualify for an expedited name check unless one of the expedited criteria are met.

**Details On Name Check Procedure**

Unlike the February 20, 2007 notice, the internal memo provides great details on the FBI name check procedure. Although the memo states that the FBI name checks have "proven to be an effective tool in the identification of potential threats to our national security and in providing other relevant information that may affect the eligibility of an application for a benefit," it fails to provide further details or examples.

The name check must be initiated on the following form types: I-485 (Application to Register Permanent Residence or Adjust Status); I-589 (Application for Asylum and Withholding of Removal); I-601 (Application for Waiver of Ground of Excludability); I-687 (Application for

Copyright
© 1995-2007
ILW.COM,
American
Immigration LLC.



SEARCH [GO]

Advanced search

**Home Page**

Status as a Temporary Resident Under Section 245A of the Immigration and Nationality Act); I-698 (Application to Adjust Status from Temporary to Permanent Resident); and N-400 (Application for Naturalization).

The memo goes on to state that the name checks are conducted using an applicant's name and date of birth, as listed on the application. Alias submissions and spelling variations do not require a separate check. If only the month and date of birth is incorrect, but not the year, a separate name check is not required. But if the year is incorrect, a separate name check needs to be initiated. Names are searched in a multitude of combinations, switching the order of the first, middle, and last names, as well as the combination of just the first and last names, referred to as an "around the clock" search. The memo cites the example of how the name, "Jose Garcia Rodriguez" would be checked:

Jose Garcia Rodriguez
Jose Rodriguez Garcia
Jose Garcia
Jose Rodriguez
Garcia Jose Rodriguez
Garcia Rodriguez Jose
Garcia Jose
Garcia Rodriguez
Rodriguez Jose Garcia
Rodriguez Garcia Jose
Rodriguez Jose
Rodriguez Garcia

The FBI search capability will also search for other versions of the name, such as Rodrigues. Although the name check can be initiated through the Claims computer system, certain name checks can only be initiated manually through a spread sheet. Also, when certain searches do not appear on the system, the name check query has to be initialed manually. The initiation of a manual name check request can inherently lead to further delays.

**Different FBI Responses**

The memo further notes that if the FBIQUERY System response indicates "No Record" (NR), an officer can proceed with the adjudication of the application. If, on the other hand, the FBIQUERY states "Positive Response" (PR), the report is sent to the HQ Office of Fraud and Detection and National Security (FDNS) for preliminary review before being forwarded to field offices and service centers. The FBIQUERY can also provide other responses such as "Pending Response" (PR), which also means that no approval can be rendered until there is a definitive response, either NR or PR. Other FBIQUERY responses include "Error" (E), "Duplicate" (D), "Unknown Response" (UR) or "No Data Found," and the memo instructs how each of these responses ought to be dealt with by the USCIS officer before approving the application.

Given all of these complex procedures described in the memo, one gains a deeper insight into the inordinate delays faced by many naturalization applicants. In the event that the FBIQUERY reveals a Positive Response (PR), the memo requires a long drawn out procedure for reviewing the FBI report before the application can be processed for approval, including contacting the third agencies identified by the FBI.

**Results Of Law Suits**

Regardless of the memo, an applicant should not be deterred from suing the various agencies of the government based on their refusal to act on a benefits application. In the context of naturalization, Section 336(b) of the Immigration and Nationality Act allows applicants to request a hearing in federal district court if there is a failure to make a determination before the 120-day period after the date of the examination. The government has tried to argue that the examination period does not begin to run until the initial interview of the applicant as well as mandatory background check records. Fortunately, few courts have agreed with the government's position. *See e.g. Danilov v. Aguirre*, 370 F. Supp. 2d 442 (E.D. Va. 2005) ("an examination is not a single event, but instead is essentially a process the agency follows to

gather information concerning the applicant"). Most courts have held that the term "examination" only reflects the applicant's interview and not the ongoing process, which includes the background security checks.

A decision in the US District Court in New Jersey, *Khamal Kheridden v. Michael Chertoff*, 2007 U.S. Dist. LEXIS 13571, is illustrative of this approach. In that case, plaintiff Khamal Kheridden sued the Department of Homeland Security (DHS) four years after his naturalization interview on November 19, 2002, which he passed. The court agreed that the 120-day period had passed and therefore it had jurisdiction over Kheridden's law suit. While the court was unable to grant naturalization unless the FBI background check was completed, it held that Kheridden had an interest in "completing the naturalization process so that he can fully enjoy the benefits of a US citizen." The court nevertheless fashioned a remedy by directing the USCIS to use its best efforts to determine the status of Kheridden's name check and to expedite this process. The USCIS was further ordered to report to this court every 30 days the status of Kheridden's name check and its efforts to obtain the results of the name check, including correspondence and any other relevant documents. The court further ordered that once the USCIS received the results of the name check, it should make a decision on Kheridden's naturalization application as expeditiously as possible, but no later than 60 days after receipt of the name check results.

## Conclusion

In conclusion, the best way to resolve the problem is for Congress to step in and mandate time limits for background checks. Fortunately, the Citizenship Promotion Act of 2007 (S. 795/H.R. 1379) was introduced in both the House and Senate on March 7, 2007. In addition to preventing fee increases, this bill also proposes to mandate that background checks be completed within a certain time frame, and if the background check is not completed within that time limit, it imposes a requirement on the government to document and account for the reasons for the delay. It is hoped that this worthy legislation gets passed very soon!

*This article from www.cyrusmehta.com was written on March 9, 2007.*

## About The Author

<u>Cyrus D. Mehta</u>, a graduate of Cambridge University and Columbia Law School, practices immigration law in New York City and is the managing member of Cyrus D. Mehta & Associates, P.L.L.C. He is the Past Chair of the Board of Trustees of the American Immigration Law Foundation and recipient of the 1997 Joseph Minsky Young Lawyers Award. He is also Secretary of the Association of the Bar of the City of New York and former Chair of the Committee on Immigration and Nationality Law of the same Association. He frequently lectures on various immigration subjects at legal seminars, workshops and universities.

The opinions expressed in this article do not necessarily reflect the opinion of ILW.COM.

Copyright © 1999-2006 American Immigration LLC, ILW.COM

**Immigration Daily:** the news source for legal professionals. **Free!** Join 17000+ readers

Enter your email address here:
Enter email address [Go]

Search for: Enter keyword(s) [Search] Advanced search

**Immigrants & Employers**
- Immigrant's Weekly
- Advertise
- Find a lawyer
- Processing times

**For Lawyers**
- Immigration Daily
- Archives
- Processing times
- Immigration forms

- Discussion board
- Immigrationlawwiki

- Immigration forms
- Resources

- Classifieds
- Seminars
- Workshops
- Immigration books
- Yellow pages

- CRS reports
- Resources
- Joel Stewart
- Greg Siskind
- Hammond Law Firm

**About us** | **Non-profit** | **Link to us**

## FIND A LAWYER                                      More options

| State: | Specialty: | Language: | |
|---|---|---|---|
| All | All | All | Find |

**Share this page** | **Bookmark this page** | **Print this page**

**The Immigration Portal from the leading immigration law publisher**
**Over 25000 pages of free information!**

© Copyright 1995-2007 American Immigration LLC, ILW.COM

Search for:   Enter keyword(s)    Search    Advanced search



U.S. Department of Homeland Security
20 Massachusetts Avenue, N.W.
Washington, D.C. 20529

U.S. Citizenship
and Immigration
Services

## Interoffice Memorandum

To:    Regional Directors
       Service Center Directors
       District Directors (except foreign)
       Officers in Charge (except foreign)
       National Benefit Center Director

