UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| LEO KELLY, et al. | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 1:07CV1601(RBW) |
| | ) |
| EVELYN UPCHURCH, Director, Texas | ) |
| Service Center, U.S. Department of | ) |
| Homeland Security, et al. | ) |
| | ) |
| Defendants. | ) |

_____)

**DEFENDANTS' ALTERNATIVE MOTION FOR SUMMARY JUDGMENT**

Defendants have moved that the case be dismissed for lack of subject matter jurisdiction or failure to state a claim or, in the alternative, transferred to the United States District Court for the Northern District of Texas.  See Dkt. Entry 2.  Defendants further move in the alternative that the Court award summary judgment to Defendants, pursuant to Federal Rule of Civil Procedure 56, if the Court denies Defendants' motion to dismiss.  A supporting memorandum, statement of material facts, and proposed order are submitted herewith.

Dated:  January 3, 2008                    Respectfully submitted,


_____/s/_____.
JEFFREY A. TAYLOR, D.C. BAR # 598610
United States Attorney
_____/s/_____.
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


_____/s/ Robin M. Meriweather_____.
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198 Fax: (202) 514-8780

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
LEO KELLY, <u>et al.</u>                          )
)
   Plaintiffs,                       )
)
  v.                                        )  No. 1:07CV1601(RBW)
)
EVELYN UPCHURCH, Director, Texas      )
Service Center, U.S. Department of       )
Homeland Security, <u>et al.</u>               )
)
   Defendants.                      )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANTS' ALTERNATIVE MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

## <u>SUMMARY</u>

  Despite the good faith efforts of Defendants United States Citizenship and Immigration

Services ("USCIS") and the Federal Bureau of Investigations ("FBI"), the adjustment of status

applications filed by Plaintiffs Leo Kelly, Margaret Kelly, Jack Kelly, and Ross Kelly remain

pending.  Those applications seek lawful permanent resident status, memorialized in what is

commonly known as a green card.  USCIS has determined that, in light of national security

interests, it cannot complete its adjudication of an adjustment of status application until all of the

security checks — including the FBI's security investigation and background check — have

been completed.  The FBI — which processed over 3.4 million background checks in Fiscal

Year 2006 alone — has determined that accurate and thorough background checks are a priority

which cannot be sacrificed for speed.

  Plaintiffs ask this Court to disturb those judgments and issue an order compelling

Defendants to complete their adjudication of Plaintiffs' pending applications for lawful

permanent resident status, and to complete the security investigation and background checks which the FBI conducts for all applicants. However, Plaintiffs are not entitled to the extraordinary remedy of mandamus, and Defendants' actions do not constitute "unreasonable delay" in violation of Section 706(1) of the Administrative Procedures Act. Instead, the Court should defer to Defendants' judgments concerning these security concerns, and respect the FBI's judgments concerning how to allocate the resources available to process background checks. Prioritizing Plaintiffs' applications over others which have been pending for even longer would not serve the interests of the agencies or other applicants. It would only reduce the resources available to process other applications and background checks, moving other individuals' applications and background checks farther back in the queue. The Court should therefore grant Defendants' alternative motion for summary judgment, and deny Plaintiffs' motion for summary judgment.

## **BACKGROUND**

Defendants discussed the statutory, regulatory, and factual background in detail in their Motion to Dismiss, which is incorporated herein by reference. See Dkt. Entry 2 at 3-8. This case concerns Plaintiffs' pending I-485 applications to register permanent residence or adjust status. See Compl. ¶ 11. Defendant USCIS has not completed its adjudication of those applications because the mandatory national security investigations and background checks remain pending. See Declaration of Robert D. Meyer, ¶ 19 (Exh. 1 hereto) ("Meyer Decl."); Declaration of Kathy B. Vaughan, ¶ 19 (Exh. 1 to Dkt. Entry 2) ("Vaughan Decl."). The I-485 applications are ready to be adjudicated but for the pending background and security checks. See Meyer Decl. ¶ 19; Vaughan Decl. ¶ 19.

2

**STANDARD OF REVIEW**

Under Rule 56, summary judgment is required when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995).   A genuine issue of material fact is one that would change the outcome of the litigation.  See Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 243 (1986).  While all evidence and the inferences drawn therefrom must be considered in the light most favorable to the nonmoving party, see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), summary judgment should be granted if the moving party submits "affirmative evidence that negates an essential element of the nonmoving party's claim" or demonstrates "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." Celotex, 477 U.S at 331.  The nonmoving party has the burden of establishing more than the "mere existence of a scintilla of evidence" demonstrating a genuine issue in dispute for purposes of defeating the moving party's motion. See Lester v. Natsios, 290 F. Supp.2d 11, 19-20 (D. D.C. 2003), citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.  "[M]atters of law rather than of fact" may be presented for summary judgment.  Douglas v. First Nat'l Realty Corp., 437 F.2d 666, 669 (D.C. Cir. 1970).

**ARGUMENT**

I.    **PLAINTIFFS CANNOT ESTABLISH MANDAMUS JURISDICTION OR A**
      ***PRIMA FACIE* CASE FOR MANDAMUS RELIEF.**

A petition for a writ of mandamus is an extraordinary remedy that can be applied only in exceptional circumstances.  To meet the mandamus standard, there must be: 1) a clear right to relief; 2) a plainly defined and nondiscretionary duty on the part of the defendant; and 3) no other adequate remedy available.  In re Medicare Reimbursement Litigation, 414 F.3d 7, 10

(D.C. Cir. 2005); see also Heckler v. Ringer, 466 U.S. 602, 616 (1984); Ganem v. Heckler, 746

F.2d. 844, 852 (D.C. Cir. 1984) (citing United States ex rel. Girard Trust Co. v. Helvering, 301

U.S. 540, 543 (1937)); Whittle v. Moschella, 756 F. Supp. 589, 596 (D. D.C. 1991).  The Court's

decision whether or not to exercise mandamus jurisdiction is discretionary.  Public Citizen v.

