# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **LEO KELLY, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| v. | ) | **CIVIL ACTION NO. 07-1601(RBW)** |
| | ) | |
| **EVELYN UPCHURCH, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### I.    ARGUMENT

Defendants again ask the Court to take it on faith that they are acting reasonably to process Plaintiffs' applications for permanent residence after sitting on Plaintiffs' applications for more than 41 months. Defendants skillfully provide a multiplicity of clever rationales to justify their inaction, valiantly attempting to paint utter inaction as a series of conscious decisions to withhold judgment. These arguments appear somewhat reasonable on their face, but are belied by Defendants actual practices and upon close scrutiny, these contentions wither and decay.

Defendants contend that they have made "good faith efforts" to adjudicate Plaintiffs' applications, but fail to demonstrate what, ***if any,*** action, they have taken with regard to Plaintiff Leo Kelly's security clearances. In the absence of any particularized evidence to establish the reasonableness of their inaction, Defendants are quick to retreat to the justification that is all too often advanced by the government in these cases – unlimited deference is required in the post-9/11 world. <u>Compare</u> Def's Memo in Support

of Def's Mot. For Sum. Judgment at 1 & 15-6 (stating that Defendants have made "good faith" efforts), with Id. at 11-12 (citing 9/11 and national security as the reason that they cannot provide specifics regarding any of their purported acts).

Defendants' insinuate that the "name check" at issue here is a necessary safeguard that might have prevented the 9/11 attacks. Id. at 11. However, the reality is, Defendants' cannot provide even the most basic specifics as to what is being done to complete this name check because there is no ongoing investigation into Plaintiff's background. Moreover, if there was an actual investigation, of course, the efficient processing of the security checks is in the nation's best interests, as Mr. Leo Kelly lives and works in the U.S. unmonitored. Obviously, Mr. Kelly's unmonitored presence in the U.S. does not make the U.S. and its people any safer. On the contrary, as the USCIS Ombudsman points out, the efficient treatment of these name checks is in everyone's best interests, except for those that mean to do this country and its people harm. Exhibit 1.

It is abundantly clear that there is no investigation from Defendants' failure to show that they have taken any of the actions required of them by their own regulation when a prolonged undisclosed investigation is necessary to protect U.S. interests, 8 C.F.R. § 103.2(b)(18). In accordance with 8 C.F.R. §103.2(b)(18), USCIS is required to undertake periodic review at certain specified intervals "if an [undisclosed] investigation has been undertaken and has not been completed within one year of its inception."

Under that regulation, once a year has passed from the inception of the investigation, the district director of USCIS is to:

> review the matter and determine whether adjudication of the petition or application should be held in abeyance for six months or until the investigation is completed, whichever comes sooner. If, after six months of the district director's determination, the investigation has not been completed, the matter shall be

> reviewed again by the district director and, if he/she concludes that more time is
> needed to complete the investigation, adjudication may be held in abeyance for up
> to another six months. If the investigation is not completed at the end of that time,
> the matter shall be referred to the regional commissioner, who may authorize that
> adjudication be held in abeyance for another six months. Thereafter, if the
> Associate Commissioner, Examinations, with the concurrence of the Associate
> Commissioner, Enforcement, determines it is necessary to continue to withhold
> adjudication pending completion of the investigation, he/she shall review that
> determination every six months.

After being given ample opportunity, Defendants have failed to supply any evidence that

they have undertaken any of these mandated actions.

Clearly, Defendants are not foreclosed by national security concerns from

providing at least some evidence that they have acted in accordance with 8 C.F.R.

§103.2(b)(18). In fact, the U.S. Supreme Court required the government to satisfy more

than a "very deferential 'some evidence' standard" to prove that a given individual poses

a threat to national security interests and should be labeled a "enemy combatant" in

Hamdi v. Rumsfeld, 542 U.S. 507, 527-28 (U.S. 2004). That case involved the detention

of a suspected al Qaeda operative, which implicates far more sensitive national security

interests than those at issue here. In her Opinion, Justice O'Connor noted that:

> As critical as the Government's interests may be in detaining those who actually
> pose an immediate threat to the national security of the United States during
> ongoing international conflict, history and common sense teach us that an
> unchecked system of detention caries the potential to become a means for
> oppression and abuse of others who do not present that sort of threat. Id. at 530.