From:  Michael L. Aytes
       Associate Director, Domestic Operations

Date:  DEC 2 1 2006

Re:    FBI Name Checks Policy and Process Clarification for Domestic Operations

### Background

Over the past few years, definitive FBI name checks (hereafter referred to as name checks) have been mandated on several form types as part of the effort to ensure that immigration benefits are provided only to those individuals who are eligible. Name checks search FBI administrative and investigative files based on the name and date of birth of the applicant. These checks have proven to be an effective tool in the identification of potential threats to our national security and in providing other relevant information that may affect the eligibility of an applicant for a benefit. This memorandum explains existing policy for domestic operations regarding name checks in order to provide all employees with a thorough understanding of this specific type of background check and of how the results affect the adjudication of applications for immigration benefits. In addition, several policy changes, which are explained in more detail later in this memorandum, are being instituted in the following areas:

1.  *Missing or Incorrect Date of Birth (DOB)* – A new name check is required for year of birth changes or discrepancies.
2.  *Validity Period* – A name check response can be used for multiple applications if the response is not more than 15 months old.
3.  *Duplicate Requests* – Only one definitive response is necessary per application or within the 15-month validity period.

www.uscis.gov

FBI Name Checks
Page 2

4. *Expedited Name Checks* - Mandamus filings will no longer be routinely expedited. The loss of Social Security benefits or other subsistence, however, continue to be a basis for routine expeditious processing.

This memorandum shall not apply to adjudications of I-589 and I-881 applications by the Asylum Division, which shall continue to be governed by the relevant sections of the Identity and Security Checks Procedures Manual. This memorandum also does not apply to adjudications of I-601 waiver applications filed overseas in conjunction with immigrant visa processing, which are subject to CLASS checks, and in some cases SAO clearances.

**General Name Check Process**

A definitive name check is required for the following form types: I-485, I-589, I-601, I-687, I-698, and N-400. Name checks for Form I-192, Application for Advance Permission to Enter as Nonimmigrant, are still required and will be performed if the form is filed with USCIS. A case may be denied, dismissed, administratively closed, withdrawn, or referred to immigration court prior to obtaining the final results of a name check, but offices may only exercise this option if they implement a post-audit system to monitor for the completion of the name check[1]. A completed name check or an initiated check is required prior to the issuance of a Notice to Appear[2]. A name check is not required for a Native American who is being accorded permanent resident status under section 289 of the Immigration and Nationality Act. Most name checks are initiated through data entry of case information into the corresponding processing system. CLAIMS 3 / CLAIMS Mainframe initiate name checks for I-485s and CLAIMS 4 initiates name checks for N-400s. Name checks for I-687s and I-698s must be initiated using a manual spreadsheet process discussed below and in attachment B. An I-601 name check will generally be completed by the associated I-485 name check. However, if an I-601 is filed independently of an adjustment application, then that name check must be initiated using the manual spreadsheet process discussed later in this memo[3]. The manual spreadsheet process may also be used to initiate name checks that were not otherwise initiated by automated systems. However, there are additional areas of the name check process that require further guidance as follows:

*Name Variations:*

Name checks are conducted using an applicant's name and date of birth, as listed on the application. Alias submissions and spelling variations do not require a separate check. Names are searched in a multitude of combinations, switching the order of the first, middle, and last names, as well as combinations of just the first and last names, first and middle names, etc (this is referred to as an 'around the clock' search). Through this process, the FBI automatically repositions the names submitted and the check will match against the primary name on record as well as any aliases.

For example, if the name submitted were Jose Garcia Rodriguez, the following names would be checked automatically:

---

[1] Refer to memorandum titled Closing of Cases with Pending Law Enforcement Checks, dated April 5, 2004.

[2] Refer to memorandum titled Security Check Requirements Preceding Notice to Appear Issuance, dated March 2, 2004

[3] Except for I-601s filed overseas in conjunction with immigrant visa applications.

FBI Name Checks
Page 3

Jose Garcia Rodriguez
Jose Rodriguez Garcia
Jose Garcia
Jose Rodriguez
Garcia Jose Rodriguez
Garcia Rodriguez Jose
Garcia Jose
Garcia Rodriguez
Rodriguez Jose Garcia
Rodriguez Garcia Jose
Rodriguez Jose
Rodriguez Garcia

The name check automatically includes a phonetic search and retrieves records with similar spelling variations (e.g. Rodriguez = Rodrigues). Due to these search methodologies, name checks shall not be resubmitted because of misspellings or use of alias names.

*Missing or Incorrect Date of Birth (DOB):*

The name check also includes an automatic variation on the DOB that is submitted. The DOB is an important primary value used by the FBI in the name check process. The check includes a search on the exact full date of birth as well as an expanded search on the year of birth. This methodology accounts for the different ways that a date of birth can be written (e.g. the day and the month may be written in different positions). Discrepancies within the day and month of birth do not warrant resubmission of a name check and a new name check should only be initiated if the year of birth is incorrect. If a new name check is required, the manual spreadsheet process must be used.

*Missing or Incorrect Place of Birth (POB):*

The POB is not used as a value in the initial stages of the name check process. The POB is used as an optional indicator or matching value in the later part of the name check process for only those cases that are returned with an initial response of "pending." See Attachment A for more information.

*Missing or Incorrect A-Number:*

Name checks are conducted using biographical information relating to the applicant. The Alien Registration Number (A-number) is not used as a variable in the FBI's process. Therefore, name checks performed with an inaccurate or missing A-number are valid and should not be resubmitted for a new check.

In instances where the FBIQUERY system reflects an inaccurate A-number, the system may be corrected by providing the following information to your respective regional office or service center point of contact:

FBI Name Checks
Page 4

Applicant Name
Correct A-number
Incorrect A-number
Synopsis of reason(s) for requesting an A-number correction

Regional offices and service centers should submit A-number correction requests via E-mail to the designated POC at Headquarters' Office of Field Operations, presently Pam Wallace.

*Age Limits:*

Names checks are required for applicants age 14 years and older **at the time of adjudication** for all of the above-listed form types[4] **except** Form I-485, which has an upper age limit. CLAIMS 4 processes name check requests for applicants age 14 years and over (no upper age limit) while CLAIMS 3 submits name check requests for applicants between the ages of 14 and 80 years. The upper age limit of 80 years can be misleading in that a name check is conducted only if the applicant's 80th birthday falls on the same day that the USCIS name check utility is performed. If an applicant is 80 years and a day, a name check will not be performed. Until a CLAIMS 3 system modification to remove the upper age limit can be performed, the upper age limit of 80 years will remain in effect. For the purpose of the name check, the upper age limit of 80 years is defined as the date the applicant turns 80 years old. Further, if an applicant is less than 14 years of age at the time of filing but turns 14 years old while the application is pending, then a name check is required. If a new name check is required, the manual spreadsheet process must be used.

*Validity Period:*

A definitive (No Record "NR" or Positive Response "PR") name check response is valid indefinitely for the application for which it was conducted. If a definitive name check response is used to support other applications, the name check response is only valid for 15 months from the FBI process date. For example, an I-485 is filed on June 1, 2004 and a definitive name check response is processed for that application on December 1, 2004. The I-485 is denied on February 15, 2005, and another I-485 is filed for the same applicant on May 15, 2005. The December 1, 2004, FBI response may be used for the I-485 filed on February 15, 2005, even if another name check has been initiated. However, final adjudication or naturalization must occur within the 15-month validity period or a new name check will be required. Additional information, including a set of frequently asked questions, is included in this memorandum as Attachment A.