Kantor, 864 F. Supp. 208 (D.D.C.1994).

    As explained in Defendants' motion to dismiss, Plaintiffs cannot establish mandamus

jurisdiction or state a claim for mandamus relief.  See Dkt. Entry 2.  The approval of an

adjustment of status application and the timing of the FBI's security investigation and

background checks are subject to agency discretion, and Plaintiffs have no clear right to agency

action.  See id.  Moreover, for the reasons discussed infra, agency action has not been

unreasonably delayed in this case.  See Part II, infra.   It follows that Plaintiffs have no clear right

to relief, and the Court should dismiss their complaints or enter summary judgment for

Defendants.

**II.    DEFENDANTS' ADJUDICATION OF PLAINTIFFS' I-485 APPLICATIONS
AND THEIR COMPLETION OF THE RELATED SECURITY INVESTIGATION
AND BACKGROUND CHECKS ARE PROCEEDING ON A REASONABLE
PACE.**

    As the D.C. Circuit has made clear, the issuance of equitable relief under APA section

706 "is an extraordinary remedy" and requires "extraordinary circumstances to be present before

[courts] will interfere with an ongoing agency process."  In re: United Mine Workers of America

Int'l Union, 190 F.3d 545, 549 (D.C. Cir. 1999).  Accordingly, a finding of unreasonable delay is

appropriate only upon a showing "that the agency has a duty to act and that it has 'unreasonably

delayed' in discharging that duty."  In re American Rivers and Idaho Rivers United, 372 F.3d

413, 418 (D.C. Cir. 2004) (quoting (5 U.S.C. § 706(1)); 5 U.S.C. § 555(b); In re Bluewater

Network, 234 F.3d 1305, 1315 (D.C. Cir. 2000).  Moreover, the Court must find that the delay is

"egregious," Cobell v. Norton, 240 F.3d 1081, 1095 (D.C. Cir. 2001), and even then a court

should order an agency to complete its consideration of an issue only in "the exceptionally rare

cases." In re Barr Labs Inc., 930 F.2d 72, 76 (D.C. Cir. 1991). Even "a finding that delay is

unreasonable does not, alone, justify judicial intervention." Cobell, 240 F.3d at 1096 (quoting

Barr Labs., 930 F.2d at 75). These principles arise out of courts' recognition that an

administrative agency is entitled to substantial deference in establishing a timetable for

completing administrative action, and that the Court should properly be hesitant to upset an

agency's priorities by ordering it to expedite one specific action, and thus give it precedence over

others. Sierra Club v. Thomas, 828 F.2d 783, 794, 797 (D.C. Cir. 1987). As such, "respect for

the autonomy and comparative institutional advantage of the executive branch has traditionally

made courts slow to assume command over an agency's choice of priorities." Barr Labs., 930

F.2d at 74.

Consistent with these principles, the D.C. Circuit has identified six factors courts should

consider when reviewing claims that allege unreasonable agency delay:

> (1) the time agencies take to make decisions must be governed by a "rule of
> reason"; (2) where Congress has provided a timetable or other indication of
> the speed with which it expects the agency to proceed in the enabling statute,
> that statutory scheme may supply content for this rule of reason; (3) delays
> that might be reasonable in the sphere of economic regulation are less
> tolerable when human health and welfare are at stake; (4) the court should
> consider the effect of expediting delayed action on agency activities of a
> higher or competing priority; (5) the court should also take into account the
> nature and extent of the interests prejudiced by delay; and (6) the court need
> not "find any impropriety lurking behind agency lassitude in order to hold
> that agency action is 'unreasonably delayed.'"

In re United Mine Workers of America Inter. Union, 190 F.3d at 547 (quoting

Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 75-77, 79 (D.C. Cir. 1984)

("TRAC"). Significantly, under D.C. Circuit precedent, courts should not "grant relief, even

when all the other factors considered in <u>TRAC</u> favored it, where a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain." <u>Mashpee Wampanoag Tribal Council, Inc. v. Norton</u>, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (citing <u>In re Barr Labs., Inc.</u>, 930 F.2d 72, 75 (D.C. Cir. 1991)). In this case, the <u>TRAC</u> factors favor Defendants.

### A. Defendants' Actions Are Reasonable When Evaluated By Reference to a "Rule of Reason."

Defendants' delay in completing the security investigation and background checks, and in completing the adjudication of Plaintiffs' adjustment applications, does not warrant judicial intervention. As to the first two factors of the <u>TRAC</u> test, Congress has provided no mandatory statutory timetable for USCIS to adjudicate applications for adjustment of status under the INA. There are no federal statutes limiting the FBI's discretion to set the pace at which its security investigations and background checks can be completed. Therefore, under <u>TRAC</u>, in evaluating whether agency delay constitutes an abuse of discretion, the Court must apply a "rule of reason" analysis. <u>See TRAC</u>, 750 F.2d at 80. Such an analysis "turns on the facts of each particular case." <u>Midwest Gas Users Ass'n v. FERC</u>, 833 F.2d 341, 359 (D.C. Cir. 1988).