Therefore, Justice O'Connor concluded, that the government must provide more than

'some evidence' to support its national security interests and cannot merely invoke 9/11

as a justification for their inaction. Id. at 533.

In this vein, despite Defendants' arguments, when esteemed federal court judges

like the Honorable Emmet Sullivan and the Honorable Stewart Dalzell ask Defendants to

supply at least some evidence that they are acting reasonably to adjudicate an alien's application for permanent residence, they are not asking the agencies to jeopardize an ongoing investigation, but rather, they are compelling Defendants to provide at least some evidence that they are acting and that their actions are reasonable within the confines of U.S. immigration laws. Liu v. Novak, 509 F.Supp.2d 1, 7, 10 (D.D.C. Aug. 30, 2007) (J. Emmet Sullivan); also see Cao v. Upchurch, 496 F.Supp.2d 569, 577 (ED.PA. July 16, 2007) (J. Stewart Dalzell) (noting that "there may be situations in which evidence to justify defendants' delay exists but such evidence cannot be shared with the applicant. 8 C.F.R. § 103.2(b) (18), however, provides USCIS with adequate means to deal with such a situation. Section 103.2(b)(18) does not require USCIS to reveal to the applicant the reasons for delay. It merely requires that certain procedures for delaying adjudication be followed. Similarly, in a suit claiming unreasonable delay, USCIS may defend its actions merely by demonstrating compliance with the regulations. It need not file with the court details of the ongoing investigation. Because defendants here have made no attempt to rebut plaintiffs' proof of unreasonable delay, Rule 56(e) requires us to grant plaintiffs' motion for summary judgment."); also see Mize v. Swacina, 07-21230, 5-7, 11 (D.C. Southern District of Florida, Nov. 6, 2007) (J. Jose Martinez) (applying the logic of Judge Sullivan in Liu and ordering the government to "specifically address the delay in completing [the applicant] Mr. Cardad's FBI name check").

It is unfortunate that Assistant U.S. Attorneys are hamstrung by the agencies to advance disingenuous arguments and to invoke 9/11 as a catch-all for Defendants' failure to comply with the immigration laws, after all, these attorneys have to do the best that they can with facts that indicate that these agencies have utterly failed in their mission.

However, it is difficult if not impossible to imagine how an alien who lives and works in the U.S. untracked could gain any knowledge that would jeopardize national security based on a showing that the agencies complied with this periodic review process. Other basic information such as the location of the name check files, when the name check actually began as opposed to when it was sent to the FBI, and information concerning the prolonged delay of this name check *vis a vis* standard processing times do not undercut any national security interests. In this vein, 9/11 is not a compelling justification for the agencies' complete failure to set-forth any evidence of their purported actions in this case.

Even in the absence of specifics concerning the adjudication of Plaintiffs' individual applications, Defendants have failed to supply convincing evidence that would demonstrate that generally a 41 month wait is reasonable under the circumstances. Defendants insinuate that the FBI generally lacks resources to complete Plaintiff Leo Kelly's name check within a reasonable time-frame. Def's Memo in Support of Def's Mot. For Sum. Judgment at 15. However, the boilerplate Vaughn, Meyer and Cannon declarations upon which this supposition is based, fail to describe the resources that have been devoted generally to the completion of the name checks, the number of examiners who are working on such cases, and why the agencies have chosen to allocate them in this way. While these declarations cite the number of name checks USCIS has been sending to the FBI, there is no comparative evidence showing that FBI examiners are being overtaxed based on their budget and numbers by this workload. Once again, Defendants ask that the Court take it on faith that they lack the resources to complete these name checks within a 41 month period.

Additionally, once analyzed, Defendants' own numbers show that the 41 month wait in this case is unreasonable in relation to the agency's general turn-around times. The agency claims that in May 2007 the number of aliens awaiting FBI name check clearances was 329,160. The numbers suggest that 52.7% of these clearances, 173,568, are completed within six months, 83.2%, 273,919, are completed within two years, and that only 9.5%, 31,144, remain pending for more than 33 months. Exhibit 1 at 38. The agency does not track the number of name checks that have been pending even longer, such as Plaintiffs' who have waited 41 months and counting.