*Duplicate Requests:*

In many instances, duplicate name checks are initiated for a single application. The causes for multiple name check requests are primarily systems issues or resubmission requests made by local offices in an effort to facilitate a name check that is already in a "pending" status. Duplicate requests for the purpose of resolving "pending" name checks must not be initiated. Duplicate requests do not facilitate the resolution of "pending" name checks and only add to the backlog. In addition, duplicate requests for a single application result in multiple name check responses being

---

[4] Refer to Operating Instructions 105.10.

FBI Name Checks
Page 5

posted to the FBIQUERY system. Often, a final response will be received from the FBI and posted to FBIQUERY, but because duplicate requests were made there are additional "pending" responses in the system. **Only one** definitive response is necessary and adjudication may continue in those instances where a final FBI response has been processed, and is within the **15-month validity period**, even though additional "pending" responses remain unresolved for that application.

*Manual Spreadsheet Process:*

A manual spreadsheet is available to domestic offices to be used when a name check cannot be performed or was not initiated by one of the automated systems. The local offices send their spreadsheets to their respective regional offices on a weekly basis as needed. Regional offices and Service Centers forward the spreadsheets to designated points of contact in Headquarters' Office of Field Operations to initiate the name checks with the FBI. The initial response should appear in FBIQUERY within forty-five (45) days from the date of submission by the local office. See Attachment B for manual spreadsheet instructions and a sample spreadsheet.

There are several situations that may necessitate the initiation of a check outside of the normal data entry process:

1.  An applicant turns fourteen (14) years of age during the time his/her case is pending and, therefore, requires a name check to be completed.

2.  "NO DATA" response cases: If the FBIQUERY system shows "NO DATA" for a case more than ninety (90) days after the date the information was entered into CLAIMS 3 / CLAIMS Mainframe or CLAIMS 4. If a name check request was submitted through the spreadsheet process and ninety (90) days have passed without a response posted in the database, the local office should contact their regional or service center point of contact in order to verify that the name was included on the weekly report submitted to HQ. If it is verified that the name check was included on the submission to HQ, the regional or service center point of contact should report the missing name check to the HQ point of contact. If the name check cannot be verified as having been forwarded to HQ, then the local office will need to resubmit the name check request on the spreadsheet to their regional or service center point of contact.

3.  "ERROR" response cases: If FBIQUERY shows an "ERROR" response, the office with the case must resubmit the case data on the manual spreadsheet if the error has not been corrected in 30 days.

4.  Prior to issuance of an NTA if an FBI name check has not been initiated.

*Expedited Name Checks:*

Cases with significant and compelling issues can have the name check expedited. Cases that are simply "old" or the subject of a congressional inquiry *do not* qualify for an expedited name check unless one or more of the expedite criteria are met. An expedite can be requested by an office

FBI Name Checks
Page 6

whether the FBIQUERY system shows "NO DATA" or "PENDING." Requests must meet at least one of the following criteria for expeditious treatment:

1.  Military Deployment
2.  Age-out cases not covered under the provision of the Child Status Protection Act (CSPA) and applications affected by sunset provisions such as Diversity Visas (DVs)
3.  Compelling reasons as provided by the requesting office (e.g. critical medical conditions)
4.  Loss of Social Security benefits or other subsistence in the discretion of the District Director

NOTE: In the interest of fairness and in processing cases chronologically mandamus filings are no longer routinely treated expeditiously.

Expedite processing is done via fax to a designated headquarters point of contact. HQ will fax a response to the initiating office, which will serve as evidence that the name check was completed. The fax will be annotated with the final response from the FBI. There may be a delay of 3 weeks or more in updating the FBIQUERY system with the results of an expedited check. However, the faxed response is acceptable for adjudication purposes and should be placed with the case file. See Attachment C for additional information regarding expedited name checks. Expedite requests shall be faxed to the attention of Pam Wallace at (202)-272-1008.

*Use of the FBIQUERY System:*

The official repository for name check responses is the FBIQUERY system, located on the FBI Tracking Menu in National Systems. A user can access the name check database through the CLAIMS, RNACS, or RAPS sub-menu, or from the CIS system by pressing the 'CLEAR' button and typing 'FBIQUERY.'

Normally, a user should initiate a query in the name check database by using the alien registration number (A#) of the applicant; however, a search can also be initiated by using the name and date of birth. When querying the system by name, it is recommended to broaden the search by changing the "Name Search" value from "F or Full" to "P or Partial." The name check database will provide one of several different results in response to a query. All name check responses from the FBI with process dates on or after December 1, 2002 are valid responses. The system default is to display the most recent data. The table below is a synopsis of the specific codes that a user will see in the name check database:

### FBIQUERY System Responses

| Code | Description | Action |
|------|-------------|--------|
| NR | No Record | Proceed with the adjudication of the application. A printout of the FBI response or the faxed expedited response must be included in the case file. |

FBI Name Checks
Page 7

| | | |
|---|---|---|
| PR | Positive Response | An FBI report was sent to HQ FDNS and will be forwarded to the local office. HQ FDNS forwards the report to the office shown as the File Control Office (FCO) in CIS. Do not proceed with the adjudication until the FBI report has been reviewed by the adjudicator and a determination is made based on the content of the report. |
| IP H I | Pending | The FBI has not completed the background check. Except for N-400 applications[*], an interview can be conducted, but an approval cannot be rendered until a definitive response (either NR or PR) has been received from the FBI. A case may be denied or withdrawn if the office implements a post-audit system. |
| E | Error | The name check request could not be processed due to formatting or code error. Do not proceed with the adjudication until a definitive response has been received from the FBI. If the error has not been corrected in 30 days, the office should submit a manual name check using the manual spreadsheet process. |
| D/DD | Duplicate | The FBI previously processed the name check. The original response should be displayed in the name check response database either under the same A# or under the same name/DOB. If no original response can be found, the 'Duplicate' response can be used in its place. In the 'Duplicate' response, the final response information will show the date and the response on the right side of the 'FBI RESPONSE INFORMATION' section. 'FN' means final response and it will be followed by the date and a code for a No Record response (NR) or a code for a PENDING response (H or I). |
| RC | Request Cancelled | The name check request has been cancelled. |
| UN | Unknown Response | This is actually a POSITIVE response and follows |

---

[*] Refer to memoranda regarding N-400 interview without completed FBI name checks, titled Background Checks and Naturalization Interview Scheduling, dated April 25, 2006, and Background Checks and Naturalization Interview Scheduling Follow-Up Memo, dated May 22, 2006.

FBI Name Checks
Page 8

| | | |
|---|---|---|
| | | the action of "PR" above. The UN code appears because a new code was added by the FBI that is not included in the USCIS conversion tables. Therefore the system defaults to UN or Unknown. The HQ FBIQUERY system technical team has been tasked to correct the response information in the system. |
| No Data Found | No Data Found | The query provided no information that a name check has been initiated. If you checked by A#, you should also search by the name/DOB. Change the "F" to a "P" in the NAME SEARCH field in the lower part of the FBI Query screen when querying by name/DOB. If, after 90 days from the data entry date of the case, or if 90 days after the name data was provided on a manual spreadsheet, the database still shows 'no data', then the case information should be submitted (or resubmitted) using the manual spreadsheet process. |

The response codes listed above are not necessarily the actual response codes returned by the FBI. The FBI uses many different response codes but for purposes of consistency and simplicity, USCIS consolidates the original FBI responses into the codes noted above. On occasion, primarily with manual Name checks and duplicate responses, the internal FBI response code will appear in the FBIQUERY database. The following codes are considered NO RECORD responses: ND, NP, and NR. The codes DS, RP, OC, and RF, are considered POSITIVE RESPONSE results and offices must wait for a report from FDNS. Additional information regarding the processes supporting positive responses is explained later in this memorandum.