Plaintiffs focus on the amount of time that has passed since their applications were filed (approximately 3 and a half years). <u>See</u> Dkt. Entry 4 at 24-25 ("Pl. MSJ"). District Judge Sullivan also focused on the length of time the application was pending when awarding summary judgment to the plaintiff in <u>Liu v. Novak</u>, on which Plaintiffs principally rely. <u>See</u> 509 F. Supp. 2d 1, 5-6 (D.D.C. 2007). However, "this Circuit [has] made clear that measuring the delay by years alone cannot establish unreasonable delay." <u>Liberty Fund, Inc. v. Chao</u>, 394 F. Supp. 2d 105, 115 (D.D.C. 2005); <u>see Mashpee Wampanoag Tribal Council, Inc.</u>, 336 F.3d at 430 (reasonableness "cannot be decided in the abstract, by reference to some number of months or

6

years beyond which agency inaction is presumed to be unlawful").   Instead, the relevant factors

include "the complexity of the task at hand, the significance (and permanence) of the outcome,

and the resources available to the agency."  Mashpee Wampanoag Tribal Council, Inc., 336 F.3d

at 430 (emphasis added).  Moreover where, as here, Congress has declined to establish a specific

timetable for agency action, the Court is "not free to ignore that judgment and rewrite the statute

to include a specific timetable."  In re American Fed. of Govt. Employees AFL-CIO, 837 F.2d

503, 506 (D.C. Cir. 1988).

      In this case, Defendants' actions survive review under a "rule of reason" standard.

Although Plaintiffs are concerned only with their own applications and security investigations,

the heavy volume of similar applications that Defendants have before them cannot be ignored.

See Espin v. Gantner, 381 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (noting that plaintiff's

mandamus complaint and request for preliminary injunction ignored the volume of applications

pending in New York and nationwide).  The Texas Service Center has approximately 114,500

employment-based I-485 applications pending, of which approximately 34,549 are still awaiting

completion of FBI background checks.  See Myer Decl. ¶ 20.  The FBI processed over 3.4

million background checks in Fiscal Year 2006.[1]  See Cannon Decl. ¶ 21.  As of the end of

Fiscal Year 2006, the FBI had over 364,600 pending background check requests, of which

157,800 involved adjustment of status applications; those pending background check requests

represent only a fraction of the over 1.6 million background check requests that USCIS

_____

[1]  The fact that the FBI completed so many background checks in that year, and averaged
approximately 2.5 million per year prior to September 11, 2001, belies Plaintiffs' suggestion that
Defendants will "be left in limbo permanently" or that Defendants will never act on the pending
investigations.  See Eldeeb v. Chertoff, 2007 WL 2209231, at * 5 (M.D. Fla. July 30, 2007)
("The fact that 90 percent to 99 percent of the name check requests are timely processed suggests
that 100 percent of name check requests are initiated, and the requests without results after six
months are so because those particular name checks require more time to investigate.").

submitted to the FBI in that fiscal year. <u>See</u> <u>id.</u> ¶ 26. Moreover, the FBI has over 440,000 residual background checks which were among the 2.7 million background checks resubmitted to the FBI after September 11, 2001; those 440,000 background checks are still being processed because the FBI's initial responses indicated that the FBI might have information relating to the applicants. <u>See</u> <u>id.</u> ¶ 24. That high volume of background check requests has placed a significant burden on the FBI's resources, and it is processing most background checks in the order in which they are received. <u>See</u> <u>id.</u> ¶ 26 (noting that the volume of background check inquiries has outpaced the FBI's resources). Once those security screenings have been completed, USCIS will adjudicate Plaintiffs' applications. <u>See</u> Meyer Decl. ¶ 19. In the mean time, Texas Service Center staff makes regular inquiries about the status of the security screenings. <u>See</u> <u>id.</u> Accordingly, this is not a case in which Defendants have refused to take any action on Plaintiffs' applications. Instead, any delay is attributable to the agencies' limited resources and their desire to process applications and security screenings in an orderly fashion.[2] <u>See generally</u> <u>Saleh v. Ridge</u>, 367 F. Supp. 2d 508,513 (S.D.N.Y. 2005) (concluding five-year delay in adjudicating asylum based I-485 was not unreasonable in light of the volume of applications in the system).

The complexity of the task at issue, which is another factor contributing to the FBI's backlogs, also is relevant to the rule of reason analysis. <u>See</u> <u>Mashpee Wampanoag Tribal Council, Inc.</u>, 336 F.3d at 430. The FBI background check is a complex process. <u>See</u> Cannon Decl. ¶¶ 2-30; <u>Eldeeb v. Chertoff</u>, 2007 WL 2209231, at *2-*5 (M.D. Fla. July 30, 2007) (describing the steps and actions entailed in the process). It involves a check of a variety of sources, and although many background checks are resolved in a matter of days, approximately

---

[2] The FBI has taken several steps to improve the background check program, including the use of contractors and hiring additional personnel. <u>See</u> Cannon Decl. ¶¶ 31-38.

thirty two percent require additional, manual review.  See id. ¶ 13.  Most of those remaining checks typically are returned within three months.  See id. ¶ 14.  However, approximately ten percent are identified as possibly being the subject of an FBI record, and the FBI must retrieve and review the relevant records (many of which are in paper, and not electronic, form).  See id. ¶ 15.

Further, background checks from applicants with "common names" typically take longer to process.  Id. ¶ 28.  Plaintiffs admit that they have a common name.  See Pl. MSJ at 25.  Common names often have more than two hundred "hits," i.e., possible matches with a name in an FBI record.  See Cannon Decl. ¶¶ 27-28.

The fact that the Texas Service Center has reported an average processing time of six months for adjustment applications does not change the foregoing analysis.  See Pl. MSJ at Exh. 1.  Plaintiffs were not among the ninety percent of applicants whose background checks could be completed within three months.  Instead, their background checks remain pending.  As a result, USCIS could not complete its adjudication of Plaintiffs' applications within that average processing time of six months.  See Meyer Decl. ¶ 9 ("Due both to the sheer volume of security checks USCIS conducts, and the fact that USCIS must await responses from the internal security agencies that conduct some of the required security checks, some delays on individual applications are unavoidable and may be lengthy.").