For this reason, as it has been shown that the delay here is unreasonable in relation to the standard processing of name checks, it becomes all the more incumbent on Defendants' to rebut the unreasonableness of the delay at issue here with specifics showing that the more than 41 month long name check at issue in Leo Kelly's case is in fact reasonable. Mize v. Swacina, 07-21230, 10-11 (D.C. Southern District of Florida, Nov. 6, 2007); Cao , 496 F.Supp.2d at 577 (citing Fed.R.Civ.P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

As a result, Plaintiff implores the Court not to grant the agencies the unfettered discretion they seek, based on nothing more than faith.

Respectfully Submitted,


*/s/ Thomas A. Elliot*
Thomas A. Elliot, Esquire
D.C. Bar No. 259713
Elliot & Mayock, LLP
1629 K Street, N.W., Suite 1250
Washington, DC 20006-1641
(202) 429-1725

*/s/Daniel M. Rudnick*
Daniel M. Rudnick, Esquire
PA Bar No. 201481
Steel, Rudnick and Ruben
1608 Walnut Street, Suite 1500
Philadelphia, PA 19103
(215) 546-4333

Dated: January 11, 2008          Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| KELLY, et al.<br>    Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | CASE NO. 1:07-CV-01601 |
| | ) | |
| UPCHURCH, et al. | ) | JUDGE REGGIE B. WALTON |
|     Defendants. | ) | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of January, 2008, I caused Plaintiffs'

Memorandum of Points and Authorities in Opposition to Defendants' Motion for

Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment to be

served electronically, via the ECF system, to the person at the address set forth below.

This document is available for viewing and downloading from the ECF system.

Jeffrey A. Taylor, U.S. Attorney
Rudolph Contreras, Assistant U.S. Attorney
Robin M. Meriweather, Assistant U.S. Attorney
555 Fourth Street, N.W.
Washington, DC  20530

I declare under penalty of perjury that the foregoing is true and correct.  Executed

this 11th day of January, 2008.

/s/ Thomas A. Elliot
Thomas A. Elliot, Esquire
D.C. Bar No. 259713
Elliot & Mayock, LLP
1666 Connecticut Ave., NW
5th Floor
Washington, DC 20009
(202) 429-1725

# EXHIBIT 1



Citizenship and Immigration Services Ombudsman

# Annual Report 2007

**Submitted to:**

**United States Senate**
**Committee on the Judiciary**

**United States House of Representatives**
**Committee on the Judiciary**

**June 11, 2007**



*Citizenship and Immigration Services Ombudsman*                    **Annual Report to Congress June 2007**

---

## MESSAGE FROM THE OMBUDSMAN

 The Citizenship and Immigration Services Ombudsman's 2007 Annual Report marks 46 months of cumulative analysis and recommendations since the establishment of the office. The Ombudsman's office is Congressionally-mandated to assist individuals and employers in resolving problems with the U.S. Citizenship and Immigration Services (USCIS) of the Department of Homeland Security (DHS) by advancing recommendations on improving USCIS services and operations. It is an independent DHS office that reports directly to the DHS Deputy Secretary with an annual report to Congress without prior review and comment by DHS or the executive branch, as directed by the Homeland Security Act of 2002.

The Ombudsman's first three annual reports focused on the systemic issues that caused delay in granting immigration benefits and customer service complaints. These reports identified pervasive and serious issues that were addressed in 28 formal recommendations directed at solving problems faced by individuals and employers in their interactions with USCIS. The USCIS Director and the Ombudsman generally agree on the identified problems and their need for priority attention, although the solutions proposed and those adopted by USCIS may differ.

Challenges still exist within USCIS. Customers continue to have difficulties with confusing forms and processes and many customers wait months, and perhaps years, for final adjudication of their cases. The Ombudsman will continue to assist individuals to receive lawful benefits in a timely, customer-friendly, secure, and efficient manner.