*Positive Responses (PR):*

In instances where the name check produces a positive response, a report detailing the information contained in the FBI record is returned to USCIS and, ultimately, the report is forwarded to the field office or service center shown as the A-file File Control Office (FCO) in the Central Index System (CIS). Prior to June 7, 2004, the Immigration and Customs Enforcement (ICE) Law Enforcement Support Center (LESC) forwarded FBI G-325 positive responses to the field offices and service centers, but on June 7, 2004, the HQ Office of Fraud Detection and National Security (HQ FDNS) assumed that responsibility[6]. All FBI reports are sent to HQ FDNS for preliminary review before being forwarded to field offices and service centers.

---

[6] Refer to memorandum titled FDNS Processing of Positive FBI Responses to G-325 Name Checks, dated October 21, 2004

FBI Name Checks
Page 9

HQ FDNS will contact the third agencies identified by the FBI for the files referenced in the FBI's positive response record, unless the third agency is identified as a local agency in respect to the local USCIS office. Further, if FDNS determines the FBI report includes information relating to National Security, the case will be referred to the National Security Adjudication Unit.

If more than 90 days have elapsed after the posting of a "PR" result in the FBIQUERY system without a report being received, and the office is the FCO as shown in CIS, the office should contact HQ FDNS to inquire about the status of the PR record.   Offices may contact Mr. Robert Kruszka at HQ FDNS via E-mail.

*Hardcopy Responses:*

Hardcopy responses are acceptable for documenting the name check results.  In nearly all instances, hardcopy responses will be used for expedited checks, but hardcopy responses are not limited to expedited cases.

**Points of Contact**

Questions regarding this memorandum should be directed through appropriate supervisory and operational channels to the attention of Greg Collett, 202-272-1023, HQ Field Operations.  Local offices should work through their regional offices.

## ATTACHMENT A
### Frequently Asked Questions Regarding FBI Name Checks

What do I do if there is an NR and an IP/E update in the FBIQUERY system?

If multiple records appear for the same application, only one definitive response is necessary. Adjudication may continue in those instances where a final FBI response has been received even though additional "pending" responses remain unresolved for that name. Likewise, a definitive response may be used with another application if final adjudication occurs within 15 months of the FBI process date. Applications can continue to be denied, dismissed, administratively closed, withdrawn, or referred to immigration court because of reasons other than the name check, but only if the office implements a post-audit system to monitor for the completion of the name check[7].

At the time of final adjudication, or at time of oath for naturalization applicants, the FBIQUERY system shall be checked again to determine if any "pending" responses have subsequently resulted in a "PR." In instances where a "PR" is returned, adjudication shall cease and offices are to follow the guidance provided in the memo relating to positive responses.

If an applicant's primary name changes between the time of filing and the time of adjudication, does the new name need to have a name check conducted prior to an approval adjudication?

No, USCIS does not need to conduct a name check on the applicant's new name.

What do I do if the DOB in the system is wrong?

For name checks initiated by automated systems (CLAIMS 3, CLAIMS 4, RAPS) and for name checks submitted on the manual spreadsheet, the FBI searches the entire year of the submitted date of birth. For example, if a date of birth is March 1, 1980, the FBI will do a search for all dates in the year 1980. Therefore, if the year of the date of birth is incorrect, you should resubmit the name via the manual spreadsheet using the correct year of the date of birth. Stated another way, if only the month and/or the day of the date of birth are incorrect, a new name check is not required.

For expedited name checks that are faxed to HQ and manually checked at the FBI, the FBI will search the date of birth provided and also do a search by reversing the day and the month of the date provided. The FBI will not search the entire birth year for these expedited checks. For example, if an expedited name check has a date of birth of March 10, 1980, the FBI will also search using a date of birth of October 3, 1980.

If the date of birth does not meet the above guidelines and a new name check is needed with the corrected date of birth, you should resubmit the name using the correct date of birth on the

FBI Name Checks
Page 11

manual spreadsheet or, if for an expedited name check, via fax to the HQ point of contact for expedited name checks.

What do I do if the applicant's A-number is wrong in the FBIQUERY system?

The name search is based on the name and date of birth of the applicant. If a record can be located in the name check database using a name/DOB search, the record can be used. Name checks performed with an inaccurate or missing A-number are valid and should **not** be resubmitted for a new check. See page 3 and 4 of this memo for information on how to submit an A-number correction.

What do I do if the applicant's Place of Birth is incorrect/missing?

The place of birth does not need to be displayed in the response to make the response valid. The FBI does not consider the POB in the initial query so if the initial response from the FBI is No Record, the POB was not needed. If the incorrect POB was submitted and the initial response is PENDING, a new name check is required and the manual spreadsheet process must be used.

What do I do if the applicant's name is misspelled in FBIQUERY?

Misspelled names are not required to be re-run. The FBI uses an "around the clock" name search engine combined with a phonetics search logic that takes into account misspellings, name variations, and alias names. This means that all probable variations of a name are checked to include spelling and the order of names.

Does a name check expire?

A name check response is valid indefinitely for the application for which it was conducted. In addition, a definitive name check response may be used to support other applications but, when used for another application, the response is only valid for 15 months from the FBI response date.

How do I obtain third agency information?

Prior to June 7, 2004, the Immigration and Customs Enforcement (ICE) Law Enforcement Support Center (LESC) forwarded FBI G-325 responses to the field when the name check was updated as "PR." Since June 7, 2004, the HQ Office of Fraud Detection and National Security (HQ FDNS) assumed that responsibility[8]. For additional information, refer to the October 21, 2004 memorandum issued by Don Crocetti entitled FDNS Processing of Positive FBI Responses to G-325 Name Checks.

---

[8] Refer to memorandum titled FDNS Processing of Positive FBI Responses to G-325 Name Checks, dated October 21, 2004

FBI Name Checks
Page 12

If more than 90 days have passed after the posting of a "PR" result without a report being received and the office is the FCO as shown in CIS, then the office should contact HQ FDNS to inquire about the status of the PR record.  Offices may contact their regional or service center point of contact for assistance in requesting another copy of the PR report, if that is required.

A case has been listed as PENDING for several months; should I resubmit it?

No.  Although some cases seem to take an inordinate amount of time to move from a PENDING response to a final response, submitting a second check will actually delay clearance.  Check with your supervisor to determine if the case warrants expeditious processing.

# EXHIBIT 3



Citizenship and Immigration Services Ombudsman

# Annual Report 2007

**Submitted to:**

**United States Senate**
**Committee on the Judiciary**

**United States House of Representatives**
**Committee on the Judiciary**

**June 11, 2007**



Homeland
Security

## MESSAGE FROM THE OMBUDSMAN

 The Citizenship and Immigration Services Ombudsman's 2007 Annual Report marks 46 months of cumulative analysis and recommendations since the establishment of the office. The Ombudsman's office is Congressionally-mandated to assist individuals and employers in resolving problems with the U.S. Citizenship and Immigration Services (USCIS) of the Department of Homeland Security (DHS) by advancing recommendations on improving USCIS services and operations. It is an independent DHS office that reports directly to the DHS Deputy Secretary with an annual report to Congress without prior review and comment by DHS or the executive branch, as directed by the Homeland Security Act of 2002.

The Ombudsman's first three annual reports focused on the systemic issues that caused delay in granting immigration benefits and customer service complaints. These reports identified pervasive and serious issues that were addressed in 28 formal recommendations directed at solving problems faced by individuals and employers in their interactions with USCIS. The USCIS Director and the Ombudsman generally agree on the identified problems and their need for priority attention, although the solutions proposed and those adopted by USCIS may differ.

Challenges still exist within USCIS. Customers continue to have difficulties with confusing forms and processes and many customers wait months, and perhaps years, for final adjudication of their cases. The Ombudsman will continue to assist individuals to receive lawful benefits in a timely, customer-friendly, secure, and efficient manner.