**B.  The Impact of the Delay Is Insubstantial Compared With the National Interest in Complete and Thorough Background Checks.**

The third TRAC factor, which somewhat overlaps with the fifth factor, asks whether the case is primarily about "human health and welfare" or "economic regulation."  See In re Barr Laboratories, Inc., 930 F.2d 72, 75 (D.C. Cir.), cert. denied, 502 U.S. 906 (1991).  The fifth factor addresses the nature and the extent of the interests prejudiced by the delay.  Plaintiffs may

be inconvenienced by the delay in adjudication and completion of their background checks.

However, in most cases, the adverse impact caused by the delay is not substantial.  Applicants

for adjustment of status who have pending applications may apply for and obtain employment

authorization for the entire time the application is pending.  Additionally, most applicants may

apply for and receive advance parole to enable them to travel abroad during the pendency of their

application.  Plaintiffs do not claim that the delay has prevented them from traveling abroad or

finding gainful employment, but simply state that this could cause them to incur fees of $340 and

$305.  See Pl. MSJ at 28.  Those fees would cause purely economic harm, if any, which is given

less weight in the TRAC analysis.  See In re Barr Laboratories, Inc., 930 F.2d at 75; see also

Potomac Electric Power Co. v. ICC, 702 F.2d 1026, 1027-28, 1034 (D.C. Cir. 1983) (delay

causing commercial harm found to be unreasonable after 9 years).  The fact that Plaintiffs'

adjustment applications remain pending is not itself sufficient to make them subject to

deportation.   Further, it is far from certain that Plaintiffs will be eligible to become lawful

permanent residents; if the background checks or subsequent inquiries yield information that

causes USCIS to deny Plaintiffs' applications for lawful permanent residency, Plaintiffs will be

in a worse position after adjudication than they are now.

　　　Turning to the fourth TRAC factor, whatever harm Plaintiffs may face as a result of

waiting for the results of Defendants' adjudication and investigations, those individual interests

cannot outweigh Defendants' interests in fully and accurately completing each background

check.  For purposes of the TRAC analysis, the relevant question is whether the importance of

acting on the allegedly delayed action is outweighed by agency activities of a higher or

competing priority.  Courts view this as the most important of the TRAC factors.  See Wong Sze

v. INS, 1997 U.S. Dist. LEXIS 10822, *25 (N.D. CA. 1997) (citing Fraga v. Smith, 607 F. Supp.

517, 521 (D. Or. 1985)).  In this case, the competing agency priorities — namely, enforcing

USCIS's security investigation and background check requirement, and the FBI's interest in

obtaining thorough and accurate results for all investigations and background checks — are of

paramount importance, and cannot be sacrificed for Plaintiffs' personal desire to obtain a more

swift ruling on their pending applications.   See Liberty Fund, 394 F. Supp. 2d at 118.

Security background checks for individuals seeking immigration benefits are a key

component to our nation's security.  See The 9/11 Commission Report, 2004 WL 1634382 at

352 (July 22, 2004) (finding that "had the immigration system set a higher bar for determining

whether individuals are who or what they claim to be . . . it could have potentially excluded,

removed, or come into further contact with several hijackers who did not appear to meet the

terms for admitting short-term visitors").  These checks have revealed "significant derogatory

information on various alien applicants for immigration benefits."  Meyer Decl. ¶ 15.  As a

result, "the public safety requires USCIS to make certain that the checks have been done before

it adjudicates any application or petition and before it issues any immigration status documents

to such persons."  Id. ¶ 16.

As the highest of priorities, "our national security requires that caution and thoroughness

in these matters not be sacrificed for the sake of expediency."  Safadi v. Howard, 466 F. Supp.

2d 696, 701 (E.D. Va. 2006).  Plaintiffs dismiss the investigations as "valueless" and

"dangerous."[3]  Pl. MSJ at 26.  But the FBI determined in 2002 that "deeper, more detailed

clearance procedures were required to protect the people and the interests of the United States

---

[3]  The "USCIS" Ombudsman whose remarks Plaintiffs have cited is not a part of USCIS. The
Ombudsman reports to the Secretary of the Department of Homeland Security.  See 5 U.S.C. §
452.  The Ombudsman's function is to identify problems individuals and employers have with
USCIS, and to propose solutions to those problems.  See id. § 452(b).  The Ombudsman does not
have the authority to dictate the terms upon which adjustment of status applications will be
adjudicated, or to eliminate the background check requirement.  See id.

effectively." Cannon Decl. ¶ 23. Moreover, the FBI has determined that it must ensure that the results of the investigatory process are "accurate and thorough," id. ¶ 39, and that those security interests cannot yield to speed. Likewise, USCIS has determined that all checks must be completed before it adjudicates an application. See Meyer Decl. ¶ 16. Although a delay in processing may have some negative impact upon individual applicants like Plaintiffs, "in this post-9/11 context, agencies must have the freedom to carefully and thoroughly investigate these applications without judicial interference in their priorities." Patil v. Mueller, 2007 WL 1302752, at *2 (E.D. Va. Apr. 30, 2007).

Plaintiffs contend that they should be awarded summary judgment because Defendants have not provided particularized information concerning the factors causing the delay in completing their pending background checks. However, disclosing specific information concerning the results of the FBI's investigation into Plaintiffs' background would be contrary to the longstanding privileges afforded to sensitive law enforcement information. The background and security check process determines, inter alia, whether the applicant's identifying information (i.e., name, social security number, or date of birth) matches that of an individual whose name has been recorded in the FBI's databases in connection with an FBI investigation. See Cannon Decl. ¶ 11. The FBI databases searched contain records compiled for law enforcement purposes, and may include files concerning individuals, organizations, activities, or foreign intelligence matters. See id. ¶ 5. Thus, if an applicant is a suspected criminal and/or terrorist, or a known associate of such a person, the background check process should reveal that information. As a result, Defendants cannot disclose whether or not Plaintiffs are the subject of an ongoing criminal investigation, or the number of "hits" (if any) found upon electronically submitting Plaintiffs' name for batch processing, regardless of the fact that Plaintiffs may wish to know that

information.  However it is reasonable to infer that, due to their common name and/or other factors, Plaintiffs' background checks were among the 10 percent of those which cannot be resolved through electronic batch processing or the manual name searches that typically are completed within 30-60 days.  See Eldeeb, 2007 WL 2209231, at *5.