I want to thank DHS Secretary Michael Chertoff, Deputy Secretary Michael P. Jackson, former Secretary Tom Ridge, former Deputy Secretary Jim Loy, former Deputy Secretary Gordon England, USCIS Director Emilio Gonzalez, Deputy Director Jonathan "Jock" Scharfen, and former Director Eduardo Aguirre for their dedication to our mission of providing secure, efficient, and expeditious immigration services. I have been privileged to work with committed professionals in DHS, USCIS, and the Ombudsman's office.

The preparation of this annual report was accomplished by tireless efforts of a dedicated staff of professionals who spent many hundreds of hours reviewing and validating facts and figures, as well as drafting and editing the report. I thank them for assisting me in completing it and for their public service in addressing national security and customer service. I especially would like to thank Wendy Kamenshine who again this year skillfully managed this complicated project.

We have accomplished a great deal, but there is much more to do in the spirit of responsive government.

*Prakash Khatri*

Prakash Khatri
Citizenship & Immigration Services Ombudsman

---

support centers, field offices, and service centers, there has been a substantial reduction in the backlog. Unfortunately, the agency's redefinition of the backlog obscures the issue and raises questions about its backlog reduction efforts.

**C.     Processing Times** – On August 23, 2006, USCIS announced changes that would improve the reporting methodology for processing times of immigration benefit applications. The Ombudsman disagrees that this change provides better information and urges USCIS to return to the practice of providing the public with the actual processing time for each field office.

**D.     Customer Service** – During the reporting period, USCIS made important strides in customer service. USCIS increased the number of appointments available via INFOPASS and began two new contracts in the effort to improve its toll-free customer service line. Nevertheless, the Ombudsman continued to observe other areas where communication issues with customers persist: (1) limited customer access to USCIS immigration officers who know about individual cases to resolve an inquiry accurately and efficiently; (2) questionable accuracy of information provided by customer service representatives; and (3) the practice of providing minimal information in response to customer inquiries.

**E.     Untimely Processing and Systemic Problems with Employment-Based Green Card Applications** – USCIS' inability to process enough green card applications and accurately track employment-based green card applications has resulted in a perpetual backlog of employment-based green card applications and widespread issuance of interim benefits. This lack of accurate data also has resulted in the underutilization of statutorily limited visa numbers.

**F.     Name Checks and Other Security Checks** – FBI name checks, one of the security screening tools used by USCIS, continue to significantly delay adjudication of immigration benefits for many customers, hinder backlog reduction efforts, and may not achieve their intended national security objectives. FBI name checks may be the single biggest obstacle to the timely and efficient delivery of immigration benefits, and the problem of long-pending FBI name check cases worsened during the reporting period.

**G.     Interim Benefits** – The Ombudsman strongly supports efforts by USCIS to eliminate the need for interim benefits in favor of timely, efficient, and secure adjudication of the ultimate immigration benefit. Legitimate customers should not have to pay filing fees for interim benefits they would not need if the underlying petition were timely processed. Interim benefits also allow ineligible and fraudulent applicants to receive work authorization and travel documents because of processing delays.

**H.     Funding of USCIS** – Due to the congressional requirement that USCIS be self-funded from fees, USCIS may make decisions that compromise operational efficiency to ensure revenue flow. The manner in which USCIS obtains its funding affects every facet of USCIS operations, including the ability to: (1) implement new program and

*Citizenship and Immigration Services Ombudsman*                    **Annual Report to Congress June 2007**

were approved. This process would ensure that USCIS does not accept more applications than the number of visas available.

Another issue with priority dates and workloads is connected to the new fee rule. The Ombudsman anticipates that when the new fee rule goes into effect in July, delays in adjudication will significantly impact the agency if it does not track visa information, including visa classifications, priority dates, and country of chargeability. Without tallying cases receipted by visa category, USCIS inevitably will accept ineligible applications and more applications than it can process in the given timeframe. The agency will not collect fees for interim benefits issued for new green card applicants, as the new fee rule requires only one payment for both. In addition, there may be large numbers of retrogressed cases and, eventually, multiple issuances of interim benefits.