I want to thank DHS Secretary Michael Chertoff, Deputy Secretary Michael P. Jackson, former Secretary Tom Ridge, former Deputy Secretary Jim Loy, former Deputy Secretary Gordon England, USCIS Director Emilio Gonzalez, Deputy Director Jonathan "Jock" Scharfen, and former Director Eduardo Aguirre for their dedication to our mission of providing secure, efficient, and expeditious immigration services. I have been privileged to work with committed professionals in DHS, USCIS, and the Ombudsman's office.

The preparation of this annual report was accomplished by tireless efforts of a dedicated staff of professionals who spent many hundreds of hours reviewing and validating facts and figures, as well as drafting and editing the report. I thank them for assisting me in completing it and for their public service in addressing national security and customer service. I especially would like to thank Wendy Kamenshine who again this year skillfully managed this complicated project.

We have accomplished a great deal, but there is much more to do in the spirit of responsive government.

*Prakash Khatri*

Prakash Khatri
Citizenship & Immigration Services Ombudsman

support centers, field offices, and service centers, there has been a substantial reduction in the backlog. Unfortunately, the agency's redefinition of the backlog obscures the issue and raises questions about its backlog reduction efforts.

**C.    Processing Times** – On August 23, 2006, USCIS announced changes that would improve the reporting methodology for processing times of immigration benefit applications. The Ombudsman disagrees that this change provides better information and urges USCIS to return to the practice of providing the public with the actual processing time for each field office.

**D.    Customer Service** – During the reporting period, USCIS made important strides in customer service. USCIS increased the number of appointments available via INFOPASS and began two new contracts in the effort to improve its toll-free customer service line. Nevertheless, the Ombudsman continued to observe other areas where communication issues with customers persist: (1) limited customer access to USCIS immigration officers who know about individual cases to resolve an inquiry accurately and efficiently; (2) questionable accuracy of information provided by customer service representatives; and (3) the practice of providing minimal information in response to customer inquiries.

**E.    Untimely Processing and Systemic Problems with Employment-Based Green Card Applications** – USCIS' inability to process enough green card applications and accurately track employment-based green card applications has resulted in a perpetual backlog of employment-based green card applications and widespread issuance of interim benefits. This lack of accurate data also has resulted in the underutilization of statutorily limited visa numbers.

**F.    Name Checks and Other Security Checks** – FBI name checks, one of the security screening tools used by USCIS, continue to significantly delay adjudication of immigration benefits for many customers, hinder backlog reduction efforts, and may not achieve their intended national security objectives. FBI name checks may be the single biggest obstacle to the timely and efficient delivery of immigration benefits, and the problem of long-pending FBI name check cases worsened during the reporting period.

**G.    Interim Benefits** – The Ombudsman strongly supports efforts by USCIS to eliminate the need for interim benefits in favor of timely, efficient, and secure adjudication of the ultimate immigration benefit. Legitimate customers should not have to pay filing fees for interim benefits they would not need if the underlying petition were timely processed. Interim benefits also allow ineligible and fraudulent applicants to receive work authorization and travel documents because of processing delays.

**H.    Funding of USCIS** – Due to the congressional requirement that USCIS be self-funded from fees, USCIS may make decisions that compromise operational efficiency to ensure revenue flow. The manner in which USCIS obtains its funding affects every facet of USCIS operations, including the ability to: (1) implement new program and

were approved. This process would ensure that USCIS does not accept more applications than the number of visas available.

Another issue with priority dates and workloads is connected to the new fee rule. The Ombudsman anticipates that when the new fee rule goes into effect in July, delays in adjudication will significantly impact the agency if it does not track visa information, including visa classifications, priority dates, and country of chargeability. Without tallying cases receipted by visa category, USCIS inevitably will accept ineligible applications and more applications than it can process in the given timeframe. The agency will not collect fees for interim benefits issued for new green card applicants, as the new fee rule requires only one payment for both. In addition, there may be large numbers of retrogressed cases and, eventually, multiple issuances of interim benefits.

As described in the Ombudsman's 2006 Annual Report (at pp. 13-16), the Ombudsman continues to be concerned about USCIS' data integrity and failure to meet its obligation to maintain an accurate count of pending employment- and family-based preference applications. Although the focus is on employment-based visa applications, similar concerns exist for family-based preference cases. The continued collaboration of these agencies supports the Ombudsman's vision of cooperation to provide benefits in a timely and efficient manner.

### F.     Name Checks and Other Security Checks

FBI name checks, one of several security screening tools used by USCIS, continue to significantly delay adjudication of immigration benefits for many customers, hinder backlog reductions efforts, and may not achieve their intended national security objectives. FBI name checks may be the single biggest obstacle to the timely and efficient delivery of immigration benefits. The problem of long-pending FBI name check cases <u>worsened</u> during the reporting period.

#### 1.     Background

As of May 2007, USCIS reported a staggering 329,160 FBI name check cases pending, with approximately 64 percent (211,341) of those cases pending more than 90 days and approximately 32 percent (106,738) pending more than one year.[40] While the percentages of long-pending cases compared to last year are similar, the absolute numbers have increased. There are now 93,358 more cases pending the name check than last year. Perhaps most disturbing, there are 31,144 FBI name check cases pending more than 33 months as compared to 21,570 last year – over a 44 percent increase in the number of cases pending more than 33 months.[41]

---

[40] *See* USCIS FBI Pending Name Check Aging Report (May 4, 2007). It is important to note that USCIS does not include within its backlog cases pending due to FBI name checks. There are 155,592 FBI name check cases pending more than six months that otherwise may be part of USCIS' backlog. See section III.B for a discussion of USCIS backlogs.

[41] *See id.*

---

Figure 10:  Pending FBI Name Checks

| Age of Pending Response | Total Count (May 4, 2007) | Total Count (May 17, 2006) |
|---|---:|---:|
| < 3 months | 117,819 | 82,636 |
| 3 - 6 months | 55,749 | 33,450 |
| 6 - 9 months | 28,029 | 20,047 |
| 9 - 12 months | 20,825 | 16,845 |
| 12 - 15 months | 14,133 | 15,064 |
| 15 - 18 months | 13,931 | 10,636 |
| 18 - 21 months | 11,035 | 8,144 |
| 21 - 24 months | 12,398 | 8,325 |
| 24 - 27 months | 11,765 | 9,754 |
| 27 - 30 months | 6,600 | 4,435 |
| 30 - 33 months | 5,732 | 4,896 |
| > 33 months | 31,144 | 21,570 |
| **Total Pending** | **329,160** | **235,802** |

During the reporting period, processing delays due to FBI name checks were an issue in approximately 25 percent of all written case problems received by the Ombudsman.  Resolving the FBI name check issue is included in the Ombudsman's top five priorities posted on the office website.[42]  Unlike FBI name checks, other types of background and security checks – *e.g.*, fingerprint checks, the Interagency Border Inspection Systems name checks (IBIS), and the Automated Biometric Identification System (IDENT) checks – return results within a few days, if not a few minutes.  These law enforcement and watch list checks do not significantly prolong USCIS processing times or contribute to the USCIS backlog.

As described in the Ombudsman's 2006 Annual Report (at p. 24), the FBI provides information to USCIS regarding anyone who is the principal subject of an investigation or is a person referenced in a file.  USCIS adjudicators and the Fraud Detection and National Security (FDNS) unit use this information to determine if applicants are ineligible for benefits.  The FBI provides the name check results at USCIS' request.  Name checks are not conducted by the FBI as part of ongoing investigations or from a need to learn more about an individual because of any threat or risk perceived by the FBI.  Instead, the name checks are a fee-for-service that the FBI provides to USCIS and according to USCIS-defined standards.