### C.  Prioritizing Plaintiffs' Applications Would Simply Delay Defendants' Adjudication and Screening of Other Individuals Seeking Immigration Benefits.

Finally, even if the TRAC factors favored Plaintiffs, this case would not warrant judicial intervention into Defendants' processing of adjustment of status applications, security investigations, or background checks.  See Mashpee Wampanoag Tribal Council, Inc., 336 F.3d at 1100.  As of the end of Fiscal Year 2006, there were approximately 364,600 pending USCIS background check requests, of which over 157,800 were related to adjustment-of-status applications.  See Cannon Decl. ¶ 26.  USCIS has reported that, as of May 2007, there were 329,160 immigration applications awaiting completion of background checks, of which 31,144 had been pending for over thirty three months.  See Vaughan Decl. ¶ 20; Meyer Decl. ¶ 20.  Giving Plaintiffs' background checks priority over those other individuals' checks would simply delay the completion of those other investigations.  That would not be equitable, and

> would set a dangerous precedent, sending a clear signal that more litigious applicants are more likely to be moved to the top of the proverbial pile over other applicants that have waited even longer.  Such a situation hardly optimizes resources, and serves only the individual at the detriment to the group.

Dmitrenko v. Chertoff, No. 07-82, 2007 WL 1303009, at * 1 (E.D. Va. Apr. 30, 2007); Orlov v. Howard, __ F. Supp. 2d __, 2007 WL 4293490, at *7 (D.D.C. Dec 10, 2007) (quoting same).  Thus this is a case in which "a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain."  Mashpee Wampanoag Tribal Council, Inc., 336 F.3d at 1100.

Given that USCIS and the FBI are treating Plaintiffs in the same manner as other applicants, and are working conscientiously to reduce the backlog, the Court should not require them to move Plaintiffs ahead of other applicants awaiting background check results.  See id. at 1100-01; In re Barr Laboratories, Inc., 930 F.2d at 75-76 (concluding that interfering with the FDA's priorities in order to place one applicant ahead of other similarly situated applicants was inappropriate); Espin, 381 F. Supp. 2d at 266 (concluding that Plaintiff "has given no reason for the Court to compel the CIS to devote immediate attention to her adjustment application" and prioritize it over the over 250,000 applications filed in New York alone that year).  As explained supra, the volume of background checks has surpassed the FBI's resources, but the FBI is taking steps to address the delays and reduce the backlog.  See Cannon Decl. ¶¶ 31-38. Unless the applicant's background check meets the criteria for being expedited, the FBI "generally works on the oldest name checks first — a first-in, first-served protocol."  Cannon Decl. ¶ 18.  This order applies at "each stage of processing," and reflects the FBI's judgment that "all applicants are equally deserving" and should be treated fairly.  Id.

Plaintiffs focus on the fact that most background checks are completed within a matter of months, and contend that this contradicts Section Chief Cannon's testimony concerning the first-in protocol.  See Pl. MSJ at 24-25.  That argument conflates the order of processing with the order of completion. To the extent that there may be individuals who filed their adjustment of status applications after Plaintiffs but have received a final adjudication of the application, that simply indicates that those individuals' background checks could be completed at the earlier (and typically shorter) stages of the FBI's process, or that they were expedited.[4]

Agencies maintain "great latitude in determining their agendas."  In re Monroe

---

[4] One other exception to the first-in policy is the FBI and USCIS effort to reduce name checks by prioritizing "single hit" name checks.  See Cannon Decl. ¶ 20.

Communications, Corp., 840 F.2d 942, 946 (D.C. Cir. 1988). As the Court of Appeals stated:

> [W]e have no basis for reordering agency priorities. The agency is in a unique - and authoritative - position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way.

In re Barr Laboratories, Inc., 930 F.2d at 76. Here, within the confines of the resources allocated to them, USCIS and the FBI have developed a process for handling the millions of applications and background checks submitted to them. A court should be loathe to upset the balance they have struck. An order requiring the shifting of priorities, accelerating one application over another, or giving some kind of preferential treatment to one group of cases would upset this delicate balance without full appreciation of the consequences to the agencies and other applicants. In sum, Plaintiffs should be required to wait their turn, like all other applicants, rather than being moved forward in the queue to the detriment of others.

### D. Defendants Are Making a Good Faith Effort to Address the Delay.

The sixth and final TRAC factor provides that a court need not find impropriety to hold that an agency action is unreasonably delayed. Conversely, "the good faith of the agency in addressing the delay weighs against mandamus." Liberty Fund, 394 F. Supp. 2d at 120. Here, the delay in USCIS's completion of the adjudications is attributable to the pendency of Plaintiffs' background checks. See Meyer Decl. ¶ 19. As discussed supra, the FBI is processing the background checks to the best of its ability, and USCIS is monitoring the case to ensure that once the background checks are complete, it can complete adjudication. Further, the FBI has taken several steps to reduce the backlog, and is continuing to explore means of improving the name check program. See Cannon Decl. ¶¶ 31-38. Given that both agencies are taking active steps towards completing the background checks and adjudicating Plaintiffs' applications, this final factor of the TRAC analysis supports entry of judgment for Defendants. See Saleh, 367 F. Supp.