As described in the Ombudsman's 2006 Annual Report (at pp. 13-16), the Ombudsman continues to be concerned about USCIS' data integrity and failure to meet its obligation to maintain an accurate count of pending employment- and family-based preference applications. Although the focus is on employment-based visa applications, similar concerns exist for family-based preference cases. The continued collaboration of these agencies supports the Ombudsman's vision of cooperation to provide benefits in a timely and efficient manner.

## F.    Name Checks and Other Security Checks

FBI name checks, one of several security screening tools used by USCIS, continue to significantly delay adjudication of immigration benefits for many customers, hinder backlog reductions efforts, and may not achieve their intended national security objectives. FBI name checks may be the single biggest obstacle to the timely and efficient delivery of immigration benefits. The problem of long-pending FBI name check cases <u>worsened</u> during the reporting period.

### 1.    Background

As of May 2007, USCIS reported a staggering 329,160 FBI name check cases pending, with approximately 64 percent (211,341) of those cases pending more than 90 days and approximately 32 percent (106,738) pending more than one year.[40] While the percentages of long-pending cases compared to last year are similar, the absolute numbers have increased. There are now 93,358 more cases pending the name check than last year. Perhaps most disturbing, there are 31,144 FBI name check cases pending more than 33 months as compared to 21,570 last year – over a 44 percent increase in the number of cases pending more than 33 months.[41]

---

[40] *See* USCIS FBI Pending Name Check Aging Report (May 4, 2007). It is important to note that USCIS does not include within its backlog cases pending due to FBI name checks. There are 155,592 FBI name check cases pending more than six months that otherwise may be part of USCIS' backlog. See section III.B for a discussion of USCIS backlogs.

[41] *See id.*

---

*Citizenship and Immigration Services Ombudsman*    **Annual Report to Congress June 2007**

Figure 10: Pending FBI Name Checks

| Age of Pending Response | Total Count (May 4, 2007) | Total Count (May 17, 2006) |
|---|---|---|
| < 3 months | 117,819 | 82,636 |
| 3 - 6 months | 55,749 | 33,450 |
| 6 - 9 months | 28,029 | 20,047 |
| 9 - 12 months | 20,825 | 16,845 |
| 12 - 15 months | 14,133 | 15,064 |
| 15 - 18 months | 13,931 | 10,636 |
| 18 - 21 months | 11,035 | 8,144 |
| 21 - 24 months | 12,398 | 8,325 |
| 24 - 27 months | 11,765 | 9,754 |
| 27 - 30 months | 6,600 | 4,435 |
| 30 - 33 months | 5,732 | 4,896 |
| > 33 months | 31,144 | 21,570 |
| **Total Pending** | **329,160** | **235,802** |

During the reporting period, processing delays due to FBI name checks were an issue in approximately 25 percent of all written case problems received by the Ombudsman. Resolving the FBI name check issue is included in the Ombudsman's top five priorities posted on the office website.[42] Unlike FBI name checks, other types of background and security checks – *e.g.*, fingerprint checks, the Interagency Border Inspection Systems name checks (IBIS), and the Automated Biometric Identification System (IDENT) checks – return results within a few days, if not a few minutes. These law enforcement and watch list checks do not significantly prolong USCIS processing times or contribute to the USCIS backlog.

As described in the Ombudsman's 2006 Annual Report (at p. 24), the FBI provides information to USCIS regarding anyone who is the principal subject of an investigation or is a person referenced in a file. USCIS adjudicators and the Fraud Detection and National Security (FDNS) unit use this information to determine if applicants are ineligible for benefits. The FBI provides the name check results at USCIS' request. Name checks are not conducted by the FBI as part of ongoing investigations or from a need to learn more about an individual because of any threat or risk perceived by the FBI. Instead, the name checks are a fee-for-service that the FBI provides to USCIS and according to USCIS-defined standards.

Once USCIS forwards records to the FBI for name checks, the process and the turnaround time for the checks are outside of USCIS' control. Completion of the name check process may take considerable time because manual reviews of FBI files are sometimes required. This review may include FBI reporting on fragments of names of people who are not necessarily central or directly related to an investigation or law enforcement matter. In discussions with the

---

[42] *See* section VI.F.