Once USCIS forwards records to the FBI for name checks, the process and the turnaround time for the checks are outside of USCIS' control.  Completion of the name check process may take considerable time because manual reviews of FBI files are sometimes required.  This review may include FBI reporting on fragments of names of people who are not necessarily central or directly related to an investigation or law enforcement matter.  In discussions with the

---

[42] *See* section VI.F.

Ombudsman, the FBI has stated that it lacks the resources to perform the function in a timely manner.

### 2.    Impact of Long-Pending FBI Name Checks on USCIS Customers

The delay caused by the FBI name check has substantial consequences to applicants and their families, as well as to our country and the economy. Examples of how legitimate applicants suffer include:

- Loss of employment and employment opportunities where the position requires green card status or U.S. citizenship;

- Possible termination of employment due to the inability to comply with required Form I-9 employment verification procedures where USCIS delays interim EAD issuance;

- Difficulties obtaining drivers' licenses;

- Inability to qualify for certain federal grants and funds;

- Limitations on the ability to purchase property;

- Difficulties obtaining credit and student loans; and

- Disqualification from in-state tuition.

---

*CASE PROBLEM*

*The applicant's green card application has been pending since early 2005 due to the FBI name check. The applicant is a valued researcher at a U.S. pharmaceutical company.*

---

*CASE PROBLEM*

*The applicant's green card application has been pending with USCIS for approximately four years due to the FBI name check. The applicant is a researcher at a U.S. university and, because of the adjudication delay, the university and the individual have been disadvantaged in seeking grant proposals and funding. Specifically, the individual reports that he is currently working on federal research projects. The applicant's inability to advance critical work for the project is a serious impediment to the university, its competitiveness, and the applicant's professional advancement.*

---

> *CASE PROBLEM*
>
> *In fall 2003, an applicant filed a green card application, which remained pending due to FBI name checks until spring 2007. During the course of the adjudication, the applicant was fingerprinted and applied for interim benefits several times. Although the applicant applied for most of the interim benefits in a timely manner, the filing of the last EAD was not timely, and the applicant had to end his employment. In correspondence to the Ombudsman in the winter of 2007, the applicant related that he is a cancer patient who no longer has income necessary to pay for treatments.*

In February 2007, USCIS made public the criteria for expedited treatment of FBI name checks. While this change should help with specific cases, the *status quo* for FBI name check completion is unacceptable from the standpoint of national security and immigration benefits processing.

### 3.    Value of the FBI Name Checks

The challenge for USCIS (and perhaps the challenge for DHS and the entire federal government) is to evaluate the value of maintaining the current FBI name check process relative to considerations of threat, vulnerability, and consequence. The Ombudsman agrees with the assessment of many case workers and supervisors at USCIS field offices and service centers that the FBI name check process has limited value to public safety or national security, especially because in almost every case the applicant is in the United States during the name check process, living or working without restriction.

The Ombudsman recommended in the 2006 Annual Report (at p. 25) that the FBI name check process be re-examined. Delays in the name check process actually prolong an individual's presence in the United States while the check is pending. In this sense, the current USCIS name check policy may increase the risk to national security by extending the time a potential criminal or terrorist remains in the country.

In its 2006 Annual Report Response (at p. 10), USCIS stated:

> Although these security checks may require a more lengthy processing time, USCIS believes that performing them is essential to identifying national security and public safety concerns that would not have been uncovered by other means . . . in, a few cases, the information obtained from the FBI through this process has reflected very significant issues and risks. FBI name checks disclose information to USCIS that is otherwise not available. Information contained in 39 [percent] of the FBI positive responses (letterhead memoranda) received in FY 06 was not contained in IBIS/TECS, USCIS' primary background check tool. . . . [A]lthough a heavy price is paid in inquiries, mandamus actions, and other forms of litigation, USCIS is committed to effective

background checks, and thus is committed to the FBI name check. In fact, under the new fee rule currently under review, USCIS proposes to dedicate more funds to the FBI name check process as the FBI has indicated the fees they charge for these checks will increase and additional staff will be added to the process. This should help to speed up the name check process and reduce the backlog significantly.

Use of the 39 percent positive response rate as referenced by USCIS to justify continuing this program may exaggerate the value of the FBI name check. It is unclear how many of the FBI name check "responses" also were revealed by one or more of the other security checks conducted for the applications. To date, the Ombudsman has been unable to ascertain from USCIS the total number of actual problem cases that the agency discovered exclusively as a result of the FBI name check. The Ombudsman understands that most, if not all, of the problem cases which would result in an eventual denial of benefits also can be revealed by the other more efficient, automated criminal and security checks that USCIS initiates.

---

*COMMENTS FROM OMBUDSMAN'S TELECONFERENCE*

*One caller mentioned that USCIS does not schedule applicants for interviews because security clearances are not yet completed. He suggested that USCIS needs to look at the cost-benefit of doing these clearances. The caller stated he is in the military and has a top secret clearance.*

*Another caller suggested that information could be sent every "X" number of months to the applicant or attorney that the application still is held up for pending name checks, which would avert the many update requests.*

---

### 4.    Possible Solutions to the FBI Name Check Delays

During this and previous reporting periods, the Ombudsman had numerous meetings with USCIS leadership on FBI name checks and discussed a number of solutions to the name check logjam.

#### a.    Pre-Application Security Checks

A possible solution to the name check problem is pre-application security checks. USCIS has not chosen to implement such a process, which would dramatically impact the agency's revenue stream for a short period of time. Simultaneously, USCIS is failing to make basic changes to its processing methodology to reduce fraud and ineligible applicants. Instead, USCIS continues to substantially fund a process with questionable value. USCIS maintains that the name check process is of value, but it remains unclear whether the process has added any additional value over the security processes already in place.

**Figure 11: Ombudsman's Suggested Pre-Application Security Check Process**



Figure 11 outlines the security screening steps to clear an applicant prior to interview, where necessary, and for adjudication of the immigration benefits application. The applicant/petitioner would register intent and pay a fee to cover the costs of the process. Pre-application is more than a pre-screening that determines *prima facie* eligibility. It moves the case to an adjudicating officer who reviews the file and interviews the applicant, if necessary. Since all fingerprints, biometrics, security clearances, necessary documents, medical evaluation, financial support, and visa availability are cleared, the applicant can be processed to conclusion immediately after interview. A Clearance Report is documentary proof that the applicant successfully completed the pre-application process. This process would place biometrics capture and security screening in the hands of appropriate law enforcement/contract employees, trained in the pre-screening process, and the determination of eligibility for benefits in the hands of USCIS officers trained in immigration law.

The agency also should review the DHS resources available to assist in exploring options to solve the backlogged FBI name check process. A number of DHS law enforcement entities perform security checks similar to those performed by USCIS.

### b.    USCIS Background Check Service IT System for Tracking FBI Name Check Cases

USCIS' 2006 Annual Report Response (at p. 10)indicates that the agency's planned Background Check Service (BCS), a new IT system that will track the status of background and security checks for pending cases, was to be implemented in late April with deployment beginning in May 2007. As of this writing, the BCS is not yet deployed. Currently, USCIS has limited capability to produce reports detailing the status of long-pending FBI name check cases. In addition, USCIS systems do not automatically indicate when a delayed name check is complete and the case can be adjudicated. Often, this leads to a situation where the validity of other checks expire before USCIS reviews the case. Those other checks then need to be reinitiated, adding financial and time costs for applicants and USCIS. The Ombudsman fully supports the expeditious rollout of the BCS system.