2d at 513 (finding five-year delay was not unreasonable under APA); <u>Espin</u>, 381 F. Supp. 2d at

266 (three-year delay not unreasonable because of government's limited resources and

substantial caseload); <u>Alkenani v. Barrows</u>, 356 F. Supp. 2d 652, 656-57 (N.D. Tex. 2005) (no

unreasonable delay in naturalization context because of need to wait for completion of FBI

investigation).

## CONCLUSION

For the foregoing reasons and those set forth in Defendants' Motion to Dismiss,

Defendants respectfully request that the Court DENY Plaintiffs' Motion for Summary Judgment

and GRANT Defendants' motion to dismiss, or in the alternative, GRANT Defendants' motion

for summary judgment, or, in the alternative, TRANSFER this case to the Northern District of

Texas.

Dated:  January 3, 2008                    Respectfully submitted,

                                           _____/s/_____
                                           JEFFREY A. TAYLOR, D.C. BAR # 598610
                                           United States Attorney


                                           _____/s/_____
                                           RUDOLPH CONTRERAS, D.C. BAR # 434122
                                           Assistant United States Attorney


                                           _____/s/ Robin M. Meriweather_____.
                                           ROBIN M. MERIWEATHER, D.C. Bar. # 490114
                                           Assistant United States Attorney
                                           555 Fourth St., N.W.
                                           Washington, D.C.  20530
                                           Phone: (202) 514-7198 Fax: (202) 514-8780
                                           Robin.Meriweather2@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                )
LEO KELLY, <u>et al.</u>                        )
                                                )
                    Plaintiffs,                 )
                                                )
        v.                                      )    No. 1:07CV1601(RBW)
                                                )
EVELYN UPCHURCH, Director, Texas                )
Service Center, U.S. Department of              )
Homeland Security, <u>et al.</u>                )
                                                )
                    Defendants.                 )
_____)

**STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE DISPUTE**

Pursuant to Local Rules 7(h) and 56.1, Defendants hereby submit the following statement of material facts as to which there is no genuine dispute. Defendants believe that there are no material facts in dispute that would preclude disposition of this case on the merits by entry of summary judgment. The facts established below are sufficient to support the award of summary judgment to Defendants.

1. Plaintiff Leo Kelly filed an I-485 application for adjustment of status to that of a lawful permanent resident. <u>See</u> Compl. ¶ 11. Plaintiffs Margaret Kelly, Jack Kelly, and Ross Kelly seek adjustment of status as derivative beneficiaries of Plaintiff Leo Kelly's application. <u>See</u> <u>id.</u>

2. United States Citizenship and Immigration Services requested national security screenings in connection with Plaintiffs' adjustment of status applications. <u>See</u> Declaration of Robert D. Meyer, ¶¶ 18, 19.

3. USCIS has determined that the public safety requires it "to make certain that the

[security] checks have been done before it adjudicates any application or petition and before it issues any immigration status documents to such persons."  Meyer Decl. ¶ 16.

4.  The FBI has not yet completed the background checks for Plaintiff Leo Kelly.  <u>See</u> Declaration of Michael Cannon, ¶ 41; Meyer Decl. ¶ 19.

5.  The FBI has determined that its "mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results."  Cannon Decl. ¶ 39.

6.  The derivative applications for adjustment of status filed by Plaintiffs Margaret Kelly, Jack Kelly, and Ross Kelly are dependent upon Plaintiff Leo Kelly's application for adjustment of status, and can be granted only if Plaintiff Leo Kelly's application is approved.  <u>See</u> Compl. ¶ 11; 8 U.S.C. § 1153(d).

Dated:  January 3, 2008                          Respectfully submitted,

                                        _____/s/_____
                                        JEFFREY A. TAYLOR, D.C. BAR # 598610
                                        United States Attorney


                                        _____/s/_____
                                        RUDOLPH CONTRERAS, D.C. BAR # 434122
                                        Assistant United States Attorney


                                        _____/s/ Robin M. Meriweather_____.
                                        ROBIN M. MERIWEATHER, D.C. Bar. # 490114
                                        Assistant United States Attorney
                                        555 Fourth St., N.W.
                                        Washington, D.C.  20530
                                        Phone: (202) 514-7198 Fax: (202) 514-8780
                                        Robin.Meriweather2@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
LEO KELLY, <u>et al.</u>                      )
                                        )
              Plaintiffs,               )
                                        )
       v.                               )   No. 1:07CV1601(RBW)
                                        )
EVELYN UPCHURCH, Director, Texas        )
Service Center, U.S. Department of      )
Homeland Security, <u>et al.</u>              )
                                        )
              Defendants.               )
_____)

**ORDER**

Upon consideration of Defendants' Alternative Motion for Summary Judgment, it is this
_____ day of _____, 2008,

       ORDERED that Defendants' Alternative Motion for Summary Judgment be and hereby is
GRANTED;

       It is further ORDERED that summary judgment be and hereby is entered in favor of
Defendants.

       SO ORDERED.


                              _____
                              United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Leo Kelly, Margaret Kelly, Jack Kelly & Ross Kelly<br><br>                    Plaintiffs,<br><br><br>v.<br><br><br>Department of Homeland Security, et. al<br><br>                    Defendants. | Civ. Act. Number: **1:07-CV-01601** |

## DECLARATION

I, the undersigned officer of the Texas Service Center, United States Citizenship and Immigration Services, pursuant to 28 U.S.C. 1746, do hereby declare the following under the penalty of perjury:

1. I am over the age of 21 and of sound mind.  I am an officer with the Texas Service Center, U.S. Citizenship and Immigration Services. There are five USCIS regional Service or Benefit Centers throughout the United States, each of which has jurisdiction over certain applications and petitions filed by persons or companies within its respective geographic jurisdiction, and/or exclusive nationwide jurisdiction over other types of applications. These Centers adjudicate cases on a mail-in basis only; they do not conduct in-person interviews. Employment-based adjustment of status cases like Plaintiff's are handled at the Nebraska and Texas Service Centers. TSC processes many type of applications/petitions that do not require personal interviews and anticipates annual receipts of about 800,000 with about 700,000 anticipated completions. The TSC receives roughly 6,000 pieces of mail a day, sends out a corresponding amount, and has about 2,000,000 active files.