Ombudsman, the FBI has stated that it lacks the resources to perform the function in a timely manner.

### 2. Impact of Long-Pending FBI Name Checks on USCIS Customers

The delay caused by the FBI name check has substantial consequences to applicants and their families, as well as to our country and the economy. Examples of how legitimate applicants suffer include:

- Loss of employment and employment opportunities where the position requires green card status or U.S. citizenship;

- Possible termination of employment due to the inability to comply with required Form I-9 employment verification procedures where USCIS delays interim EAD issuance;

- Difficulties obtaining drivers' licenses;

- Inability to qualify for certain federal grants and funds;

- Limitations on the ability to purchase property;

- Difficulties obtaining credit and student loans; and

- Disqualification from in-state tuition.

> **CASE PROBLEM**
>
> *The applicant's green card application has been pending since early 2005 due to the FBI name check. The applicant is a valued researcher at a U.S. pharmaceutical company.*

> **CASE PROBLEM**
>
> *The applicant's green card application has been pending with USCIS for approximately four years due to the FBI name check. The applicant is a researcher at a U.S. university and, because of the adjudication delay, the university and the individual have been disadvantaged in seeking grant proposals and funding. Specifically, the individual reports that he is currently working on federal research projects. The applicant's inability to advance critical work for the project is a serious impediment to the university, its competitiveness, and the applicant's professional advancement.*

---

> **CASE PROBLEM**
>
> *In fall 2003, an applicant filed a green card application, which remained pending due to FBI name checks until spring 2007. During the course of the adjudication, the applicant was fingerprinted and applied for interim benefits several times. Although the applicant applied for most of the interim benefits in a timely manner, the filing of the last EAD was not timely, and the applicant had to end his employment. In correspondence to the Ombudsman in the winter of 2007, the applicant related that he is a cancer patient who no longer has income necessary to pay for treatments.*

---

In February 2007, USCIS made public the criteria for expedited treatment of FBI name checks. While this change should help with specific cases, the *status quo* for FBI name check completion is unacceptable from the standpoint of national security and immigration benefits processing.

### 3.    Value of the FBI Name Checks

The challenge for USCIS (and perhaps the challenge for DHS and the entire federal government) is to evaluate the value of maintaining the current FBI name check process relative to considerations of threat, vulnerability, and consequence. The Ombudsman agrees with the assessment of many case workers and supervisors at USCIS field offices and service centers that the FBI name check process has limited value to public safety or national security, especially because in almost every case the applicant is in the United States during the name check process, living or working without restriction.

The Ombudsman recommended in the 2006 Annual Report (at p. 25) that the FBI name check process be re-examined. Delays in the name check process actually prolong an individual's presence in the United States while the check is pending. In this sense, the current USCIS name check policy may increase the risk to national security by extending the time a potential criminal or terrorist remains in the country.

In its 2006 Annual Report Response (at p. 10), USCIS stated:

> Although these security checks may require a more lengthy processing time, USCIS believes that performing them is essential to identifying national security and public safety concerns that would not have been uncovered by other means . . . in, a few cases, the information obtained from the FBI through this process has reflected very significant issues and risks. FBI name checks disclose information to USCIS that is otherwise not available. Information contained in 39 [percent] of the FBI positive responses (letterhead memoranda) received in FY 06 was not contained in IBIS/TECS, USCIS' primary background check tool. . .. [A]lthough a heavy price is paid in inquiries, mandamus actions, and other forms of litigation, USCIS is committed to effective

*Citizenship and Immigration Services Ombudsman*                    **Annual Report to Congress June 2007**

background checks, and thus is committed to the FBI name check. In fact, under the new fee rule currently under review, USCIS proposes to dedicate more funds to the FBI name check process as the FBI has indicated the fees they charge for these checks will increase and additional staff will be added to the process. This should help to speed up the name check process and reduce the backlog significantly.