### c.    A Risk-Based Approach to FBI Name Checks

Name checks do not differentiate whether the individual has been in the United States for many years or a few days, is from and/or has traveled frequently to a country designated as a State Sponsor of Terrorism, or is a member of the U.S. military. Many individuals subject to lengthy name checks are either already green card holders or have been issued Employment Authorization Documents (EADs). These documents allow them to receive Social Security cards and state drivers' licenses. Most green card applicants are also eligible to receive advance parole enabling them to travel outside the United States and return as long as their cases are pending, which can be for many years under the current process.

---

*CASE PROBLEM*

*In early 2006, the applicant applied for naturalization. USCIS informed the applicant that the application is pending due to the FBI name check. The applicant currently is a contract employee for a federal agency and was security screened prior to beginning that employment.*

---

*CASE PROBLEM*

*The applicant's green card application was filed in early 2004. The application remains pending due to the FBI name check. The applicant previously served as a security officer at a U.S. embassy and was subject to rigorous security screening for the position.*

---

In November 2006, Secretary Chertoff discussed a risk-based approach to homeland security threats, vulnerabilities, and consequences:

> [T]he core principle that animates what we do at DHS . . . is risk management. It is a recognition of the fact that management of risk is not elimination of risk. There is no elimination of risk in life, and anybody who promises every single person protection against every threat at every moment in every place in the country is making a false promise . . .. What we do have to do is identify and prioritize risks -- understanding the threat, the vulnerability and the consequence. And then we have to apply our resources in a cost-effective manner, using discipline and common sense in order to minimize the risk without imposing undue cost on our communities and our families.[43]

Despite Secretary Chertoff's continuing emphasis on risk management, USCIS performs FBI name checks without the benefit of risk management modeling. In recent visits to USCIS field offices, a number of leaders have questioned the usefulness of the FBI name checks citing some of the same concerns discussed here. The process is not working and consideration should be given to re-engineering it to include a risk-based approach to immigration screening and national security. The U.S. Government Accountability Office recently noted in a report that "[w]hile the Secretary of DHS has expressed a commitment to risk management, DHS has not

---

[43] DHS Secretary Michael Chertoff, Prepared Remarks at the 2006 Grants & Training National Conference, Washington, D.C. (Nov. 28, 2006); http://www.dhs.gov/xnews/speeches/sp_1164738645429.shtm (last visited June 3, 2007).

performed comprehensive risk assessments in . . . immigration and customs systems to guide resource allocation decisions."[44]

Every effort should be undertaken to identify and remove persons who pose threats to the United States, which would include rescinding immigration benefits after USCIS has granted them. It would be irresponsible for law enforcement entities to stop their investigation of a potential crime merely because the person who is the subject of their investigation has obtained a green card or U.S. citizenship. Similarly, it would be illogical to think that delaying issuance of a green card or U.S. citizenship will prevent a criminal from committing a crime. Considering the protection the FBI name check provides, the cost of government resources used, and mental and actual hardships to applicants and their families, USCIS should reassess the continuation of its policy to require FBI name checks in their current form.

---

*RECOMMENDATION AR 2007 -- 06*

*In addition to the Ombudsman's recommendation in the 2006 Annual Report, AR 2006 –04, the Ombudsman recommends that USCIS: (1) evaluate the value of the name check in its current format and establish a risk-based approach to screening for national security concerns; (2) work with the FBI to provide the necessary resources to perform name checks in a timely manner; and (3) provide greater transparency to customers by publishing monthly the number of long-pending FBI name check cases.*

---

## G.    Interim Benefits

The Ombudsman strongly supports efforts by USCIS to eliminate the need for interim benefits in favor of timely, efficient, and secure adjudication of the ultimate immigration benefit.

### 1.    Background

Generally, USCIS issues interim benefits – EADs and advance parole documents (international travel documents) – to individuals who have green card applications pending with the agency for over 90 days.[45] The Ombudsman is encouraged by constructive dialogue with USCIS during the reporting period that addresses funding and security issues related to the processing of interim benefits.

On May 30, 2007, USCIS established new filing fees for immigration benefits.[46] Under the new fee schedule, USCIS will charge a single fee for green card applications to include recovery of the processing costs for interim benefits. The Ombudsman supports this approach to

---

[44] U.S. Government Accountability Office Report "Homeland Security: Management and Programmatic Challenges Facing the Department of Homeland Security," GAO-07-398T at 2 (Feb. 2007); http://www.gao.gov/new.items/d07398t.pdf (last visited June 6, 2007).

[45] *See* 8 C.F.R. § 274a.13(d).

[46] *See* "Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule," 72 Fed. Reg. 29,851 (May 30, 2007); *see also* section III.H.1.

# EXHIBIT 4

# washingtonpost.com

# FBI Name Check Cited In Naturalization Delays

Official Calls Backlog 'Unacceptable'

By Spencer S. Hsu and N.C. Aizenman
Washington Post Staff Writers
Sunday, June 17, 2007; A01

Advertisement

Ken Fisher's Private Research Report Can Be Downloaded Now!

In his latest report, *Forbes* columnist and money manager Ken Fisher tells you where he thinks the stock market is headed and why. If you are interested in reading this exclusive report that contains information you won't find anyplace else, now is the time to act!

Click Here to Download Your Report!

FISHER INVESTMENTS

Jin Ju Yoo, a stay-at-home mother who immigrated from South Korea in 1990 and applied for U.S. citizenship in 2002, would seem a minimal security risk. So say friends in Clarksburg, Md., where Yoo, 36, plays drums at a Presbyterian church and raises three children with her husband, a flooring contractor. Her husband and children are citizens.

The would-be American is still waiting for approval, however, because the FBI has not completed a security check of her name against its more than 86 million investigative files. Neither the bureau nor the U.S. Citizenship and Immigration Services agency will say why.

Since 2005, the backlog of legal U.S. immigrants whose applications for naturalization and other benefits are stuck on hold awaiting FBI name checks has doubled to 329,160, prompting a flood of lawsuits in federal courts, bureaucratic finger-pointing in Washington and tough scrutiny by 2008 presidential candidates.

At a time when Congress is intensely focused on border security, the growing backlog is one of the most visible signs of the U.S. immigration system's breakdown, current and former government officials said.

Unexplained delays in determining whether longtime residents pose a threat promise neither justice to the applicants nor added security to the country, they said. They blame bureaucratic mismanagement and poor coordination at the FBI and the immigration service, and the inefficient methods of screening files for genuine security threats.

In his annual report to Congress last week, U.S. Citizenship and Immigration Services (USCIS) ombudsman Prakash I. Khatri called the backlog of FBI name checks "unacceptable from the standpoint of national security and immigration benefits processing."

Calling the delays the "most pervasive problem" in processing, Khatri concluded that they "may increase the risk to national security by prolonging the time a potential criminal or terrorist remains in the country." He concluded that the agency should end or sharply narrow its use of name checks.

As Dawn Lurie, a Vienna immigration lawyer, put it: "If there's a security reason [for the delay], then what are those people still doing here? . . . And if there isn't a security reason, then why are we making them wait for so long?"

The withholding of citizenship -- and the continuation of the attendant restrictions on voting, employment, travel, reunification with family members, and access to credit and federal assistance programs -- replicates on a far vaster and more damaging scale the inconvenience rendered to travelers who are mistakenly placed on no-fly lists because of spelling confusions or errors, civil liberties lawyers said.

Some lawyers warn that such burdens may be discriminatory if they fall disproportionately on people perceived to be from Muslim countries or from ethnic groups whose names are transliterated from non-Roman alphabets. But others representing individuals in the Washington area or participating in four national class-action lawsuits over the delays say the most distinctive -- and frustrating -- feature is their seeming randomness, and the refusal of agencies to say when checks will be done or why problems have arisen.