2. The Plaintiffs filed an I-140/I-485. The goal of the 1-140 and 1-485 filings are to obtain lawful permanent resident ("green card") status for Plaintiff and any qualified dependent spouse or child through Plaintiff's employment. By statute, only about 140,000 aliens can get green cards through employment-based categories during each fiscal year, with percentage limits set per country and preference category. These visa numbers are tracked and issued by the Department of State.  The I-485 cannot be approved until after the I-140 is approved.  There is often a need to further develop the information needed for an I-140 petition before the I-485 may be considered.  Similarly, there is often a needed to further develop the information needed for an I-485 application before it is ready for consideration.

3. Center Adjudications Officers, under authority delegated by the Director, independently evaluate and weigh the sometimes voluminous and complex evidence and statements a petitioner submits, may request additional evidence from the petitioner and others, make

discretionary factual determinations and resolve any conflicts in the evidence, review decisions of the Administrative Appeals Office (an appellate adjudicatory body that decides appeals and issues decisions), Policy Statements and Procedural Manuals issued under the authority of the Director of U.S.CIS, the Foreign Affairs Manual of the Department of State, the INA and other legal sources, and draft a proposed written decision for the Director of the Texas Service Center that is consistent with the precedents, the policies, factual determinations, the Director's exercise of discretion, and the petitioner's burden of proving that they should be granted the visa petition and adjustment application.  The decision to approve an immigrant visa or an adjustment involves national security, social, political and foreign policy considerations and determines when, how, and under what conditions foreign nationals are to be allowed to remain within the United States.  Adjudications officers work.  The decisions are subject to internal review before the Director accepts it.  If the petitioner does not agree with the Director's Decision on the Immigrant Visa Petition, the petitioner may appeal to the Administrative Appeals Office to correct any errors in the decision but there is no internal appeal process for denial of an I-485.  An I-485 can be reconsidered upon motion and it can be renewed before an immigration judge during removal proceedings.

4. General requirements for employment-based adjustment of status applications are that the alien is the beneficiary of an approved 1-140 visa petition (or whose spouse is such a beneficiary), is in lawful immigration status on the date the Form 1-485 is filed, has a visa number immediately available under the annual per-country and preference category quota, and is not inadmissible to the United States under listed statutory grounds that include health-related, criminal, and national security provisions.

5. Once USCIS receives an I-485, a file is opened and an electronic record of that application is created.  Much of this initial electronic processing and data entry is automated, including the automatic generation and electronic transmission of a required national security screening request in FBIQUERY, the FBI repository and tracking system for FBI Name Check requests.  Once the initial file creation and processing of an I-485 application is complete, each file is placed on a Just In Time ("JIT") shelf for processing and adjudication in chronological order according to date of receipt.

6. Initially, the TSC runs a daily electronic report in FBIQUERY system for all files on the JIT shelf to confirm the successful transmission of the FBI Name Check request and to identify those applications that have received responses from the FBI name checks and FD-258 (fingerprints) and are thus ready for adjudication.  FBI name check requests that have been received by the FBI but have not yet been completed are indicated by a notation of "Pending" in FBIQUERY.  An FBI Name Check that has been completed will be indicated by various entries depending on the result.

7. This report will also identify those I-485 applications that have received a "No Data" or "Error" response in FBIQUERY indicating a problem with transmission of the name check request from USCIS to the FBI.  If such a problem is reported, the FBI name check requests will then be initiated a second time and resent manually or electronically to the FBI for a response.  In this way USCIS ensures that the FBI has in fact received all requests for name checks

8. All files on the FBI Name Check Shelf are audited regularly in order to identify those in which a response from the FBI has been received.   In this manner the agency ensures that as FBI responses are received, files are expeditiously released for adjudication.

9. Due both to the sheer volume of security checks USCIS conducts, and the fact that USCIS must await responses from the internal security agencies that conduct some of the required security checks, some delays on individual applications are unavoidable and may be lengthy.

10. Service Centers have a process for expediting processing of certain applications and petitions. However, it is important to note that whenever a particular application or petition receives expedited processing and is moved up in the adjudications queue, it is at the expense of those still unadjudicated petitions or applications that bear an earlier filing date. If, for example, USCIS asks the FBI to expedite a case, this action comes at the expense of other name check cases, many of which have been pending since December 2002, because FBI would have fewer resources with which to work the other pending cases. USCIS is currently limited in the number of expedite requests that can be made to the FBI each week, and there is a backlog even in submitting the expedite requests for cases that have been deemed to meet expedite criteria.

11. In order to address in a consistent and fair manner the increasing number of mandamus actions filed nationwide by aliens awaiting decisions on their petitions and applications, USCIS issued specific guidelines for requesting an expedited name check from the FBI. Expedited processing may be pursued in cases at USCIS's discretion for military deployment, age-out cases and applications affected by sunset provisions, significant and compelling reasons such as critical medical conditions, loss of social security benefits or other subsistence, severe financial loss, extreme emergent situation, humanitarian situation, nonprofit status of requesting organization in furtherance of the cultural and social interest of the United States, Department of Defense/National Interest requests from official U.S. government entity, USCIS error, or compelling interest of USCIS.