Use of the 39 percent positive response rate as referenced by USCIS to justify continuing this program may exaggerate the value of the FBI name check. It is unclear how many of the FBI name check "responses" also were revealed by one or more of the other security checks conducted for the applications. To date, the Ombudsman has been unable to ascertain from USCIS the total number of actual problem cases that the agency discovered exclusively as a result of the FBI name check. The Ombudsman understands that most, if not all, of the problem cases which would result in an eventual denial of benefits also can be revealed by the other more efficient, automated criminal and security checks that USCIS initiates.

---

*COMMENTS FROM OMBUDSMAN'S TELECONFERENCE*

*One caller mentioned that USCIS does not schedule applicants for interviews because security clearances are not yet completed. He suggested that USCIS needs to look at the cost-benefit of doing these clearances. The caller stated he is in the military and has a top secret clearance.*

*Another caller suggested that information could be sent every "X" number of months to the applicant or attorney that the application still is held up for pending name checks, which would avert the many update requests.*

---

### 4.    Possible Solutions to the FBI Name Check Delays

During this and previous reporting periods, the Ombudsman had numerous meetings with USCIS leadership on FBI name checks and discussed a number of solutions to the name check logjam.

#### a.    Pre-Application Security Checks

A possible solution to the name check problem is pre-application security checks. USCIS has not chosen to implement such a process, which would dramatically impact the agency's revenue stream for a short period of time. Simultaneously, USCIS is failing to make basic changes to its processing methodology to reduce fraud and ineligible applicants. Instead, USCIS continues to substantially fund a process with questionable value. USCIS maintains that the name check process is of value, but it remains unclear whether the process has added any additional value over the security processes already in place.

*Citizenship and Immigration Services Ombudsman*                    **Annual Report to Congress June 2007**

**Figure 11: Ombudsman's Suggested Pre-Application Security Check Process**



*Citizenship and Immigration Services Ombudsman*                    **Annual Report to Congress June 2007**

Figure 11 outlines the security screening steps to clear an applicant prior to interview, where necessary, and for adjudication of the immigration benefits application. The applicant/petitioner would register intent and pay a fee to cover the costs of the process. Pre-application is more than a pre-screening that determines *prima facie* eligibility. It moves the case to an adjudicating officer who reviews the file and interviews the applicant, if necessary. Since all fingerprints, biometrics, security clearances, necessary documents, medical evaluation, financial support, and visa availability are cleared, the applicant can be processed to conclusion immediately after interview. A Clearance Report is documentary proof that the applicant successfully completed the pre-application process. This process would place biometrics capture and security screening in the hands of appropriate law enforcement/contract employees, trained in the pre-screening process, and the determination of eligibility for benefits in the hands of USCIS officers trained in immigration law.

The agency also should review the DHS resources available to assist in exploring options to solve the backlogged FBI name check process. A number of DHS law enforcement entities perform security checks similar to those performed by USCIS.

    **b.**    **USCIS Background Check Service IT System for Tracking FBI Name Check Cases**

USCIS' 2006 Annual Report Response (at p. 10) indicates that the agency's planned Background Check Service (BCS), a new IT system that will track the status of background and security checks for pending cases, was to be implemented in late April with deployment beginning in May 2007. As of this writing, the BCS is not yet deployed. Currently, USCIS has limited capability to produce reports detailing the status of long-pending FBI name check cases. In addition, USCIS systems do not automatically indicate when a delayed name check is complete and the case can be adjudicated. Often, this leads to a situation where the validity of other checks expire before USCIS reviews the case. Those other checks then need to be reinitiated, adding financial and time costs for applicants and USCIS. The Ombudsman fully supports the expeditious rollout of the BCS system.

    **c.**    **A Risk-Based Approach to FBI Name Checks**

Name checks do not differentiate whether the individual has been in the United States for many years or a few days, is from and/or has traveled frequently to a country designated as a State Sponsor of Terrorism, or is a member of the U.S. military. Many individuals subject to lengthy name checks are either already green card holders or have been issued Employment Authorization Documents (EADs). These documents allow them to receive Social Security cards and state drivers' licenses. Most green card applicants are also eligible to receive advance parole enabling them to travel outside the United States and return as long as their cases are pending, which can be for many years under the current process.