Seong Ho Kang, 40, a computer engineer from South Korea who lives in Centreville, has waited for more than a year for his FBI check, possibly because the bureau since 2001 has intensified the scrutiny of immigrants with high-technology backgrounds. In frustration, Kang submitted a Freedom of Information Act request for any records the FBI might have on him. The bureau promptly replied that it had none. "If they can tell that to me, why can't they tell it to immigration?" Kang asked.

Donald Kerr, 60, the Jamaican-born lead singer of the Wailers, Bob Marley's reggae group, applied for U.S. citizenship more than three years ago after marrying a U.S. citizen. Kerr, a British citizen who goes by the stage name Junior Marvin, lives in Alexandria. "I'm not trying to put Homeland Security down. I mean, they have to do what they have to do," he said, sitting in his basement amid a mass of guitars, amplifiers and sound-mixing equipment. "But it does seem like a long time to check up on a musician."

The backlog started growing after the Sept. 11, 2001, terrorist attacks, when investigators determined that a failure to properly process immigration applications contributed to the hijackers' ability to enter and stay in the country. U.S. authorities responded by broadly expanding background checks.

FBI name checks, in particular, were intensified after errors and a lack of cooperation between the FBI and immigration authorities in Newark led to the October 2002 naturalization of a man suspected of ties to Hezbollah, which is designated a terrorist group. A policy decision was made to check applicants' names not only against the list of individuals under investigation by the FBI but also against the list of those named in investigative files for any reason.

The result was tumultuous. At the end of 2002, immigration authorities resubmitted 2.7 million names of applicants to the FBI for additional scrutiny. More than five years later, the FBI is only now emerging from that huge load, with about 5,800 names left to be rechecked.

But FBI officials say a heavy workload is not the only problem. They also blame inadequate staffing and technology, as well as a decentralized, paper-based process of status review.

About 90 percent of name checks, officials say, emerge with no matches within three months, after an automated search of databases. But the remaining 10 percent can take months or years, as 30 analysts and assistants must coordinate with 56 field offices and retrieve files stored in 265 locations nationwide.

As a result, the FBI has fallen further behind on the 1.5 million new names it receives each year from USCIS. Of about 329,000 cases pending as of May, 64 percent were stalled for more than 90 days, 32 percent for more than one year and 17 percent for more than two years.

"No one is happy with the status quo," said USCIS Deputy Director Jonathan "Jock" Scharfen. "We share the public's unhappiness with this, and we're committed to improving the process."

"We're trying to automate this as much as possible," said Michael Cannon, head of the FBI's National Name Check Program. He said the section's disruptive move from Washington to Frederick County, Va., also hindered work in 2006.

Cannon said the completion of a new Central Records System and progress toward a long-delayed, $600 million FBI computerized case-management system will help. "I can't give you a date certain when all this is going to come to fruition. My best guess is 2010," he said.

USCIS officials say they are reviewing their procedures but remain committed to detailed checks, which they call an effective tool in identifying security threats and verifying eligibility for citizenship. Even just a few terrorists can wreak havoc, the program's supporters note.

While USCIS declined to provide the number or percentage of annual name checks that result in denials, the FBI has reported that less than 1 percent of 1.5 million names are ultimately tied to potentially damaging information.

The backlog appears likely to get worse, because a USCIS fee increase -- slated to take effect in July -- has prompted a 50 percent rise in new naturalization applications so far this year. If a new immigration bill is enacted, millions of undocumented immigrants would also apply for legalization.

Frustrations among applicants have helped stoke a fourfold increase in litigation against USCIS since the middle of 2006. Critics emphasize that applicants for naturalization, by definition, are longtime residents who have lived and worked in the United States with few restrictions.

Khatri, in his June 11 report, said that given other automated security checks, "the protection the FBI name check provides, the cost of government resources used, and mental and actual hardships to applicants and their families, USCIS should reassess the continuation of its policy."

For now, tens of thousands of legal residents remain in limbo, exacting a toll on them and their employers. Pavel Kroupnik, a Russian economist who came to the United States in 1991 and sought citizenship three years ago, works at the nuclear energy firm USEC Inc. in Bethesda and directs the conversion of weapons-grade uranium from Russian nuclear warheads into fuel for commercial nuclear power plants -- a key U.S.-Russian nonproliferation effort.

But Kroupnik, 46, a Rockville resident, has been unable to get a security clearance and fuller responsibilities because he is not a citizen, even though his employer had conducted its own two-year investigation of his background before hiring him. "When immigration said we need to do a background check, I said, 'Guys, check your own [files].' The CIA, the FBI, the KGB -- they all know who I am and what I'm doing," Kroupnik said.

Adriana Rivera, a Mexican-born housecleaner living in Woodbridge, has been stymied in a different way: She cannot see her elderly parents in Veracruz, Mexico, because she holds a temporary work permit and would be unable to return if she left the United States while awaiting the background check she needs to become a legal permanent resident.

Her husband sailed through his background check and obtained a green card nearly two years ago even though he applied at the same time as Rivera.

"Every time my husband goes back to visit Mexico, I cry because I can't go with him," Rivera said. "I miss my family so much. It's a feeling of desperation."

View all comments that have been posted about this article.

**Post a Comment**

# EXHIBIT 5

Westlaw.

FIM-ADJFMAN 10.15

INS Adj. Field Manual 10.15

United States Department of Homeland Security (DHS)
United States Citizenship and Immigration Services (USCIS)

Adjudicator's Field Manual

Updated Through June, 2006

1. General Policies and Procedures
Chapter 10. An Overview of the Adjudication Process

## 10.15 EXERCISE OF DISCRETION; UNIFORMITY OF DECISIONS.

Although all types of adjudications involve proper application of laws and regulations, a few also involve an **exercise of discretion**: adjustment of status under section 245 of the Act, change of status under section 248 of the Act and various waivers of inadmissibility are all **discretionary** applications, requiring both an application of law and a consideration of the specific facts relevant to the case. An **exercise of discretion** does not mean the decision can be arbitrary, inconsistent or dependant upon intangible or imagined circumstances. Although regulations can provide guidelines for many of the types of factors which are appropriate for consideration, a regulation cannot dictate the outcome of a **discretionary** application. [See, for example, HHS Poverty Guidelines in Appendix 10-3.] For each type of adjudication, there is also a body of precedent case law which is intended to provide guidance on how to consider evidence and weigh the favorable and adverse factors present in a case. The adjudicator must be familiar with the common factors and how much weight is given to each factor in the body of precedent case law. The case law and regulatory guidelines provide a framework to assist in arriving at decisions which are consistent and fair, regardless of where the case is adjudicated or by whom.

It will be useful, particularly for inexperienced adjudicators, to discuss unusual fact patterns and novel cases requiring an **exercise of discretion** with peers and supervisors. In particularly difficult or unusual cases, the decision may be certified for review to the Administrative Appeals Office. Such certifications may ultimately result in expansion of the body of precedent case law. **Discretionary** decisions or those involving complex facts, whether the outcome is favorable or unfavorable to the petitioner or applicant, require supervisory review.

NOTE: Even in non-**discretionary** cases, the consideration of evidence is somewhat subjective. For example, in considering an employment-based petition, the adjudicator must examine the beneficiary's employment experience and determine if the experience meets or exceeds, in quality and quantity, the experience requirement stated on the labor certification by the employer. However, a subjective consideration of facts should not be confused with an **exercise of discretion**. Like an **exercise of discretion**, a subjective consideration of facts does not mean the decision can be arbitrary, inconsistent or dependant upon intangible or imagined circumstances.

References

INA: 103

Regulations: 8 CFR 103.2; 8 CFR 103.5; 8 CFR 103.5a; 8 CFR 103.7

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.