12. To my knowledge, Plaintiff has not made a formal request for expedited processing. Expedite requests are determined on a case-by-case basis. Plaintiff states in their complaint that they wishes to have their green card quickly so that they may begin accruing the years needed to apply for U.S. citizenship. This is a common reason for an alien to desire lawful permanent resident status and does not generally, as a single factor, constitute a special circumstance that would justify emergency or expedited processing. Other common reasons include a desire for "peace of mind" and the inability of non-lawful permanent residents or non-U.S. citizens to: petition for alien relatives, work and travel without special permission, get grant funds for research, apply for desirable jobs, qualify for scholarships or fellowships, or get in-state tuition for self, spouse or dependents.

13. Another common factor in the many mandamus lawsuits filed against USCIS involving pending FBI name checks is the plaintiffs' claims that they made repeated status inquiries about their case to USCIS, FBI, Congress, and the White House. While multiple status inquiries show the applicants frustration with the pace of the processing of their applications, the inquiries, and mandamus actions, increase the workload of the FBI and USCIS, rather than having the effect of faster or special treatment of the subject applications. USCIS neither tracks nor records customer service inquiries in the administrative record.

14. When an alien applies for adjustment of status, USCIS conducts several forms of security and background checks to ensure that the alien is eligible for the immigration benefit and they is not a risk to national security or public safety. In addition to records checks against DHS's own immigration systems, these background checks currently include (a) a Federal Bureau of Investigation (FBI) fingerprint check for relevant criminal history records on the alien (e.g., arrests and convictions); (b) a check against the DHS-managed Interagency Border Inspection System (IBIS) that contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies, such as the Central Intelligence Agency (CIA), FBI, other divisions of the United States Department of Justice, Department of State, DHS/U.S. Customs and Border Protection (CBP), and other DHS agencies (IBIS includes, but is not limited to, information related to persons who are wanted or under investigation for serious crimes or suspected of terrorism-related activity) ; and (c) an FBI name check, which is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS.

15. These law enforcement checks have revealed significant derogatory information on various alien applicants for immigration benefits, including applicants seeking permanent residency, which has resulted in the alien being found ineligible for the benefit and USCIS's denial of the application. Where applicable, the information has also resulted in aliens being arrested by law enforcement agencies or charged under removal grounds and deported from the United States following a final order of removal. In many instances, the disqualifying information on the alien has been discovered as a result of the IBIS or FBI name checks, but it has not been revealed by a fingerprint check alone.

16. Since the terrorist attacks of September 11, 2001, the need to conduct more rigorous and thorough background checks on aliens who are seeking immigration status in the United States has required procedures that sometimes result in individuals not receiving their documents and benefits as quickly as in the past. In order to ensure national security and public safety, as well as to reduce the waiting time for adjudication and documentation of lawful status, USCIS is currently working with DOJ, DHS, and ICE to develop and implement improved procedures that will ensure that all of the background checks are completed and the results considered as quickly as possible. However, the public safety requires USCIS to make certain that the checks have been done before it adjudicates any application or petition and before it issues any immigration status documents to such persons. USCIS will continue to perform any outstanding background and security checks as expeditiously as possible to help ensure that no eligible alien must wait longer than is reasonably necessary to receive a decision on his or her application or petition and to receive evidence of his or her immigration status.

17. The fingerprint check must be less than fifteen months old at the time any application or petition is adjudicated. The rescheduling of fingerprints is done to ensure that the case is ready to be adjudicated once Plaintiff's name check clears. Plaintiff's preliminary IBIS checks have been completed.. Since 9/11, USCIS has submitted millions of name check requests to the FBI, thus taxing that agency's resources and creating a backlog in FBI's performance of complete security checks. During the initial submission period of December 2002 and January 2003, USCIS submitted almost 3 million names to the FBI.

18. I have custody of the TSC records of Leo Kelly, Margaret Kelly, Jack Kelly & Ross Kelly, A98482952, A98482953, A98482954, A98482955, and I supervise TSC officers who are

processing Leo Kelly, Margaret Kelly, Jack Kelly & Ross Kelly's applications. [5] After reviewing the information pertaining to Leo Kelly, Margaret Kelly, Jack Kelly & Ross Kelly, I attest that USCIS has referred this case for lawfully required security screening of aliens and that TSC suspended its processing in accordance with the requirements for security screening of aliens using intelligence information having a bearing on the security of the United States.

19. During the normal processing of this case, a national security screening was requested. Plaintiff Leo Kelly's (A98482952) FBI name check is pending and fingerprint is valid. However, Margaret Kelly, Jack Kelly & Ross Kelly's applications cannot be processed prior to that of Leo Kelly, since their benefit derives only from the approval of her application. A response is required from the FBI before the case can be adjudicated. The information and records pertaining to Leo Kelly, Margaret Kelly, Jack Kelly & Ross Kelly shows that TSC Officers under my supervision make regular inquiries about the status of their security screening.   Plaintiffs application for adjustment of status is ready to be adjudicated except for their pending background and security check.

20. The Texas Service Center currently has approximately 114,500 employment-based Form I-485 adjustments of status cases pending, about 34,549 of which are still awaiting completion of FBI name checks before they can be adjudicated. Of an additional 27,332 pending asylum-based Form 1-485 adjustment of status cases, there are approximately 1,235 awaiting responses on FBI name checks. Of a total figure of approximately 148,790 naturalization applications filed and pending at TSC, approximately 48,059 are awaiting responses on FBI name checks. USCIS reports that there were 329,160 applications, nationwide, awaiting responses on FBI name checks as of May 2007. Of this number, 31,144 cases have been pending name check results for more than 33 months."

Robert D. Meyer
Supervisory Adjudicator Officer
Texas Service Center

12/12/07
Date