> *CASE PROBLEM*
>
> *In early 2006, the applicant applied for naturalization. USCIS informed the applicant that the application is pending due to the FBI name check. The applicant currently is a contract employee for a federal agency and was security screened prior to beginning that employment.*

> *CASE PROBLEM*
>
> *The applicant's green card application was filed in early 2004. The application remains pending due to the FBI name check. The applicant previously served as a security officer at a U.S. embassy and was subject to rigorous security screening for the position.*

In November 2006, Secretary Chertoff discussed a risk-based approach to homeland security threats, vulnerabilities, and consequences:

> [T]he core principle that animates what we do at DHS . . . is risk management. It is a recognition of the fact that management of risk is not elimination of risk. There is no elimination of risk in life, and anybody who promises every single person protection against every threat at every moment in every place in the country is making a false promise . . .. What we do have to do is identify and prioritize risks -- understanding the threat, the vulnerability and the consequence. And then we have to apply our resources in a cost-effective manner, using discipline and common sense in order to minimize the risk without imposing undue cost on our communities and our families.[43]

Despite Secretary Chertoff's continuing emphasis on risk management, USCIS performs FBI name checks without the benefit of risk management modeling. In recent visits to USCIS field offices, a number of leaders have questioned the usefulness of the FBI name checks citing some of the same concerns discussed here. The process is not working and consideration should be given to re-engineering it to include a risk-based approach to immigration screening and national security. The U.S. Government Accountability Office recently noted in a report that "[w]hile the Secretary of DHS has expressed a commitment to risk management, DHS has not

---

[43] DHS Secretary Michael Chertoff, Prepared Remarks at the 2006 Grants & Training National Conference, Washington, D.C. (Nov. 28, 2006); http://www.dhs.gov/xnews/speeches/sp_1164738645429.shtm (last visited June 3, 2007).

performed comprehensive risk assessments in . . . immigration and customs systems to guide resource allocation decisions."[44]

Every effort should be undertaken to identify and remove persons who pose threats to the United States, which would include rescinding immigration benefits after USCIS has granted them. It would be irresponsible for law enforcement entities to stop their investigation of a potential crime merely because the person who is the subject of their investigation has obtained a green card or U.S. citizenship. Similarly, it would be illogical to think that delaying issuance of a green card or U.S. citizenship will prevent a criminal from committing a crime. Considering the protection the FBI name check provides, the cost of government resources used, and mental and actual hardships to applicants and their families, USCIS should reassess the continuation of its policy to require FBI name checks in their current form.

> *RECOMMENDATION AR 2007 -- 06*
>
> *In addition to the Ombudsman's recommendation in the 2006 Annual Report, AR 2006 –04, the Ombudsman recommends that USCIS: (1) evaluate the value of the name check in its current format and establish a risk-based approach to screening for national security concerns; (2) work with the FBI to provide the necessary resources to perform name checks in a timely manner; and (3) provide greater transparency to customers by publishing monthly the number of long-pending FBI name check cases.*

### G.    Interim Benefits

The Ombudsman strongly supports efforts by USCIS to eliminate the need for interim benefits in favor of timely, efficient, and secure adjudication of the ultimate immigration benefit.

#### 1.    Background

Generally, USCIS issues interim benefits – EADs and advance parole documents (international travel documents) – to individuals who have green card applications pending with the agency for over 90 days.[45] The Ombudsman is encouraged by constructive dialogue with USCIS during the reporting period that addresses funding and security issues related to the processing of interim benefits.

On May 30, 2007, USCIS established new filing fees for immigration benefits.[46] Under the new fee schedule, USCIS will charge a single fee for green card applications to include recovery of the processing costs for interim benefits. The Ombudsman supports this approach to

---

[44] U.S. Government Accountability Office Report "Homeland Security: Management and Programmatic Challenges Facing the Department of Homeland Security," GAO-07-398T at 2 (Feb. 2007); http://www.gao.gov/new.items/d07398t.pdf (last visited June 6, 2007).

[45] *See* 8 C.F.R. § 274a.13(d).

[46] *See* "Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule," 72 Fed. Reg. 29,851 (May 30, 2007); *see also* section III.H.1.